# EXHIBIT A

# *LIVE NATION ENTERTAINMENT, INC.*

# *401(k) SAVINGS PLAN*

**Original Effective Date January 1, 1999**

**Restatement Effective Date:  January 1, 2022** (unless otherwise noted)

US.322200570.24

# TABLE OF CONTENTS

**Page**

ARTICLE I INTRODUCTION ................................................................................................ 1

ARTICLE II DEFINITIONS ................................................................................................... 2

| | | |
|---|---|---|
| 2.1 | **Account or Accounts** .......................................................... | 2 |
| 2.2 | **Adjustment Factor** ............................................................ | 2 |
| 2.3 | **Administrator** .................................................................. | 2 |
| 2.4 | **After-Tax Contributions** ................................................... | 2 |
| 2.5 | **Beneficiary** ..................................................................... | 2 |
| 2.6 | **Board** .............................................................................. | 2 |
| 2.7 | **Break in Service** .............................................................. | 2 |
| 2.8 | **Catch-Up Contributions** ................................................... | 3 |
| 2.9 | **Catch-Up Eligible Participant** .......................................... | 3 |
| 2.10 | **Code** .............................................................................. | 3 |
| 2.11 | **Committee** ...................................................................... | 3 |
| 2.12 | **Company** ........................................................................ | 3 |
| 2.13 | **Company Stock** ............................................................... | 3 |
| 2.14 | **Compensation** ................................................................. | 4 |
| 2.15 | **Contributions** ................................................................. | 4 |
| 2.16 | **Deferral Compensation** .................................................... | 4 |
| 2.17 | **Deferral Contributions** ................................................... | 6 |
| 2.18 | **Department of Labor Regulations** .................................... | 6 |
| 2.19 | **Disability** ....................................................................... | 6 |
| 2.20 | **Early Retirement or Early Retirement Date** ..................... | 6 |
| 2.21 | **Earnings** ........................................................................ | 6 |
| 2.22 | **Effective Date** ................................................................ | 6 |
| 2.23 | **Eligible Employee** ........................................................... | 6 |
| 2.24 | **Eligible Participant** ......................................................... | 7 |
| 2.25 | **Employee** ....................................................................... | 7 |
| 2.26 | **Employer** ........................................................................ | 8 |
| 2.27 | **Employer Discretionary Contributions** ............................ | 8 |
| 2.28 | **Employer Matching Contributions** .................................... | 8 |
| 2.29 | **Employment Commencement Date** .................................... | 8 |
| 2.30 | **Entry Date** ..................................................................... | 8 |
| 2.31 | **ERISA** ............................................................................ | 8 |
| 2.32 | **Highly Compensated Employee** ........................................ | 8 |
| 2.33 | **Hour of Service** .............................................................. | 9 |
| 2.34 | **Income Tax Regulations** ................................................. | 10 |
| 2.35 | **Leased Employee** ............................................................ | 10 |
| 2.36 | **LMA Employee** ............................................................... | 10 |
| 2.37 | **Non-Highly Compensated Employee** ................................. | 10 |
| 2.38 | **Normal Retirement or Normal Retirement Date** ............... | 10 |
| 2.39 | **Participant** ..................................................................... | 10 |
| 2.40 | **Participating Employer** ................................................... | 10 |
| 2.41 | **Plan** ............................................................................... | 11 |
| 2.42 | **Plan Year** ....................................................................... | 11 |
| 2.43 | **Prior Plans** .................................................................... | 11 |

# TABLE OF CONTENTS

(continued)

Page

| | | |
|---|---|---|
| 2.44 | Prior Plans Account | 11 |
| 2.45 | Prior Plans After-Tax Account | 11 |
| 2.46 | Prior Plans After-Tax Contributions | 11 |
| 2.47 | Prior Plans Matching Account | 11 |
| 2.48 | Prior Plans Roth Account | 11 |
| 2.49 | Prior Plans Roth Contributions | 11 |
| 2.49A | Qualified Individual | 12 |
| 2.50 | Qualified Matching Contributions | 12 |
| 2.51 | Qualified Nonelective Contributions | 12 |
| 2.52 | Reemployment Commencement Date | 12 |
| 2.53 | Rollover Contributions | 12 |
| 2.53A | Roth Contributions | 12 |
| 2.53B | Self-Employed Individual | 12 |
| 2.54 | Severance Date | 12 |
| 2.55 | Spouse or Surviving Spouse | 13 |
| 2.56 | Taxable Year | 14 |
| 2.57 | Testing Compensation | 14 |
| 2.58 | Trust | 16 |
| 2.59 | Trust Agreement | 16 |
| 2.60 | Trustee | 16 |
| 2.61 | Valuation Date | 16 |
| 2.62 | Year of Service | 16 |
| 2.63 | Other Definitions | 17 |

ARTICLE III ELIGIBILITY ............................................................... 21

| | | |
|---|---|---|
| 3.1 | Participation | 21 |
| 3.2 | Reemployment | 21 |
| 3.3 | Change in Employment Status | 22 |
| 3.4 | Enrollment of Participants | 22 |
| 3.5 | Participation Due to Rollover and Trust-To-Trust Transfer | 22 |
| 3.6 | Erroneous Participation | 22 |

ARTICLE IV ACCOUNTS AND CONTRIBUTIONS ............................. 23

| | | |
|---|---|---|
| 4.1 | Participant Accounts | 23 |
| 4.2 | Allocation of Contributions and Earnings | 23 |
| 4.3 | Deferral Contributions and/or Roth Contributions | 24 |
| 4.4 | Catch-Up Contributions | 26 |
| 4.5 | After-Tax Employee Contributions | 27 |
| 4.6 | Employer Matching Contributions and Qualified Matching Contributions | 27 |
| 4.7 | Employer Discretionary and Qualified Nonelective Contributions | 28 |
| 4.8 | Limitations on Contributions | 29 |
| 4.9 | Time and Form of Payment of Contributions | 29 |
| 4.10 | Receipt of Assets from Another Plan | 29 |

ARTICLE V LIMITATIONS AND DISCRIMINATION TESTING ...................... 31

US.322200570.24

# TABLE OF CONTENTS

(continued)

**Page**

| | | | |
|---|---|---|---|
| 5.1 | Section 415 Limitation | | 31 |
| 5.2 | Distribution of Excess Elective Deferrals. | | 33 |
| 5.3 | Discrimination Testing. | | 34 |
| 5.4 | Corrective Procedure for Discriminatory Deferral Contributions and Roth Contributions. | | 35 |
| 5.5 | Discrimination Testing of Employer Matching Contributions | | 39 |
| 5.6 | Corrective Procedure for Discriminatory Matching Contributions. | | 41 |
| 5.7 | Compliance Limits and Discrimination Testing. | | 43 |

ARTICLE VI VESTING AND FORFEITURES ........................................ 45
| | | | |
|---|---|---|---|
| 6.1 | Vested Interest. | | 45 |
| 6.2 | Disposition of Forfeitures. | | 46 |
| 6.3 | Special Vesting Formula | | 47 |

ARTICLE VII DISTRIBUTION OF ACCOUNTS ...................................... 48
| | | | |
|---|---|---|---|
| 7.1 | Normal Retirement | | 48 |
| 7.2 | Termination of Employment | | 48 |
| 7.3 | Disability | | 48 |
| 7.4 | Death Benefits | | 48 |
| 7.5 | Change to a Leased Employee or Other Ineligible Class | | 48 |
| 7.6 | Beneficiary Designation. | | 48 |
| 7.7 | Form of Distribution | | 49 |
| 7.8 | Commencement of Distribution. | | 50 |
| 7.9 | Special Rule for Deferral Contributions, Roth Contributions, Catch-Up Contributions, Qualified Matching Contributions and Qualified Nonelective Contributions | | 51 |
| 7.10 | Direct Rollovers and Withholding | | 51 |
| 7.11 | Minimum Distribution Requirements | | 53 |
| 7.12 | Distribution to Minor or Incompetent | | 58 |
| 7.13 | Location of Participant or Beneficiary Unknown | | 58 |
| 7.14 | Distributions Related to Military Service. | | 58 |

ARTICLE VIII HARDSHIPS, LOANS, IN-SERVICE WITHDRAWALS ...... 60
| | | | |
|---|---|---|---|
| 8.1 | Hardship Withdrawals. | | 60 |
| 8.2 | Loans. | | 61 |
| 8.3 | In-Service Withdrawals At and After Age Fifty-Nine and One-Half (59½) | | 62 |
| 8.4 | In-Service Withdrawals from Rollover Contributions Account. | | 63 |
| 8.5 | Coronavirus-Related Distributions. | | 63 |

ARTICLE IX ADMINISTRATION ........................................................ 64
| | | | |
|---|---|---|---|
| 9.1 | Powers of the Administrator | | 64 |
| 9.2 | Absolute Discretion of the Administrator | | 65 |
| 9.3 | Plan Sponsor, Administrator and Committee | | 65 |
| 9.4 | Participant-Directed Accounts. | | 67 |
| 9.5 | Domestic Relations Orders | | 67 |

# TABLE OF CONTENTS

(continued)

**Page**

ARTICLE X LEAVES OF ABSENCE AND TRANSFERS ................................................ 70
    **10.1**   **Military Leave of Absence** ................................................................. 70
    **10.2**   **Other Leaves of Absence** .................................................................. 70
    **10.3**   **Transfers.** ............................................................................................ 70

ARTICLE XI TRUST ........................................................................................................ 72
    **11.1**   **Trust Agreement** ............................................................................... 72
    **11.2**   **Fees and Expenses.** ............................................................................ 72
    **11.3**   **Funding Policy** .................................................................................. 72

ARTICLE XII AMENDMENT, TERMINATION OR MERGER ..................................... 73
    **12.1**   **Amendment.** ...................................................................................... 73
    **12.2**   **Termination of Plan.** ........................................................................ 73
    **12.3**   **Merger** .............................................................................................. 74

ARTICLE XIII ADOPTION OF PLAN BY RELATED ENTITIES .............................. 75
    **13.1**   **Adoption of the Plan** ........................................................................ 75
    **13.2**   **Withdrawal** ....................................................................................... 75

ARTICLE XIV CLAIMS PROCEDURE ......................................................................... 76
    **14.1**   **Right to File Claim** .......................................................................... 76
    **14.2**   **Denial of Claim.** ............................................................................... 76
    **14.3**   **Claim Review Procedure.** ................................................................ 77
    **14.4**   **Special Procedure for Claims Due to Disability** .......................... 78
    **14.5**   **Exhaustion of Claims Procedure and Right to Bring Legal Action** ............. 80
    **14.6**   **Dispute Resolution and Arbitration of Claims.** ............................ 80

ARTICLE XV TOP-HEAVY PROVISIONS .................................................................... 85
    **15.1**   **Purpose** ............................................................................................. 85
    **15.2**   **Definitions.** ....................................................................................... 85
    **15.3**   **Minimum Allocation** ....................................................................... 87

ARTICLE XVI GENERAL PROVISIONS ...................................................................... 89
    **16.1**   **Legal or Equitable Action** .............................................................. 89
    **16.2**   **Indemnification** ............................................................................... 89
    **16.3**   **No Enlargement of Plan Rights** ..................................................... 90
    **16.4**   **No Enlargement of Employment Rights** ....................................... 90
    **16.5**   **Interpretation** .................................................................................. 90
    **16.6**   **Notices and Form of Communication** ........................................... 90
    **16.7**   **Governing Law** ................................................................................ 91
    **16.8**   **Non-Alienation of Benefits** ............................................................ 91
    **16.9**   **No Reversion.** .................................................................................. 91
    **16.10**  **Conflict.** ............................................................................................ 92
    **16.11**  **Severability** ...................................................................................... 92

APPENDIX A  NON-PARTICIPATING EMPLOYERS ................................................ A-1

APPENDIX B  SPECIAL ELIGIBILITY AND VESTING PROVISIONS ..................... B-1

iv

DocuSign Envelope ID: C3054706-7670-4753-9475-ABBBBE643580

## TABLE OF CONTENTS
(continued)

Page

APPENDIX C  MERGER OF HOB PLAN ........................................................................ C-1

APPENDIX D  MERGER OF SIGNATURES NETWORK PLAN ....................................... D-1

APPENDIX E  MERGER OF MUSIC TODAY PLAN ........................................................ E-1

APPENDIX F  MERGER OF TICKETMASTER PLAN ...................................................... F-1

APPENDIX G TRUST-TO-TRUST TRANSFER  TO INSOMNIAC PLAN ........................ G-1

APPENDIX H MERGER OF FRONT GATE TICKETING SOLUTIONS 401(K) PLAN ..... H-1

APPENDIX I  MERGER OF THE LATITUDE 38 ENTERTAINMENT 401(k) PLAN ....... I-1

APPENDIX J MERGER OF THE GREEN LIGHT MEDIA & MARKETING, LLC 401(k) PLAN . . . ................................................................................................................ J-1

APPENDIX K MERGER OF THE C3 PRESENTS, LLC 401(k) RETIREMENT PLAN ..... K-1

APPENDIX L MERGER OF ARTIST NATION 401(k) PLAN . . ................................ L-1

APPENDIX M MERGER OF STUBBS AUSTIN 401(k) PROFIT SHARING PLAN ......... M-1

DocuSign Envelope ID: C3054706-7670-4753-9475-ABBBBE643580

# ARTICLE I

# INTRODUCTION

The Plan was originally established effective as of January 1, 1999, and was subsequently amended and restated in its entirety on a number of occasions, most recently, January 1, 2015, and was subsequently amended thereafter.  The Company hereby further amends and restates the Plan, in its entirety, effective as of January 1, 2022, to reflect interim amendments that, among other updates, enacted legally-required changes and Plan design changes.

Live Nation Entertainment, Inc. (the "Company") maintains the Live Nation Entertainment, Inc. 401(k) Savings Plan (the "Plan"), consisting of the following provisions, for the exclusive benefit of Participants and their Beneficiaries (and for defraying reasonable administrative expenses of the Plan and related trust).

On December 21, 2005, what is now named Live Nation Entertainment, Inc. was spun-off from Clear Channel Communications, Inc. and became a publicly-traded company on the New York Stock Exchange as of that date.  SFX Entertainment, Inc. ("SFX") established the SFX Entertainment Profit Sharing and 401(k) Plan ("SFX Plan"), effective as of January 1, 1999. Effective as of August 1, 2000, SFX was acquired by Clear Channel Communications, Inc. ("Clear Channel").  Subsequently, SFX was renamed SFX Entertainment d/b/a Clear Channel Entertainment.  As of December 21, 2005, Live Nation Worldwide, Inc. was the sponsor of the Plan.  However, effective as of August 4, 2006, the Board of Directors of Live Nation Worldwide, Inc. and the Board of Directors of Live Nation, Inc. elected to transfer sponsorship of the Plan to the parent corporation, namely, Live Nation, Inc.  Effective August 25, 2010, Live Nation, Inc. changed its name to Live Nation Entertainment, Inc. and, accordingly, the name of the Plan was changed.

The Plan has been amended on several occasions to permit the participation of specified non-affiliated employers, as discussed in Section 13.1 and Appendix A.  The Plan is currently a multiple employer Plan within the meaning of Code Section 413(c).  In addition, certain Prior Plans were merged into the Plan in connection with the Company's acquisition of certain entities that sponsor tax-qualified plans.

The Plan is intended to be a tax-qualified profit sharing plan with a related tax-exempt trust under Code Sections 401(a) and 501(a), respectively, which includes a tax-qualified cash or deferred arrangement under Code Section 401(k), and provides for a discretionary matching contribution arrangement under Code Section 401(m), as may be approved by the Company.  The Plan is also intended to provide participant-directed investments in accordance with ERISA Section 404(c).

1

# ARTICLE II

## DEFINITIONS

Wherever used in this Plan, the following terms shall have the meanings indicated below, unless a different meaning is plainly required by the context or if such term is defined differently for particular groups of Participants in one or more of the Appendices.  The singular shall include the plural, unless the context indicates otherwise.  Headings of sections are used for convenience of reference only.  In case of conflict, the text of the Plan, rather than such headings, shall control.

 **2.1** **Account or Accounts**.  "Account" or "Accounts" means a Participant's interest in the Trust that may consist of any or all of the following:  Deferral Account, Roth Account, Catch-Up Account, Employer Matching Account, Qualified Matching Contributions Account ("QMAC"), Employer Discretionary Account, Qualified Nonelective Contributions Account ("QNEC"), Rollover Account, Prior Plans After-Tax Account, Prior Plans Account, Prior Plans Matching Account, Prior Plans Roth Account, and such other account(s) as the Administrator shall determine from time to time.  Any reference to an Account in the Plan shall include reference to any or all of the above-mentioned Accounts, as applicable.

 **2.2** **Adjustment Factor**.  "Adjustment Factor" means the cost-of-living adjustment factor prescribed by the Secretary of the Treasury under Code Section 415(d), as applied to such items and in such manner as the Secretary of the Treasury shall prescribe from time to time.

 **2.3** **Administrator**.  "Administrator" (as defined in ERISA Section 3(16)(A)) means the Committee, which shall be a named fiduciary (as defined in ERISA Section 402(a)(2)).  The Administrator may from time to time designate authorized delegate(s) to act on its behalf with regard to its duties and responsibilities.

 **2.4** **After-Tax Contributions**.  "After-Tax Contributions" means after-tax amounts held under the Plan as a result of mergers of other tax-qualified plans (and related trusts) with and into the Plan (and related Trust).  Such amounts will be held in a Participant's After-Tax Account and will be administered and distributed in accordance with the terms of the Plan.  After-Tax Contributions are not permitted to be made to the Plan.

 **2.5** **Beneficiary**.  "Beneficiary" means the person(s) or entity(ies) who is (are) entitled to receive benefits payable from the Plan (and related Trust) on account of a Participant's death, as set forth in Section 7.6.

 **2.6** **Board**.  "Board" means the Board of Directors of the Company.

 **2.7** **Break in Service**.  "Break in Service" means, under the actual Hours of Service method, a computation period during which an Employee does not complete more than five hundred (500) Hours of Service.

   For purposes of eligibility, the computation period is the twelve (12)-consecutive month period beginning on the Employee's Employment Commencement Date.  Succeeding twelve (12)-consecutive month periods commence with the first Plan Year that commences on or prior to the first anniversary of the Employee's Employment Commencement Date, regardless of

whether the Employee is entitled to be credited with five hundred (500) Hours of Service during the initial computation period.

For purposes of vesting, the computation period is the Plan Year.

Solely for purposes of determining whether a Break in Service for participation and vesting purposes has occurred during a computation period, an Employee who is absent on account of maternity or paternity leave, or on account of an authorized leave of absence (as described in Article X) shall receive credit for the Hours of Service that would otherwise have been credited to such Employee but for such absence, or in any case in which such hours cannot be determined, eight (8) Hours of Service for each day of such absence. For purposes of this paragraph, maternity or paternity leave means a period during which an Employee is absent because of: (i) the pregnancy of the Employee; (ii) the birth of a child of the Employee; (iii) the placement of a child with the Employee in connection with the Employee's adoption of the child; or (iv) the caring for a child by the Employee immediately after the birth or placement of the child.

**2.8    Catch-Up Contributions**. "Catch-Up Contributions" means, effective as of January 1, 2004, Contributions under this Plan or a Prior Plan, made in accordance with Section 4.4. Notwithstanding the foregoing, the following Employees shall not be eligible to make Catch-Up Contributions: (i) those Employees covered by a collective bargaining agreement, unless such collective bargaining agreement provides for the making of Catch-Up Contributions by such Employees under an eligible plan of the Company or a Participating Employer; provided, however, that those Employees covered by a collective bargaining unit and/or employed in a position covered by a collective bargaining agreement specified in Appendix A shall nonetheless be eligible to make Catch-Up Contributions under the Plan, and (ii) those Employees under any union-sponsored plans contributed to by the Company or a Participating Employer.

**2.9    Catch-Up Eligible Participant**. "Catch-Up Eligible Participant," for any Plan Year beginning on or after January 1, 2004, means an Eligible Participant who is, or who will be, age fifty (50) or older at any time during that Plan Year regardless of whether the Eligible Participant terminates employment with the Employer or dies prior to reaching age fifty (50) during that Plan Year.

**2.10    Code**. "Code" means the Internal Revenue Code of 1986, as amended from time to time, and applicable Income Tax Regulations issued thereunder.

**2.11    Committee**. "Committee" means the Live Nation Entertainment, Inc. Benefits Committee as further detailed in Section 9.3.

**2.12    Company**. "Company" means Live Nation Entertainment, Inc., and any successor thereto by merger, consolidation or otherwise. The Company may from time to time designate authorized delegate(s) to act on its behalf with regard to its settlor duties and responsibilities under the Plan.

**2.13    Company Stock**. "Company Stock" means common and/or preferred stock, as applicable, of the Company, or any successor thereto by merger, consolidation or otherwise, that meets the requirements of "qualifying employer security" under ERISA Section 407(d)(5) and "employer securities" under Code Section 409(1).

3

**2.14**   **Compensation**.

(a)    For purposes of Contributions, "Compensation" means Deferral Compensation as set forth in Section 2.16.

(b)    For all other purposes under the Plan, "Compensation" means Testing Compensation as set forth in Section 2.57.

**2.15**   **Contributions**.    "Contributions" means Deferral Contributions, Roth Contributions, Catch-Up Contributions, After-Tax Contributions (which shall no longer be contributed to the Plan), Employer Matching Contributions, Qualified Matching Contributions, Employer Discretionary Contributions, and Qualified Nonelective Contributions.

**2.16**   **Deferral Compensation**.

(a)    "Deferral Compensation" means, subject to the provisions in this Section, amounts paid to an Employee for personal services actually rendered in the course of employment with the Participating Employer(s), with the following adjustments:

(i)    Deferral Compensation shall not include:

(A)    any distributions from a plan of deferred compensation maintained by any Participating Employer;

(B)    amounts realized from the exercise of share non-statutory options or share appreciation rights or when restricted shares (or other equity-based compensation awards or other property) held by the Employee either becomes vested, freely transferable or is no longer subject to a substantial risk of forfeiture;

(C)    amounts realized from the sale, exchange or other disposition of shares acquired under a statutory shares option;

(D)    severance, separation or salary continuation payments, or payments in lieu of notice; provided, however, that, Deferral Compensation shall include post-severance compensation that is paid by the later of two and one-half (2½) months after severance of employment or the end of the Limitation Year in which such severance from employment occurred and is either (1) regular compensation for services during the former Employee's regular working hours or compensation outside of the Employee's regular working hours (such as overtime or shift differential), commissions, bonuses or other similar payments that would have been paid to the Employee prior to severance from employment if the former Employee had continued in regular employment with the Employer or (2) unused accrued bona fide sick leave, vacation or other leave that would have been included in Compensation if they were paid to the former Employee prior to the severance from employment and the former Employee would have been able to use such leave if his or her employment had continued;

(E)    fringe benefits, including, without limitation, reimbursements or allowances for adoption assistance, tuition, automobile, rideshare, parking,

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

COBRA, and other similar allowances or reimbursements (whether or not taxable and whether or not paid or payable or reimbursed or reimburseable to the Employee or third-party vendor);

        (F)     payment characterized as miscellaneous in payroll;

        (G)     disability benefits payments under any long- or short-term disability income repayment plan or other similar third-party disability or sick payments;

        (H)     moving, relocation or home mortgage differential payments, expenses, costs or incentives and housing allowances (whether or not taxable and whether or not paid or payable or reimbursed or reimburseable to the Employee or third-party vendor or other provider);

        (I)     all forms of non-cash compensation, including, without limitation, gift cards;

        (J)     non-taxable payments that are processed through payroll;

        (K)     legal settlements, including (but not limited to) attorneys' fees, damages or other similar amounts;

        (L)     payments made in advance of when such payments are deemed earned; or

        (M)     imputed income, including, without limitation, for critical illness coverage, group term life insurance coverage and domestic partner benefits.

        (ii)     Deferral Compensation shall include only those amounts that are actually paid or made available to the Employee during the portion of the Plan Year in which that Employee was an Eligible Participant, except as otherwise specifically provided with respect to certain post-severance compensation as described in subsection (a)(i)(D) above.

        (iii)     Effective January 1, 2009, Deferral Compensation shall include any Differential Pay paid by a Participating Employer to an individual with respect to any period during which he or she is performing service in the uniformed services (as defined in chapter 43 of title 38, United States Code) while on active duty for a period of more than thirty (30) days. "Differential Pay" means an amount that is equal to all or a portion of the amount the individual would have received from a Participating Employer if he or she were performing services for the Participating Employer.

        (iv)     Effective January 1, 2020, Deferral Compensation shall include payments characterized as "disaster recovery pay" in payroll.

        (v)     For a Self-Employed Individual, Deferral Compensation means "earned income" (as defined in Section 2.23) subject to the adjustments in subsection (a)(i)-(iv) and the limitations in subsection (b) and (c) of this Section 2.16.

5

(b)     The annual Deferral Compensation of each Employee that is taken into account under the Plan shall not exceed the limit prescribed under Code Section 401(a)(17), as adjusted by the Adjustment Factor for a twelve (12)-month Plan Year (*i.e.*, Two Hundred Ninety Thousand Dollars ($305,000) in 2022); provided, however, that this limit shall not be applied to reduce or terminate a Participant's Deferral Contributions or Roth Contributions during a Plan Year .  The Adjustment Factor in effect for a calendar year applies to the Plan Year that begins in such calendar year.  If a Plan Year consists of less than twelve (12) months, then the annual Deferral Compensation limit shall be adjusted to an amount equal to the otherwise applicable limit for such Plan Year multiplied by a fraction, the numerator of which is the number of months in the short Plan Year and the denominator of which is twelve (12).

(c)     The determination of the amount of Deferral Compensation shall be made by the Participating Employer(s) (or its (their) authorized designee(s)) who employs the Employee, in accordance with the records of the Participating Employer(s), and shall be binding, final and conclusive.

**2.17    Deferral Contributions**.  "Deferral Contributions" means Participating Employer Contributions under this Plan or a Prior Plan, that a Participant elects to make on a pre-tax basis in accordance with Section 4.3.

**2.18    Department of Labor Regulations**.  "Department of Labor Regulations" means the regulations under ERISA, prescribed by the Secretary of Labor from time to time.

**2.19    Disability**.  "Disability" means a total and permanent physical or mental disability within the meaning of the Social Security Act or the Employer's long-term disability plan.  The determination of whether a Participant has a Disability shall be made by the Administrator and shall be final, binding and conclusive on all persons and entities.

**2.20    Early Retirement or Early Retirement Date**.  Except as may be specified in one or more of the Appendices, the Plan does not provide for early retirement.

**2.21    Earnings**.  "Earnings" means (a) interest, dividends, rents, royalties, net realized and unrealized gains, and other income, less (b) fees, commissions, insurance premiums and other expenses, and realized and unrealized losses.

**2.22    Effective Date**.  "Effective Date," for this restatement, means January 1, 2022, except as otherwise provided herein; provided, however, that any other provision of the Plan that is intended to, or should comply with any other applicable legislation, shall be effective as of the date specified in such legislation.  The Plan's original effective date was January 1, 1999.

**2.23    Eligible Employee**.  "Eligible Employee" means each Employee of each Participating Employer and each Self-Employed Individual, except:

(a)     an individual who is classified as a leased employee (including, without limitation, a Leased Employee) by the Employer;

(b)     an Employee who is a non-resident alien (within the meaning of Code Section 7701(b)(1)(B)) and who receives no earned income (within the meaning of Code Section

6

911(d)(2)) from the Employer which constitutes income from sources within the United States (within the meaning of Code Section 861(a)(3));

(c)       an individual who is a signatory to a contract, letter agreement, or other document with the Employer or other third party that acknowledges his or her status as an independent contractor, agency worker, consultant or the like and who is not otherwise specifically entitled to participate in or benefit under the Plan (other than as a Beneficiary or Alternate Payee), or who is not otherwise classified by the Employer as a common law employee or with respect to whom the Employer does not remit Social Security payments to the Federal government;

(d)       an Employee or individual prior to the effective date of the determination or period that he or she became a Reclassified Employee, regardless of whether such reclassification is intended to be retroactively effective.  "Reclassified Employee" means an Employee who was not classified by the Employer as an Employee for a specified period, but  who was subsequently reclassified as an Employee by a Federal, state or local group, organization, agency or court for all or a portion of that period;

(e)       an individual who is included in a unit of employees covered by a collective bargaining agreement other than as listed in Appendix A, which such Appendix may be modified from time to time without need for a formal amendment to the Plan; provided, however, that if such individual is also employed by the Employer during the same period on terms and conditions that are not subject to a collective bargaining agreement (that is, as a non-union Employee), then such individual can participate in the Plan for any period that he or she is a non-union Employee pursuant to the terms and conditions of the Plan but only with regard to service and Deferral Compensation that he or she is credited with or earns as a non-union Employee;

(f)       an individual who is a party to an agreement that provides that he or she shall not be eligible to participate in the Plan, whether or not such agreement is upheld upon governmental or judicial review;

(g)       any person covered by any other tax-exempt pension, profit sharing or retirement plan (other than a non-qualified deferred compensation or top hat arrangement) to which any Employer (including an affiliated employer) or Participating Employer is required to contribute either directly or indirectly, other than pursuant to a collective bargaining agreement;

(h)       an individual who is not on the United States payroll of the Employer (other than a Self-Employed Individual with Earned Income, as defined in Section 2.53B) ; or

(i)       an individual who is a resident of Puerto Rico.

2.24    **Eligible Participant**.  "Eligible Participant" means an Eligible Employee who meets the requirements for eligibility set forth in Sections 3.1 through 3.3, regardless of whether or not he or she has an Account established on his or her behalf under the Plan.

2.25    **Employee**.  "Employee" means any person:  (a) who is employed by, and designated as an employee by, the Employer or, if not an Employer, a Participating Employer or who incurs withholding of Federal income tax or Social Security tax with respect to his or her Compensation; or (b) who is a Leased Employee; provided, however, that if all Leased Employees

constitute less than twenty percent (20%) of the Non-Highly Compensated Employee workforce (within the meaning of Code Section 414(n)(5)(C)(ii)), then the term "Employee" shall not include those Leased Employees who are covered by a plan described in Code Section 414(n)(5). For purposes of applying the provisions of this Plan, a Self-Employed Individual is treated as an Employee.

       **2.26**   **Employer**.  "Employer" means:  (a) the Company; (b) any other corporation that is a member of a controlled group of corporations (as defined under Code Section 414(b)) that includes the Company; (c) any trade or business (whether or not incorporated) that is under common control (as defined under Code Section 414(c)) with the Company; (d) any organization (whether or not incorporated) that is a member of an affiliated service group (as defined under Code Section 414(m)) that includes the Company; and (e) any other organization or entity that is required to be aggregated with the Company pursuant to Code Section 414(o). For purposes of the calculation of Annual Additions as set forth in Section 5.1, the determination of whether any entity is an Employer shall be made in accordance with Code Section 415(h). Notwithstanding the foregoing, with respect to any Participating Employer who is not otherwise included in the definition of Employer by virtue of its relationship with the Company—that is, it does not meet the criteria specified in Code Section 414—such entity shall be considered an Employer solely to the extent required under the Code or ERISA, or as otherwise agreed to, or specified by the Company.

       **2.27**   **Employer   Discretionary   Contributions**.    "Employer   Discretionary Contributions" means Employer Contributions made by a Participating Employer under this Plan in accordance with Section 4.7.

       **2.28**   **Employer Matching Contributions**. "Employer Matching Contributions" means Employer Contributions made by a Participating Employer under this Plan in accordance with Section 4.6 on account of Deferral Contributions and/or Roth Contributions.

       **2.29**   **Employment Commencement Date**. "Employment Commencement Date" means the date on which an Employee first performs an Hour of Service for the Employer, within the meaning of Department of Labor Regulations Section 2530.200b-2(a).

       **2.30**   **Entry Date**. "Entry Date" means the first day of any month during the Plan Year; provided, however, that if an Eligible Employee does not elect to commence participation at such initial Entry Date, then the "Entry Date" means, thereafter, the beginning of any payroll period (or, in the case of a Self-Employed Individual, the date deferrals are first made from Earned Income) occurring as soon as administratively feasible following the Eligible Employee's election to participate in accordance with the Company's procedures or the Eligible Employee's automatic enrollment in accordance with Section 4.3(b).

       **2.31**   **ERISA**. "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and applicable Department of Labor Regulations issued thereunder.

       **2.32**   **Highly Compensated Employee**.

          (a)    "Highly Compensated Employee" means, for any Plan Year, an Employee in active service with the Employer who:

8

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

(i) is, at any time during the current Plan Year or the immediately preceding Plan Year, a five percent (5%) owner (as determined under Code Section 416(i)(1)) of an Employer; or

(ii) received aggregate Testing Compensation for the immediately preceding Plan Year in excess of the limit prescribed under Code Section 414(q) as adjusted by the Adjustment Factor.

(b) For purposes of this Section, the Testing Compensation of each Employee shall be determined on an aggregate basis as if all Employers were a single employer entity paying such Testing Compensation.  All other determinations under this Section shall be made in accordance with Code Section 414(q).

**2.33** <u>**Hour of Service**</u>.  "Hour of Service" means:

(a) Each hour for which an Employee is directly or indirectly paid or entitled to payment by an Employer for the performance of duties and for reasons other than the performance of duties; provided, however, that:

(i) no more than five hundred one (501) Hours of Service shall be credited on account of any single continuous period during which no duties are performed; and

(ii) no Hours of Service shall be credited if payment was made or due:

(A) under a plan maintained solely for the purpose of complying with applicable workers' compensation, unemployment compensation or disability insurance laws; or

(B) solely as reimbursement for medical or medically-related expenses incurred by the Employee.

(b) An Employee on a leave of absence (pursuant to Article X) shall be credited with Hours of Service equal to the number of regularly-scheduled working hours included in the period of such leave (subject to paragraph (a)(i) above).

(c) "Hours of Service" shall, for an Employee, include each hour for which back pay, irrespective of any mitigation of damages, has been either awarded or agreed to by the Employer (such Hours of Service shall be credited for the periods to which the award or agreement pertains rather than the periods in which the award, agreement, or payment is made); provided, however, Hours of Service shall not be credited under this paragraph to the extent such credit would duplicate any hours credited above and provided that no more than five hundred one (501) Hours of Service shall be required to be credited for payments of back pay, to the extent that such back pay is agreed to or awarded for a period of time during which an Employee did not or would not have performed duties.

(d) Notwithstanding the foregoing, unless specified otherwise on Appendix B or required by applicable law, no Employee shall receive credit for Hours of Service while performing service for an Employer pursuant to a collective bargaining agreement.

9

DocuSign Envelope ID: 62054786-7C79-47F3-9475-ABDBBF643580

(e)     For periods of employment prior to January 1, 2021, for each Employee for whom no records of actual hours worked are maintained, Hours of Service shall be credited on the basis of ten (10) Hours of Service for each day that the Employee would have been credited with at least one (1) Hour of Service under this Section.  For periods of employment on and after January 1, 2021, for each Employee for whom no records of actual hours worked are maintained, Hours of Service shall be credited on the basis of (i) for an Employee paid on a semi-monthly payroll period basis, ninety-five (95) Hours of Service for each semi-monthly pay period for which such Employee would have been credited with at least one (1) Hour of Service under this Section; or (ii) for an Employee not paid on a semi-monthly payroll period basis, one-hundred ninety (190) Hours of Service for each month for which such Employee would have been credited with at least one (1) Hour of Service under this Section.

(f)     Hours of Service shall be credited for employment with any Employer, and shall be calculated in accordance with Department of Labor Regulations Section 2530.200b-2 and, to the extent provided for under subsection (e), Department of Labor Regulations Section 2530.200b-3.

**2.34**   __Income Tax Regulations__.  "Income Tax Regulations" means the regulations under the Code, prescribed by the Secretary of Treasury from time to time.

**2.35**   __Leased Employee__.  "Leased Employee" means any individual who, pursuant to an agreement between the Employer and any other individual, has performed services for the Employer (or for the Employer and related individuals determined in accordance with Code Section 414(n)(6)) ("Recipient Employer") on a substantially full-time basis for a period of at least one (1) year, and such services are performed under the primary direction of or control by the Recipient Employer.

**2.36**   __LMA Employee__.  "LMA Employee" means those individuals under certain agreements entered into by the Employer such that, during the period covered by such an agreement, the individuals are on the Employer's payroll and are considered Employees for Plan purposes.

**2.37**   __Non-Highly Compensated Employee__.  "Non-Highly Compensated Employee" means an Employee who is not a Highly Compensated Employee.

**2.38**   __Normal Retirement or Normal Retirement Date__.  "Normal Retirement" or "Normal Retirement Date" means the date on which a Participant attains age sixty-five (65), other than as may be specified in one or more Appendices from time to time.

**2.39**   __Participant__.  "Participant" means a current or former Eligible Employee or other individual for whom an Account is maintained under the Plan.

**2.40**   __Participating Employer__.  "Participating Employer" means the Company and any other Employer, as designated by the Company from time to time that adopts the Plan for the benefit of its Eligible Employees pursuant to Article XIII.  Such Participating Employers that are within the Company's controlled group under Code Section 414 shall specifically exclude those entities designated in Appendix A, as may be informally amended from time to time.  Any other entity may commence participation in the Plan only as provided in Section 13.1.

10

2.41  **Plan**.  "Plan" means the Live Nation Entertainment, Inc. 401(k) Savings Plan, as set forth herein and in amendments from time to time made hereto.

2.42  **Plan Year**.  "Plan Year" means the twelve (12)-consecutive month period beginning each January 1 and ending each December 31.

2.43  **Prior Plans**.  "Prior Plans" means certain tax-qualified 401(k) plans (with related tax-exempt trusts) that merged with and into the Plan including, but not limited to, Bill Graham Enterprises, Inc. Employees' 401(k) Tax-Advantaged Savings Plan, Contemporary Group 401(k) Plan, Pavilion Partners 401(k) Plan, Nederlander Cincinnati, LLC 401(k) Plan, Broadway Series Management Group Inc. 401(k) Retirement Savings Plan, The Network Magazine Group 401(k) Profit Sharing Plan, SJS Entertainment 401(k) Plan, The Marquee Group 401(k) Plan, the Pace Entertainment Corporation Employees' 401(k) Profit Sharing Plan, the Clear Channel Entertainment, Inc. 401(k) Savings Transfer Plan, the HOB Entertainment, Inc. 401(k) Plan, the Signatures Network Savings and Investment Plan, the Musictoday, LLC 401(k) Plan, the Ticketmaster Retirement Savings Plan, the Front Gate Ticketing Solutions 401(k) Plan, the C3 Presents, LLC 401(k) Retirement Plan, the Green Light Media & Marketing LLC 401(k) Plan, the Insomniac 401(k) Retirement Plan, The C3 Presents LLC 401(k) Plan, the Latitude 38 Entertainment 401(k) Savings Plan, the Artist Nation 401(k) Plan and, effective January 1, 2023, the Stubbs Austin 401(k) Profit Sharing Plan, pursuant to Section 12.3 of the Plan and, if applicable, an Appendix, as may be amended from time to time.

2.44  **Prior Plans Account**.  "Prior Plans Account" means any Account under the Plan credited with certain balances transferred from a Prior Plan or from another tax-qualified plan that is fully vested.

2.45  **Prior Plans After-Tax Account**.  "Prior Plans After-Tax Account" means any Account under the Plan credited with Prior Plans After-Tax Contributions transferred from a Prior Plan that is fully vested.

2.46  **Prior Plans After-Tax Contributions**.  "Prior Plans After-Tax Contributions" means contributions made on an after-tax basis to a Prior Plan by a Participant in accordance with the provisions of such Prior Plan.

2.47  **Prior Plans Matching Account**.  "Prior Plans Matching Account" means any Account under the Plan credited with certain balances transferred from a Prior Plan or from another tax-qualified plan subject to the vesting schedule under Section 6.1 or as specified in an Appendix hereto.

2.48  **Prior Plans Roth Account**.  "Prior Plans Roth Account" means any Account under the Plan credited with Prior Plans Roth Contributions transferred from a Prior Plan that is fully vested

2.49  **Prior Plans Roth Contributions**.  "Prior Plans Roth Contributions" means amounts that were contributed to a Prior Plan in accordance with Code Section 402A and are held under the Plan as a result of a merger of such Prior Plan (and related trust) with and into the Plan (and related Trust).  Such amounts will be held in a Participant's Prior Plans Roth Account and will be administered and distributed in accordance with the terms of the Plan

11

**2.49A   Qualified Individual** means a Participant who is a "qualified individual" within the meaning of Section 2202 of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") as expanded by Notice 2020-50, as certified to by the Participant in accordance with administrative procedures.

**2.50   Qualified Matching Contributions**.  "Qualified Matching Contributions" means discretionary Contributions made by a Participating Employer under this Plan or any other tax-qualified plan of the Employer made in accordance with Section 4.6, provided that such contribution shall be subject to the distribution and nonforfeitability requirements of Code Sections 401(k)(3)(D) and applicable Income Tax regulations issued thereunder.

**2.51   Qualified Nonelective Contributions**.  "Qualified Nonelective Contributions" means discretionary Contributions made by a Participating Employer under this Plan or any other tax-qualified plan of the Employer made in accordance with Section 4.7, provided that such contribution shall be subject to the distribution and nonforfeitability requirements of Code Sections 401(k)(3)(D) and applicable Income Tax regulations issued thereunder.

**2.52   Reemployment Commencement Date**.  "Reemployment Commencement Date" means the first date, following a Severance Date, on which an Employee again performs one (1) Hour of Service for the Employer.

**2.53   Rollover Contributions**.  "Rollover Contributions" means contributions under this Plan or a Prior Plan in accordance with Section 4.10.

**2.53A   Roth Contributions** "Roth Contributions" means Contributions under this Plan or a Prior Plan, that are includible in the Participant's gross income at the time deferred and have been designated as Roth after-tax contributions by the Participant in his or her deferral election, in accordance with Section 4.3.

**2.53B   Self-Employed Individual.**  "Self-Employed Individual" means, with respect to any taxable year, an individual who has "Earned Income" for the taxable year (or would have Earned Income but for the fact that the applicable trade or business has no net profits for the taxable year) as a result of services rendered to a Participating Employer.  For purposes of the Plan, "Earned Income" means the share of the total net earnings of the applicable Participating Employer allocated to such Self-Employed Individual during a Plan Year, less Company contributions made on behalf of the Self-Employed Individual to this Plan for the Plan Year, less the deduction for 50% of the Self-Employed Individual's liability for self-employment tax.  The Company shall, in its discretion, determine a Self-Employed Individual's Earned Income for purposes of the Plan, in accordance with the Code and applicable IRS guidance.

**2.54   Severance Date**.  "Severance Date" means the first to occur of the date that an Employee terminates employment with the Employer because he or she quits, is discharged, dies, retires, or is determined to have a Disability.

Notwithstanding the foregoing, for purposes of calculating Year of Service under Section 2.62 pursuant to the elapsed time method as may be utilized under certain Appendices, "Severance Date" means a period of time, commencing with an Employee's Severance Date, of at least twelve (12) consecutive months during which the Employee is not credited with any Period of Service (as

DocuSign Envelope ID: C2054786-7C79-47F8-9475-ABDBBF643580

defined below).  If an Employee is absent on account of maternity or paternity leave, or on account of an authorized leave of absence (as described in Article X), then the Employee will not be considered to have incurred a one (1)-year Break in Service for the first twelve (12)-consecutive month period in which he or she would otherwise have had a one (1)-year Break in Service.  For purposes of this paragraph, maternity or paternity leave means a period during which an Employee is absent because of:  (i) the pregnancy of the Employee, (ii) the birth of a child of the Employee, (iii) the placement of a child with the Employee in connection with the Employee's adoption of the child, or (iv) the caring for a child by the Employee immediately after the birth or placement of the child.

For this purpose, "Period of Service" means:

(a)     An Employee's period of employment with the Employer, beginning with the Employee's Employment Commencement Date or Reemployment Commencement Date, whichever is applicable, and ending with his or her Severance Date.  An Employee's Period of Service shall be determined without regard to whether he or she is a Participant or an Eligible Employee during his or her Period of Service with the Employer.  An Employee's Period of Service shall include those periods that do not exceed twelve (12) months during which the Employee is on a leave of absence, disabled, laid off, on sick leave, on vacation or on holiday.  In addition, if an Employee ceases to be an Employee and then resumes Employee status within twelve (12) consecutive months immediately following the date of such cessation, then his or her Period of Service shall also include each day during that period of cessation, beginning with the day that he or she ceases to be an Employee and ending with the day he or she again becomes an Employee.

(b)     If an Employee is absent from service for any reason other than quit, discharge, retirement, or death, and during the absence ceases to be an Employee, his or her Period of Service shall also include the period between the Employee's Severance Date and the first anniversary of the date on which the Employee was first absent, if he or she again becomes an Employee before such first anniversary date.

(c)     An Employee's Period of Service shall be expressed in years and portions of years and shall be measured in cumulative daily increments (including holidays, weekends, and other non-working days) with three hundred sixty-five (365) Days of Service equaling a Year of Service irrespective of whether such Year of Service was completed within a twelve (12)-consecutive month period.

(d)     Service shall be credited for any period of service with any Employer regardless of whether such employer was an Employer at the time the service occurred.

(e)     Service shall be credited for any individual required under Code Section 414(n) or 414(o) to be considered an employee of any employer aggregated under Code Section 414(b), (c) or (m).

**2.55  Spouse or Surviving Spouse**.  "Spouse" or "Surviving Spouse" means a person who is legally married to a Participant and who is treated as the spouse of such Participant pursuant to the Code, ERISA, and applicable Income Tax Regulations and Department of Labor

13

DocuSign Envelope ID: C20547B6-7C79-47F2-9475-ABDBBF643580

Regulations, or who was legally married to the Participant and so treated as of the date of the Participant's death in the case of a Surviving Spouse; provided, however, that a former Spouse shall be treated as the Spouse or Surviving Spouse to the extent provided under a Qualified Domestic Relations Order, as described in Section 9.5.  Notwithstanding anything to the contrary in the Plan, an unmarried Participant's domestic partner, as designated by the Participant with the Employer in accordance with its Domestic Partner Benefits Policy, as in effect from time to time, shall be treated as a Spouse of such Participant for the purpose of crediting Hours of Service during an Employer-approved period of leave of such Participant to care for such domestic partner and for the purpose of naming a Beneficiary of such Participant under Section 7.6.

**2.56**   **Taxable Year**.  "Taxable Year" means the Employer's fiscal year which is the twelve (12)-consecutive month period beginning each January 1st and ending each December 31st.

**2.57**   **Testing Compensation**.

(a)   "Testing Compensation," subject to paragraphs (b), (c), (d) and (e) below, means:

(i)   all of an Employee's wages, salaries and fees for professional services and other amounts received (without regard to whether or not an amount is paid in cash) for personal services actually rendered in the course of employment with the Employer (as determined in accordance with Code Section 415(h)) to the extent that the amounts are includable in gross income (including, but not limited to, commissions paid to salespersons, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses, fringe benefits, and reimbursements or other expense allowances under a nonaccountable plan (as described in Income Tax Regulations Section 1.62-2(c));

(ii)   regular pay after severance from employment if:  (A) the payment is regular compensation for services during the former Employee's regular working hours, or is compensation for services outside of the Employee's regular working hours (such as overtime or shift differential), commissions, bonuses or other similar payments, and (B) the payment would have been paid to the former Employee prior to a severance from employment if the former Employee had continued in regular employment with the Employer; provided, however, that such amounts shall only be included if paid by the later of two and one-half (2½) months after severance of employment or the end of the Limitation Year in which such severance from employment occurred;

(iii)   payments made to a former Employee upon severance from employment to the extent that:  (A) such payments are for unused accrued bona fide sick leave, vacation or other leave; (B) those amounts would have been included in Compensation if they were paid to the former Employee prior to the severance from employment; and (C) the former Employee would have been able to use such leave if his or her employment had continued; provided, however, that such amounts shall only be included if paid by the later of two and one-half (2½) months after severance of employment or the end of the Limitation Year in which such severance from employment occurred;

US.322200570.24

DocuSign Envelope ID: 62054786-7C79-47F3-9475-ABDBBF643580

(iv)    payments made to an individual who does not currently perform services for the Employer by reason of qualified military service (as defined in Code Section 414(u)(1)) to the extent that such payments do not exceed the amount that the individual would have received if the individual had continued in employment with the Employer rather than entering qualified military service;

(v)    payments made to an individual who is permanently and totally disabled, within the meaning of Code Section 22(e)(3);

(vi)    amounts earned but not paid during the Limitation Year solely because of the timing of pay periods and pay dates within the meaning of Income Tax Regulations Section 1.415 (c)-2 (e)(2);

(vii)    amounts that are includible in the gross income of an Employee under Code Section 409A or 457(f)(1)(A), or because the amounts are constructively received by the Employee;

(viii)    back pay, within the meaning of Income Tax Regulations Section 1.415(c)-2(g)(8), for the Limitation Year or Plan Year (as applicable) to which the back pay relates to the extent that the back pay represents wages or compensation that would have otherwise been included as Testing Compensation; and

(ix)    any Differential Pay (as defined in Section 2.16(a)(iii)).

(b)    Testing Compensation shall not include the following:

(i)    Employer contributions to a plan of deferred compensation that are not includable in the Employee's gross income for Federal tax purposes for the taxable year in which contributed, or Employer contributions under a simplified employee pension plan to the extent such contributions are deductible by the Employee, or any distributions from a plan of deferred compensation;

(ii)    amounts realized from the exercise of share non-statutory options or share appreciation rights or when restricted shares (or other equity-based compensation awards or other property) held by the Employee either become vested, freely transferable or are no longer subject to a substantial risk of forfeiture;

(iii)    amounts realized from the sale, exchange or other disposition of shares acquired under a statutory shares option;

(iv)    severance, separation or salary continuation payments, or payments in lieu of notice; or

(v)    other amounts that received special tax benefits, or contributions made by the Employer (whether or not under a salary reduction agreement) towards the purchase of an annuity contract described in Code Section 403(b) (whether or not the contributions are actually excludable from the gross income of the Employee); or

US.322200570.24

(vi)    restorative payments, as described in Income Tax Regulations Section 1.415(c)-1(b)(2)(ii)(C) and other applicable guidance, including, but not limited to, the Preamble to the Income Tax Regulations under Code Section 415.

(c)    Testing Compensation shall include only those amounts that are actually paid or made available to the Employee during the Plan Year.  Testing Compensation shall include elective deferrals as defined in Code Section 402(g)(3), as well as any amount that is contributed and deferred by the Employer at the election of an Employee and is not includable in gross income by reason of Code Section 125(a), 132(f)(4), 402(e)(3), 402(h)(1)(B), 402(k), or 457.

(d)    The annual Testing Compensation of each Employee that is taken into account under the Plan shall not exceed the limit prescribed under Code Section 401(a)(17), as adjusted by the Adjustment Factor for a twelve (12)-month Plan Year (i.e., Two Ninety Thousand Dollars ($305,000) in 2022).  The Adjustment Factor in effect for a calendar year applies to the Plan Year that begins in such calendar year.  If a Plan Year consists of less than twelve (12) months, then the annual Testing Compensation limit shall be adjusted to an amount equal to the otherwise applicable limit for such Plan Year multiplied by a fraction, the numerator of which is the number of months in the short Plan Year and the denominator of which is twelve (12).

(e)    The determination of the amount of Testing Compensation for an Employee shall be made by the Participating Employer(s) (or its authorized designee) that employs the Employee, in accordance with the records of the Participating Employer(s), and shall be final, binding and conclusive.

**2.58    Trust**.  "Trust" means the asset-bearing entity created and maintained under this Plan and pursuant to its Trust Agreement.

**2.59    Trust Agreement**.  "Trust Agreement" means the separate agreement entered into with the Trustee, in accordance with Article XI, pursuant to which the Trust is held, administered and distributed.

**2.60    Trustee**.    "Trustee" means the person(s) or entity(ies) named in the Trust Agreement pursuant to Article XI or any successor(s) thereto.

**2.61    Valuation Date**.  "Valuation Date" means each business day for the United States financial markets of each Plan Year and such other date(s) as the Administrator may designate from time to time.

**2.62    Year of Service**.  "Year of Service" means:

(a)    Other than as specified in the Appendices (or as may be specified in subsequent Appendices pursuant to amendments hereto) with regard to an Employee's Prior Plan Account, a Year of Service for an Employee means a  computation period during which an Employee is credited with at least one thousand (1,000) Hours of Service.

For purposes of determining Years of Service and Breaks in Service for purposes of eligibility and vesting, the initial computation period is the twelve (12)-consecutive month period beginning on the Employee's Employment Commencement Date.  Succeeding

twelve (12)-consecutive month periods commence with the first Plan Year that begins on or prior to the first anniversary of the Employee's Employment Commencement Date, regardless of whether the Employee is entitled to be credited with one thousand (1,000) Hours of Service during the initial computation period. An Employee who is credited with one thousand (1,000) Hours of Service in both the initial computation period and the first Plan Year that begins prior to the first anniversary of the Employee's initial computation period shall be credited with two (2) Years of Service for purposes of eligibility to participate and vesting.

For both eligibility and vesting purposes, the Plan shall include Hours of Service with certain acquired entities, as set forth in Appendix B. Except as provided in Appendix B or as required under Code Section 414(a) for certain Prior Plans, Hours of Service of an Employee with an entity that becomes an Employer shall only be counted from the date that such entity first becomes an Employer.

(b)    For Employees of any entity for which the elapsed time method is specified in the Appendices, a Year of Service means each twelve (12)-consecutive month period measured from the date the Employee is credited with an Hour of Service to the date of the Employee's Severance Date.

If the Employee has a severance from employment and is subsequently reemployed by the Employer, then such Employee's period of absence shall be treated as part of the service counted for vesting purposes if such period of absence is not longer than twelve (12)-consecutive months.

Notwithstanding anything to the contrary in the Plan, the Severance Date for an Employee who is absent for any reason other than death, voluntary resignation, or discharge by the Employer (such as due to vacation, sick leave, maternity leave or other approved leave of absence) is the first anniversary of the date on which such absence begins.

For both eligibility and vesting purposes, the Plan shall include Periods of Service with certain acquired entities, as set forth in Appendix A. Except as provided in Appendix A or as required under Code Section 414(a) for certain Prior Plans, Periods of Service of an Employee with an entity that becomes an Employer shall only be counted from the date that such entity first becomes an Employer.

(c)    Any Employee who has a change in the method of the computation of such Employee's Year of Service for vesting purposes to or from the methods described in paragraphs (a) and (b) above due to a change in such Employee's employment status, will be credited with vesting service in the transition year in which such change occurs, in accordance with Department of Labor Regulations Section 2520.200b-9(f), which regulation is incorporated herein by this reference.

**2.63    Other Definitions.** In addition to the definitions contained in this Article, the following terms are defined in the Section specified below:

| Section | Term |
|---------|------|
| 7.11(a)(iv) | 2009 RMD |

| | |
|---|---|
| 7.11(a)(v) | 2020 RMD |
| 5.6(c)(i) | ACP Allocations |
| 5.5(a)(i) | Actual Contribution Percentage ("ACP") |
| 5.3(a)(i) | Actual Deferral Percentage ("ADP") |
| 5.5(a)(ii) | Aggregate Limit |
| 9.5(a)(i) | Alternate Payee |
| 5.1(a)(i) | Annual Additions |
| 5.5(a)(iii) | Average ACP |
| 5.3(a)(ii) | Average ADP |
| 7.8(b) | Benefit Starting Date |
| 14.1 | Claimant |
| 5.5(a)(iv) | Contribution Percentage Amount |
| 5.1(a)(ii) | Defined Contribution Dollar Limitation |
| 7.11(b)(i) | Designated Beneficiary |
| 15.2(a) | Determination Date |
| 2.16(a)(iii) | Differential Pay |
| 7.10(a)(i) | Direct Rollover |
| 14.4(a) | Disability Benefit(s) |
| 7.10(a)(ii) | Distributee |
| 7.11(b)(ii) | Distribution Calendar Year |
| 9.5(a)(ii) | Domestic Relations Order or Order |
| 5.2(a)(i) | Elective Deferrals |
| 7.10(a)(iii) | Eligible Retirement Plan |
| 7.10(a)(iv) | Eligible Rollover Distribution |
| 3.6 | EPCRS |

18

| 5.3(a)(iii) | Excess 401(k) Contributions |
|---|---|
| 5.1(a)(iii) | Excess Amount |
| 5.2(a)(ii) | Excess Elective Deferrals |
| 5.5(a)(v) | **Excess Matching Contributions** |
| 7.11(b)(iii) | Five Percent Owner |
| 4.3(d) | In-Plan Roth Rollover |
| 9.1(k) | Investment Managers |
| 15.2(b) | Key Employee |
| 7.11(b)(iv) | Life Expectancy |
| 5.1(a)(iv) | Limitation Year |
| 9.1(i) | Loan Administrator |
| 8.2(a) | Loan Applicant |
| 5.1(b) | Maximum Annual Addition |
| 5.1(a)(v) | Maximum Permissible Amount |
| 15.2(c) | Non-Key Employee |
| 7.10(c) | Non-Spouse Designated Beneficiary |
| 5.1(a)(vi) | Other Plan |
| 7.11(b)(v) | Participant's Account Balance |
| 15.2(d) | Permissive Aggregation Group |
| 12.1(c)<br>Appendices<br>C, D, E, F, G, H | Protected Benefits |
| 9.5(a)(iii) | Qualified Domestic Relations Order or Order or QDRO |
| 7.4 | Qualified Military Service |
| 7.14(c)(i) | Qualified Reservist Distribution |

US.322200570.24

| | |
|---|---|
| 2.35 | Recipient Employer |
| 15.2(e) | Required Aggregation Group |
| 7.11(b)(vi) | Required Beginning Date |
| 14.1 | Review Panel |
| 7.6(a) | Spousal Consent |
| 15.2(f) | Top-Heavy Plan |
| 15.2(g) | Top-Heavy Ratio |
| 10.1 | USERRA |

US.322200570.24

# ARTICLE III

# ELIGIBILITY

**3.1    Participation.**

(a)      Each Eligible Participant in the Plan on the day before the Effective Date who is an Eligible Employee on the Effective Date, shall continue as an Eligible Participant on the Effective Date.

(b)      Each Eligible Employee who is at least age twenty-one (21) and is classified by the Company as a full-time Employee shall become an Eligible Participant in the Plan on the Entry Date coincident with or next following his or her Employment Commencement Date or, if later, the date he or she reaches age 21.

(c)      Each Eligible Employee not otherwise covered pursuant to subsection (b) (including, without limitation, an Eligible Employee classified by the Company as a part-time, seasonal or temporary Employee) shall become an Eligible Participant in the Plan on the Entry Date that is as soon as administratively feasible coincident with or next following the date on which he or she attains age twenty-one (21) and completes one (1) Year of Service.

(d)      Notwithstanding the foregoing, an Employee shall become an Eligible Participant as of the first Entry Date that is as soon as administratively feasible coincident with or next following the date that is no earlier than sixty (60) days following either of the events described below, provided that as of such date, he or she is an Eligible Employee, has attained age twenty-one (21) and the Company has not provided otherwise:

(i)      A stock acquisition of an entity which becomes a subsidiary of the Company and a Participating Employer in accordance with Article XIII and Appendix; or

(ii)      The designation of an individual as an LMA Employee.

(e)      For any particular event described in paragraph (d) above, the Company, as applicable, may permit or exclude such Eligible Employee in accordance with Article XIII or Appendix A.

**3.2    Reemployment.**

(a)      If an Eligible Participant terminates employment with a Participating Employer and is thereafter reemployed by a Participating Employer as an Eligible Employee, then such Eligible Employee shall become an Eligible Participant in the Plan as soon as administratively feasible following the later of his or her Reemployment Commencement Date or the Entry Date on which he or she could have first become an Eligible Participant in the Plan.

(b)      If an Eligible Employee incurs a Break in Service prior to completing the service requirement specified in Section 3.1, then any service rendered prior to the Break in Service will be disregarded in determining whether the Eligible Employee subsequently meets the service requirement in Section 3.1.

21

DocuSign Envelope ID: 62054786-7C79-4FF2-9475-ABDBBF643580

      **3.3**      **Change in Employment Status**.  If an Eligible Participant ceases to be an Eligible Employee, then such Employee shall be reinstated as an Eligible Participant as soon as administratively feasible after again becoming an Eligible Employee.  If, however, an Employee who is not, and has never been, an Eligible Employee becomes an Eligible Employee, then such Eligible Employee shall become an Eligible Participant in accordance with Section 3.1.

      **3.4**      **Enrollment of Participants**.  Each Eligible Participant shall comply with such enrollment procedures as the Company may prescribe from time to time and shall make available to the Company, each Participating Employer, the Administrator and the Trustee any information they may require for such purpose.  By virtue of his or her participation in the Plan, each Eligible Participant agrees, on his or her behalf and on behalf of all individuals who may make any claim arising out of, relating to, or resulting from that Eligible Participant's participation in the Plan, to be bound by all provisions of the Plan, the Trust Agreement and other related documents.

      **3.5**      **Participation Due to Rollover and Trust-To-Trust Transfer**.  An Eligible Employee who makes a Rollover Contribution (including trust-to-trust transfer) pursuant to Section 4.10 shall become a Participant as of the date that such Rollover Contribution is deposited into the Trust on his or her behalf, even if he or she has not previously become an Eligible Participant.  Such an Eligible Employee shall be a Participant only for the purpose(s) of such Rollover Contribution and shall not be eligible to make Deferral Contributions, Roth Contributions, or Catch-Up Contributions or to share in any other Contributions until he or she has become an Eligible Participant in accordance with Sections 3.1 and 3.4.

      **3.6**      **Erroneous Participation**.  In the event of erroneous Contribution(s) under the Plan (including, but not limited to, a Deferral Contribution, Roth Contribution, and/or Catch-Up Contribution erroneously made on behalf of an individual who is not eligible to participate in the Plan; a Rollover Contribution that is erroneously made by an individual who is not eligible to make a Rollover Contribution; or any other Contributions made on behalf of an individual who is not entitled to such Contributions), such failure(s) may be corrected in accordance with the Internal Revenue Service's Employee Plans Compliance Resolution System (the "EPCRS") or as otherwise permitted by applicable law and regulations or as otherwise determined appropriate by the Company.

# ARTICLE IV

## ACCOUNTS AND CONTRIBUTIONS

**4.1** <u>**Participant Accounts**</u>. The following separate Accounts, if applicable, shall be maintained for each Participant:

(a) <u>Deferral Account</u>. A Participant's Deferral Contributions Account shall be credited with all amounts attributable to Deferral Contributions pursuant to Section 4.3.

(b) <u>Roth Account</u>. A Participant's Roth Account shall be credited with all amounts attributable to Roth Contributions pursuant to Section 4.3.

(c) <u>Catch-Up Account</u>. A Participant's Catch-Up Contributions Account shall be credited with all amounts attributable to Catch-Up Contributions pursuant to Section 4.4.

(d) <u>Employer Matching Account</u>. A Participant's Employer Matching Contributions Account shall be credited with all amounts attributable to Employer Matching Contributions pursuant to Section 4.6.

(e) <u>Qualified Matching Contributions Account</u>. A Participant's Qualified Matching Contributions Account shall be credited with all amounts attributable to Qualified Matching Contributions pursuant to Section 4.6.

(f) <u>Employer Discretionary Account</u>. A Participant's Employer Discretionary Contributions Account shall be credited with all amounts attributable to Employer Discretionary Contributions pursuant to Section 4.7.

(g) <u>Qualified Nonelective Contributions Account</u>. A Participant's Qualified Nonelective Contributions Account shall be credited with all amounts attributable to Qualified Nonelective Contributions pursuant to Section 4.7.

(h) <u>Rollover Account</u>. A Participant's Rollover Account shall be credited with all amounts transferred to the Plan pursuant to Section 4.10.

(i) <u>Prior Plan Account.</u> A Participant's Prior Plans Account(s) shall be credited with all amounts attributable to contributions to Prior Plans, including any Prior Plans After-Tax Account, any Prior Plans Matching Account, and any Prior Plans Roth Account.

(j) <u>Other Accounts</u>. Such other Account(s) as the Administrator shall deem necessary or appropriate.

**4.2** <u>**Allocation of Contributions and Earnings**</u>.

(a) <u>Accounts</u>. The Administrator shall allocate to the Accounts of each Participant the Contributions made on his or her behalf and, if applicable, the Rollover Contributions.

DocuSign Envelope ID: C2054786-7C70-47F3-9475-ABDBBF643580

      (b)    <u>Value of Accounts</u>.  Participant Accounts shall be valued at their fair market value at least annually, as of a date and in a manner specified by the Administrator.  The Administrator shall adjust each Account:  <u>first</u>, to reflect any allocations made to, or any distributions or withdrawals made from, such Account since the immediately preceding Valuation Date, to the extent not previously credited or charged thereto, and <u>second</u>, to reflect the Earnings allocable to each Account.

### 4.3    <u>Deferral Contributions and/or Roth Contributions</u>.

      (a)    Subject to the automatic enrollment and escalation provisions of Section 4.3(b) below and the limitations of this Section and Sections 5.1 and 5.2, an Eligible Participant may elect, in accordance with the procedures established from time to time by the Company, to have a portion of his or her Deferral Compensation contributed to his or her Account on a pre-tax basis as a Deferral Contribution, or Roth Account on an after-tax basis as a Roth Contribution, or partly to each, as designated by the Eligible Participant; provided, however, that if no designation is made by the Eligible Participant, the amount shall be deposited as a pre-tax Deferral Contribution in the Eligible Employee's Deferral Account.  The Eligible Participant's election shall specify the amount or percentage of his or her Deferral Compensation to be contributed, which amount or percentage shall not be less than one percent (1%) and not more than fifty percent (50%), in increments of one percent (1%), of the Eligible Participant's Deferral Compensation for each payroll period (or, in the case of a Self-Employed Individual, the Deferral Compensation for the applicable Plan Year).  The Company may change the percentage (or amount) of Deferral Compensation that Eligible Participants may contribute to the Plan.  Provided, further, that the Company may elect from time to time to further reduce the maximum percentage permitted for Highly Compensated Employees.  Amounts deposited to the Eligible Participant's Deferral Account pursuant to this Section 4.3 shall be considered Deferral Contributions under a qualified cash or deferred arrangement as defined in Code Section 401(k)(2) such that the amounts will not be included in the Eligible Participant's income for federal income tax purposes in the year of the contribution.  Amounts deposited to the Eligible Participant's Roth Account pursuant to this Section 4.3 shall be considered Roth Contributions under a qualified cash or deferred arrangement as defined in Code Section 401(k)(2), which are designated as Roth elective deferral contributions as defined in Code Section 402A, such that the amounts will be included in the Eligible Participant's income for federal income tax purposes in the year of the contribution but the amounts and earnings thereon will not be included in the Participant's income for federal income tax purposes in the year such amounts and earnings are distributed, to the extent such distribution is a "qualified distribution" within the meaning of Code Section 402A(d)(2).

      (b)    Subject to the limitations of this Section and Sections 5.1 and 5.2, effective on and after January 1, 2016, each Eligible Participant (other than a Self-Employed Individual) who is hired by a Participating Employer, rehired by a Participating Employer, or otherwise first becomes an Eligible Participant pursuant to Section 3.1(c), shall automatically be enrolled in the Plan and shall have a portion of his or her Deferral Compensation equal to three percent (3%)--provided, however, that, effective on and after January 1, 2018, automatic enrollment shall be at a rate equal to four percent (4%) of Deferral Compensation--for each payroll period contributed on his or her behalf to his or her Deferral Contributions Account.  Effective January 1, 2017, the percentage of such automatic Deferral Contributions will automatically increase by one percent (1%) of the Eligible Participant's Deferral Compensation beginning as soon as administratively

24

feasible on or after each January 1st, up to a maximum of five percent (5%); provided, however, that such increase will only take effect if at least six (6) months have elapsed since the affected Eligible Participant's hire, rehire or other eligibility date for automatic enrollment or, if six (6) months have not elapsed, then it shall be deferred until as soon as administratively feasible on or after the following January 1st.  Such automatic Deferral Contributions shall commence for each affected Eligible Participant as soon as administratively feasible following the thirtieth (30th) day after he or she first meets the requirements to be an Eligible Participant.  Such an Eligible Participant may elect thereafter at any time not to make Deferral Contributions to the Plan, or to defer a different percentage of Deferral Compensation and/or to make Roth Contributions in accordance with paragraph (a) herein, which such election shall be made in such manner and at such time as the Company shall specify from time to time and shall be effective as soon as administratively feasible thereafter.  The provisions of this Section 4.3(b) shall not apply to any Self-Employed Individual.

(c)    An Eligible Participant may elect to commence, increase, decrease or discontinue Deferral Contributions and/or Roth Contributions in such manner and at such time as the Company shall specify from time to time.

(d)    Notwithstanding any other provision of the Plan to the contrary, effective on and after October 22, 2018, an Eligible Participant may, pursuant to uniform rules established by the Company, elect to make a taxable direct rollover as described in Code Section 402A(c)(4), of a distribution contributed in a qualified rollover contribution, and/or a transfer of an amount "not otherwise distributable" that is treated as a qualified rollover contribution under Code Section 402A(c)(4)(E) (as the case may be), from such Eligible Participant's Account (other than the portion attributable to Roth Contributions and/or Qualified Nonelective Contributions, and certain Prior Plans Accounts as specified by the Company prior to the time a Participant attains age fifty-nine and one-half (59-1/2)) to such Participant's Roth Contribution Account in the Plan (an "In-Plan Roth Rollover").  For the avoidance of doubt, any In-Plan Roth Rollover elected by an Eligible Participant shall be irrevocable, and to the extent applicable, any amounts so rolled over that were not "otherwise distributable" as described in Code Section 402A(c)(4)(E), and any earnings attributable thereto, shall remain subject to all applicable distribution restrictions that applied to such amounts prior to the In-Plan Roth Rollover following the In-Plan Roth Rollover. The Company or its designee shall maintain such sub-accounts, or otherwise account separately for In-Plan Roth Rollover amounts from various Accounts, as shall be necessary for the proper application of all withholding and other tax rules.  This Section 4.3(d) shall be construed in accordance with IRS Notice 2013-74 and IRS Notice 2010-84 to the extent applicable, and any other applicable guidance issued by the Secretary of the Treasury.

(e)    In no event shall the aggregate dollar amount of Deferral Contributions and Roth Contributions contributed on behalf of an Eligible Participant to the Plan for any calendar year exceed the limit prescribed under Code Section 402(g)(5) (i.e., Twenty Thousand Five Hundred Dollars ($20,500) in 2022).

(f)    Notwithstanding the provisions of this Section, the Company may, but need not, adopt a procedure to enable Eligible Participants to make lump sum Deferral Contributions and/or Roth Contributions under the Plan through payroll deductions.

25

(g)      The Company shall adopt procedures to enable Self-Employed Individuals to make Deferral Contributions and/or Roth Contributions under the Plan.  The Company may limit the frequency of such Deferral Contributions and/or Roth Contributions to once per Plan Year.

(h)      Subject to the automatic enrollment and escalation provisions of paragraph (b) above, an Eligible Participant's election to defer Deferral Compensation for purposes of Deferral Contributions and/or Roth Contributions shall remain in effect from Plan Year to Plan Year, unless and until the Eligible Participant elects to change such election in such manner and such time as the Company shall specify.

### 4.4    Catch-Up Contributions.

(a)      A Catch-Up Eligible Participant may, in accordance with the procedures established from time to time by the Company, elect to have a portion of his or her Deferral Compensation contributed to his or her Catch-Up Account.  The Catch-Up Eligible Participant's election shall specify the amount of his or her Deferral Compensation to be contributed for each payroll period (or, in the case of a Self-Employed Individual, the Deferral Compensation for the applicable Plan Year) which such amount or percentage may be limited by the Company from time to time.

(b)      A Catch-Up Eligible Participant may elect to commence, increase, decrease or discontinue Catch-Up Contributions in such manner and at such times as the Company shall specify from time to time, such election to take effect as soon as administratively feasible following the election, as determined by the Company.  The Company may also reduce the amount that the Catch-Up Eligible Participant has elected to defer towards Catch-Up Contributions as necessary to allow for Federal tax withholding and other mandatory or permissive withholding.

(c)      Amounts determined to be Catch-Up Contributions for a Plan Year shall not be subject to the Plan's limits on Deferral Contributions, Roth Contributions, or the limit prescribed under Code Section 402(g)(5) (as set forth in Section 4.3), the limitation under Code Section 415 (as set forth in Section 5.1), or the ADP Test (as set forth in Section 5.3).  The Plan shall not be treated as failing to meet the requirements of Code Section 401(a)(4), 401(a)(30), 401(k)(3), 401(k)(12), 410(b), 415(c) or 416, as applicable, by reason of the making of, or the right to make, Catch-Up Contributions.

(d)      Catch-Up Contributions shall not be eligible for Matching Contributions under the Plan.

(e)      In no event shall the dollar amount contributed on behalf of such Catch-Up Eligible Participant's Catch-Up Contributions to the Plan for any calendar year exceed the limit prescribed under Code Section 414(v) (i.e., Six Thousand Five Hundred Dollars ($6,500) in 2022). If a Catch-Up Eligible Participant is determined to have Catch-Up Contributions for a calendar year that exceed the applicable dollar limit prescribed under Code Section 414(v)(2) for that calendar year, under this Plan alone or when combined with amounts determined to be catch-up contributions that meet the requirements of Code Section 414(v) that are made under another plan

26

for the same calendar year, then the excess Catch-Up Contributions will be corrected in the same manner as Excess Elective Deferrals, as set forth in Section 5.2(a).

(f)     Amounts contributed by a Catch-Up Eligible Participant as Deferral Contributions and/or Roth Contributions pursuant to Section 4.3 may, to the fullest extent permitted under Code Section 414(v), the Income Tax Regulations and other applicable guidance thereunder, and without regard to a Catch-Up Eligible Participant's actual election, be recharacterized as Catch-Up Contributions, as may be required by operation of the limits of the Code, including those limits on Deferral Contributions, Roth Contributions, the limit under Code Section 402(g)(4), and/or the ADP Test.

(g)     As of the end of each Plan Year, the Administrator shall make the final determination as to the amount of Deferral Contributions and/or Roth Contributions that shall be treated as Catch-Up Contributions for each Catch-Up Eligible Participant for the Plan Year, as well as the amount of Catch-Up Contributions that shall be recharacterized as Deferral Contributions and/or Roth Contributions for the Plan Year.  The determination shall be made in accordance with, and subject to the limitations of Section 4.3 and Article V, as well as the limitations of Code Section 414(v) and the Income Tax Regulations and other applicable guidance thereunder.

(h)     If a Participant's Annual Additions to the Plan, as determined under Section 5.1 (after application of paragraph (e) above with regard to the final determination of Catch-Up Contributions), exceed the Maximum Annual Addition by more than the amount of the dollar limit prescribed under Code Section 414(v)(2) (but such Annual Additions in the aggregate do not exceed the limitation under Code Section 402(g)), then the amount in excess of the limitation prescribed under Code Section 414(v)(2) will be an Excess Amount and treated in accordance with the provisions of Section 5.1(e).

4.5     **After-Tax Employee Contributions**.  After-Tax Employee Contributions shall not be permitted to be made under the Plan.

4.6     **Employer Matching Contributions and Qualified Matching Contributions**.

(a)     The Company may elect, subject to the provisions of paragraphs (b), (c) and (d) below, that Participating Employers shall make Employer Matching Contributions to the Trust on behalf of Eligible Participants for each payroll period equal to a specified percentage of the Deferral Contributions and/or Roth Contributions for that payroll period (or, in the case of a Self-Employed Individual, the Deferral Compensation for the applicable Plan Year).  All Employer Matching Contributions shall be made in such amount, form and manner as prescribed by the Company from time to time.

(b)     The Company may further elect that Participating Employers shall make an additional Employer Matching Contribution, to be allocated as of the last day of the Plan Year to Participants as a year-end adjustment to take into account any changes in Deferral Compensation or Participant Deferral elections that may have occurred during the Plan Year.  If elected, the amount of this additional Employer Matching Contribution for a given Plan Year shall be equal to the difference, if any, between (i) the Employer Matching Contributions allocated to the Eligible

27

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

Participant pursuant to paragraph (a) during such Plan Year, and (ii) an Employer Matching Contribution determined pursuant to any applicable formula that the Company elected pursuant to paragraph (a), but based on an Eligible Participant's Deferral Compensation and Deferral Contributions and Roth Contributions for the Plan Year; provided, however, that if the Employer Matching Contribution elected in accordance with subsection (a) is not in effect for an entire Plan Year, any additional Employer Matching Contribution shall be determined based only on an Eligible Participant's Deferral Compensation and Deferral Contributions and Roth Contributions during the portion of the Plan Year in which such Employer Matching Contribution is in effect . This additional Employer Matching Contribution, if any, shall be allocated to the Employer Matching Contributions Account of Participants specified by the Company from time to time.

(c)     Employer Matching Contributions that would otherwise be made on behalf of an Eligible Participant may be reduced to the extent necessary to comply with the limitations of Sections 4.4 (Catch-Up Contributions recharacterization to Deferral Contributions and Roth Contributions), 5.1 (Section 415 Limitation), 5.2 (Forfeiture related to Excess Elective Deferrals), and 5.6 (Correction for Discriminatory Matching Contributions), and the Employer shall have no obligation to contribute such amounts to the Trust.

(d)     Catch-Up Contributions shall not be eligible for any Employer Matching Contributions.

(e)     The Company may elect to treat all or a portion of any Employer Matching Contributions for a Plan Year as Qualified Matching Contributions for purposes of the ADP test under Section 5.3; provided, however, that any such treatment must be in compliance with the provisions of Income Tax Regulations Section 1.401(k)-2(a).

(f)     For all purposes under the Plan, any Employer Matching Contributions and Qualified Matching Contributions shall be subject to the distribution limitations of Article VII.  A Participant's Qualified Matching Contributions Account, whether comprised of amounts contributed or allocated, shall not be eligible for hardship withdrawal under Section 8.1 prior to December 1, 2022.   On and after December 1, 2022, a Participant's Qualified Matching Contributions Account shall be eligible for hardship withdrawal.

**4.7     <u>Employer Discretionary and Qualified Nonelective Contributions</u>**.

(a)     No Employer Discretionary Contributions shall be made under the Plan.

(b)     The Company may, with respect to a Plan Year, allocate Qualified Nonelective Contributions to such Eligible Participants and in such definitely determinable amount and manner as it deems necessary or appropriate to satisfy the requirements of the Plan.  The Company may allocate Qualified Nonelective Contributions to all or a subset of the Non-Highly Compensated Employees who are Eligible Participants for a Plan Year in order to satisfy the discrimination testing requirements in Sections 5.3 and 5.5.

(c)     For all purposes of the Plan, Employer Discretionary Contributions and Qualified Nonelective Contributions shall be subject to the distribution limitations of Article VII. Amounts allocated to a Participant's Qualified Nonelective Contributions Account shall not be eligible for hardship withdrawal under Section 8.1 prior to December 1, 2022.  On and after

US.322200570.24

December 1, 2022, a Participant's Qualified Nonelective Contributions Account shall be eligible for hardship withdrawal.

**4.8**   **Limitations on Contributions**.  Contributions for any Plan Year shall not exceed the maximum amount allowable as a deduction to the Employer (including, without limitation, the Participating Employers) under the provisions of Code Section 404.   Notwithstanding the preceding sentence, to the extent necessary to provide Top Heavy minimum allocations, the Employer (and, accordingly, each Participating Employer) shall make Contributions, even if such Contributions exceed the amount deductible to the Employer under the provisions of Code Section 404.

**4.9**   **Time and Form of Payment of Contributions**.  Except as otherwise expressly provided in the Plan, Contributions shall be paid to the Trustee by Participating Employers in such form (that is, cash or Company Stock, or any combination thereof) and at such time as determined by the Company, subject to the timing requirements of applicable law.

**4.10**   **Receipt of Assets from Another Plan**.

(a)   If directed by the Administrator, the Trustee shall accept a transfer of assets for the benefit of an Employee or group of Employees regardless of whether such Employee or group of Employees has/have met the eligibility requirements under Article III.  Such transfer may be in the form of:  (i) a trust-to-trust transfer from the trustee of a tax-qualified plan under Code Section 401(a) and related tax-exempt trust under Code Section 501(a) that is not subject to the funding requirements of Code Section 412; or (ii) a rollover by the Eligible Employee or a Direct Rollover in cash from:  (A) a tax-qualified plan described in Code Section 401(a) or 403(a) (excluding after-tax employee contributions); (B) an annuity contract described in Code Section 403(b) (excluding after-tax employee contributions); (C) an eligible plan under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state (excluding after-tax employee contributions); or (D) an individual retirement account or annuity described in Code Section 408(a) or 408(b) that is eligible to be rolled over and would otherwise be includible in gross income.

(b)   The Administrator may direct the Trustee to accept a transfer to the Trust of all of the assets held for the benefit of an Eligible Employee directly from the trustee of a defined contribution plan that is tax-qualified and related trust that is tax-exempt under Code Sections 401(a), 401(k) and 501(a) if the transfer qualifies as an elective transfer under Income Tax Regulations Section 1.411(d)-4, Q&A 3(b).

(c)   Amounts attributable to elective contributions (as defined in Income Tax Regulations Section 1.401(k)-1(g)(3)), including amounts treated as elective contributions that are transferred in a plan-to-plan transfer, shall be subject to the distribution limitations provided in Income Tax Regulations Section 1.401(k)-1(d).

(d)   Notwithstanding any provision in the Plan to the contrary, any amounts transferred to this Plan directly from the trustee of another tax-qualified plan under Code Section 401(a) and related tax-exempt trust under Code Section 501(a) shall, to the extent such transferred amounts include benefits that are protected benefits under Code Section 411(d)(6) ("Protected

29

DocuSign Envelope ID: 62054786-7C79-47F3-9475-ABDBBF643580

Benefits"), be preserved under this Plan, and shall not in any way be affected, reduced or eliminated, except to the extent permitted under Income Tax Regulations Section 1.411(d)-4.

(e)     An Eligible Participant, with the approval of the Administrator, may roll over an outstanding loan from a tax-qualified plan in accordance with the Income Tax Regulations promulgated under Code Section 401(a)(31).

# ARTICLE V

## LIMITATIONS AND DISCRIMINATION TESTING

**5.1**   **Section 415 Limitation**.

(a)   <u>Definitions</u>.

(i)   <u>Annual Additions</u>.  "Annual Additions" means, with respect to each Participant, the sum of the following amounts for the Limitation Year under this Plan, any Other Plan(s) (as defined in Section 5.1(a)(vi)), or as otherwise specified:

(A)   Contributions made by a Participating Employer (other than amounts determined to be Catch-Up Contributions (under Code Section 414(v) and Income Tax Regulations Section 1.414(v)-1) for the Limitation Year pursuant to Section 4.4);

(B)   Employee contributions;

(C)   forfeitures;

(D)   amounts allocated, after March 31, 1984, to the Participant's individual medical account (as defined in Code Section 415(l)(2)), that is part of a pension or annuity plan maintained by the Employer;

(E)   amounts derived from contributions paid or accrued after December 31, 1985, in taxable years ending after such date, that are attributable to post-retirement medical benefits, allocated to the separate account of a Key Employee (as defined in Code Section 419A(d)(3)) and under a welfare benefit fund (as defined in Code Section 419(e)) maintained by the Employer; and

(F)   amounts contributed to any Other Plan not included in paragraphs (A) through (E) above, and deemed to be annual additions under such Other Plan.

Contributions do not fail to be Annual Additions merely because they are Excess Elective Deferrals, Excess 401(k) Contributions, or Excess Matching Contributions or merely because excess contributions or excess matching contributions (as defined in Code Section 401(k)(8) or 401(m)(6), respectively) are corrected through distribution or recharacterization.

The following amounts shall be specifically excluded from the meaning of Annual Additions:  (A) Excess Elective Deferrals that are distributed in accordance with Section 5.2; (B) amounts treated as Catch-Up Contributions pursuant to Section 4.4; (C) a restorative payment that is allocated to a Participant's Account of the type described in Income Tax Regulations Section 1.415(c)-1(b)(1)(ii)(C) (and other applicable guidance (including, but not limited to, Preamble of the Income Tax Regulations thereunder)); and (D) any loan repayments made to a Participant from the Plan.

(ii)   <u>Defined Contribution Dollar Limitation</u>.   "Defined Contribution Dollar Limitation" means the dollar amount specified in Code Section 415(c)(1)(A), as adjusted

by the Adjustment Factor (i.e., Sixty-One Thousand Dollars ($61,000) for the Limitation Year beginning in 2022).

(iii)    Excess Amount.  "Excess Amount" means the amount of Annual Additions which, if credited to a Participant's Account under this Plan and any Other Plan(s) for a Limitation Year, would exceed the Maximum Permissible Amount.

(iv)    Limitation Year.  "Limitation Year" means the twelve (12)-consecutive month period ending on the last day of the Plan Year.  If the Limitation Year is amended to a different twelve (12)-consecutive month period, then the new Limitation Year must begin on a date within the Limitation Year in which the amendment is made effective.

(v)    Maximum Permissible Amount.  "Maximum Permissible Amount" means the maximum Annual Addition contributed or allocated to a Participant's Account under this Plan and any Other Plan(s) for any Limitation Year which shall not exceed the lesser of:

(A)    the Defined Contribution Dollar Limitation, or

(B)    one hundred percent (100%) of the Participant's Testing Compensation for the Limitation Year.  The limitation with respect to Testing Compensation shall not apply to any contribution for medical benefits (within the meaning of Code Section 401(h) or 419A(f)(2)) that is otherwise treated as an Annual Addition under Code Section 415(l)(1) or 419A(d)(2).  If a short Limitation Year is created because of an amendment changing the Limitation Year to a different twelve (12)-consecutive month period, then the Maximum Permissible Amount will not exceed the Defined Contribution Dollar Limitation multiplied by the following fraction:

$$\frac{\text{Number of months in the short Limitation Year}}{12}$$

(vi)    Other Plan(s).  "Other Plan" means any other defined contribution plan to which contributions are or have been made on behalf of Participants in this Plan by one or more members of the controlled group of corporations (as determined in accordance with the ownership rules of Code Section 1563, without regard however, to Code Section 1563(a)(4) or 1563(e)(3)(C)) and any other employer entity which constitutes an affiliated service group or is required to be aggregated with the Employer pursuant to Code Section 414(c), 414(m) or 414(o).

(b)    Maximum Annual Additions.  "Maximum Annual Additions" means that the amount of Annual Additions that may be credited to the Participant's Account under this Plan and any Other Plan(s) for any Limitation Year shall not exceed the lesser of the Maximum Permissible Amount or any other limitation contained in this Plan or any Other Plan(s).  If the Contributions that would otherwise be contributed or allocated on behalf of the Participant would cause the Annual Additions for the Limitation Year to exceed the Maximum Permissible Amount, then the amount contributed or allocated shall be reduced so that the Annual Additions for the Limitation Year equal the Maximum Permissible Amount.

(c)    Timing.  Prior to determining the Participant's actual Testing Compensation for the Limitation Year, the Employer may determine the Maximum Permissible Amount for a

Participant on the basis of a reasonable estimation of the Participant's Testing Compensation for the Limitation Year.

(d)    Actual Testing Compensation.  As soon as is administratively feasible after the end of the Limitation Year (or within such other period as applicable for a Participant who terminates employment and requests a distribution from the Plan), the Maximum Permissible Amount for the Limitation Year shall be determined on the basis of the Participant's actual Testing Compensation for the Limitation Year.

(e)    Disposition of Excess Amount.  Notwithstanding any provision of the Plan to the contrary, if an Excess Amount exists with respect to one or more Participants for a Limitation Year, then appropriate corrections shall be made, as determined by the Employer, pursuant to EPCRS, including corrections pursuant to former Income Tax Regulations Section 1.415-6(b)(6), if such corrections would otherwise meet the requirements of EPCRS, or other relevant guidance from the Internal Revenue Service (including but not limited to the preamble of the Income Tax Regulations under Code Section 415).

**5.2**    **Distribution of Excess Elective Deferrals**.

(a)    Definitions.

(i)    Elective Deferrals.

(A)    "Elective Deferrals" means with respect to any calendar year, any amount allocated to a Participant's Deferral Account and/or Roth Account pursuant to Section 4.3, and any contributions made on behalf of such Participant pursuant to an election to defer under any qualified cash or deferred compensation arrangement described in Code Section 401(k), any simplified employee pension cash or deferred arrangement as described in Code Section 402(h)(1)(B), any eligible deferred compensation plan under Code Section 457, any plan as described in Code Section 501(c)(18), and any contributions made on behalf of a Participant for the purchase of an annuity contract under Code Section 403(b) pursuant to a salary reduction agreement.  Elective Deferrals shall not include any deferrals properly distributed as excess Annual Additions.

(B)    Notwithstanding the foregoing, amounts contributed to the Plan as Deferral Contributions and/or Roth Contributions and later determined to be Catch-Up Contributions pursuant to Section 4.4, shall not be counted as Elective Deferrals for purposes of this Section.  However, amounts contributed to the Plan as Catch-Up Contributions that are later determined to be Deferral Contributions and/or Roth Contributions pursuant to Section 4.4, shall be counted as Elective Deferrals for purposes of this Section.

(ii)    Excess Elective Deferrals.  "Excess Elective Deferrals" means those Elective Deferrals that exceed the dollar limitation under Code Section 402(g) and any Earnings allocable thereto.  Excess Elective Deferrals not distributed pursuant to this Section shall be treated as Annual Additions under the Plan.

(b)    Notification by Participant of Excess Elective Deferrals.  A Participant may assign to the Plan any Excess Elective Deferrals made during a taxable year of the Participant by

notifying the Administrator in writing of the amount of such Excess Elective Deferral to be assigned to the Plan on or before March 15th of the year following the close of the Participant's taxable year in which the Excess Elective Deferrals were made (or such later date as specified by the Administrator; provided that such date shall not be later than the date specified in paragraph (c) below.  A Participant is automatically deemed to have notified the Administrator to the extent he or she has Excess Elective Deferrals arising from Deferral Contributions and/or Roth Contributions made to the Plan and any Other Plan of the Employer.

(c)     Distribution of Excess Elective Deferrals and Forfeiture of Any Related Employer Matching Contributions. Excess Elective Deferrals shall be distributed to the Participant no later than April 15th of the calendar year following the year in which the Excess Elective Deferrals were made.  Any Employer Matching Contributions made on account of such Excess Elective Deferrals shall be forfeited as soon as administratively feasible thereafter and applied to reduce future Employer Contributions by the appropriate Participating Employer.

(d)     Adjustment for Earnings.  Excess Elective Deferrals and any Employer Matching Contributions attributable thereto shall be adjusted for any Earnings.  Earnings shall be calculated through the end of the Plan Year for which the Excess Elective Deferrals and Employer Matching Contributions attributable thereto were made.  The Earnings allocable to Excess Elective Deferrals and any Employer Matching Contributions attributable thereto shall be calculated by the Administrator using any reasonable method for computing the Earnings allocable to Excess Elective Deferrals and any Employer Matching Contributions attributable thereto; provided, however, that the method shall not violate Code Section 401(a)(4), and shall be determined in accordance with the Internal Revenue Service's Employee Plans Compliance Resolution System or as otherwise permitted by applicable law and regulations or as otherwise determined appropriate by the Company.

**5.3     Discrimination Testing**.

(a)     Definitions.

(i)     Actual Deferral Percentage ("ADP").  "Actual Deferral Percentage" or "ADP" means:

(A)     with respect to each Eligible Participant, a percentage, calculated as the sum of the amount of Deferral Contributions, Roth Contributions, Qualified Matching Contributions, and Qualified Nonelective Contributions, made on behalf of such Eligible Participant for the Plan Year (and allocated for purposes of the ADP test), divided by such Eligible Participant's Testing Compensation for that Plan Year.  If an Eligible Participant makes no Deferral Contributions, no Roth Contributions, and no Qualified Matching Contributions or Qualified Nonelective Contributions are taken into account with respect to the Eligible Participant, then the ADP of the Eligible Participant shall be zero (0);

(B)     the ADP for any Eligible Participant who is a Highly Compensated Employee for the Plan Year and who is eligible to have Deferral Contributions and/or Roth Contributions (and Qualified Nonelective or Qualified Matching Contributions, or both, if treated as Deferral Contributions and/or Roth Contributions for purposes of the ADP test)

34

allocated to his or her account under two (2) or more arrangements described in Code Section 401(k) that are maintained by the Employer, shall be determined as if such Deferral Contributions and/or Roth Contributions (and, if applicable, such Qualified Nonelective Contributions or Qualified Matching Contributions, or both) were made under a single arrangement.  If a Highly Compensated Employee participates in two (2) or more cash or deferred arrangements that have different plan years, then all cash or deferred arrangements ending with or within the same calendar year shall be treated as a single arrangement.  Notwithstanding the foregoing, certain plans shall be treated as separate if mandatorily disaggregated pursuant to Code Section 401(k); and

(C)     notwithstanding the foregoing, amounts contributed to the Plan as Deferral Contributions and/or Roth Contributions that are subsequently determined to be Catch-Up Contributions pursuant to Section 4.4, shall not be counted as Deferral Contributions nor Roth Contributions for purposes of this Section.  However, amounts contributed to the Plan as Catch-Up Contributions that are later determined to be Deferral Contributions and/or Roth Contributions pursuant to Section 4.4, shall be counted as Deferral Contributions or Roth Contributions, as applicable, for purposes of this Section.

(ii)     <u>Average ADP</u>.  "Average ADP" means the average (expressed as a percentage) of the ADPs for all Eligible Participants in the relevant group.

(iii)     <u>Excess 401(k) Contributions</u>.   "Excess 401(k) Contributions" means, with respect to any Plan Year, the excess of (A) the aggregate amount of Employer Contributions actually taken into account in computing the ADPs of Highly Compensated Employees for such Plan Year, over (B) the maximum amount of such Contributions permitted by the ADP test.  Excess 401(k) Contributions shall be treated as Annual Additions under the Plan for the Plan Year that such Contributions were allocated to the affected Eligible Participant's Account.

(b)     <u>ADP Test</u>.  One of the following ADP tests shall be satisfied for each Plan Year:

(i)     the Average ADP for Eligible Participants who are Highly Compensated Employees for the Plan Year shall not exceed the current Plan Year's Average ADP for Eligible Participants who are Non-Highly Compensated Employees for the current Plan Year multiplied by one and twenty-five one-hundredths (1.25); or

(ii)     the Average ADP for Eligible Participants who are Highly Compensated Employees for the Plan Year shall not exceed the current Plan Year's Average ADP for Eligible Participants who are Non-Highly Compensated Employees for the prior Plan Year multiplied by two (2), provided that the ADP for Eligible Participants who are Highly Compensated Employees does not exceed the Average ADP for Eligible Participants who are Non-Highly Compensated Employees for the current Plan Year by more than two (2) percentage points.

**5.4     <u>Corrective Procedure for Discriminatory Deferral Contributions and Roth Contributions</u>**.

(a)     <u>Correction of Excess 401(k) Contributions</u>.  The Administrator may take any and all steps it deems necessary or appropriate to ensure compliance with the limitations of

DocuSign Envelope ID: 62054786-7C79-47F3-9475-ABDBBF643580

Section 5.3(b).  Such steps may include, without limitation, one or any combination of the following:

        (i)    restricting the amount of Deferral Contributions and/or Roth Contributions on behalf of Highly Compensated Employees;

        (ii)    distributing Excess 401(k) Contributions to the Highly Compensated Employees who made such Excess 401(k) Contributions, pursuant to paragraph (e) below;

        (iii)    treating Employer Matching Contributions or Employer Discretionary Contributions, as applicable, as Qualified Matching Contributions or Qualified Nonelective Contributions, respectively.  The amount of Qualified Matching Contributions and/or Qualified Nonelective Contributions made under this Plan and taken into account as Deferral Contributions and/or Roth Contributions for purposes of calculating the ADP test, subject to such other requirements as may be prescribed by the Secretary of the Treasury, shall be such Qualified Matching Contributions and/or Qualified Nonelective Contributions as are needed to meet the ADP test; and/or

        (iv)    allocating by the last day of the calendar year following the Plan Year tested, Qualified Nonelective Contributions to all or a subset of the Non-Highly Compensated Employees who are Eligible Participants for such Plan Year in an amount of up to five percent (5%) of each such Eligible Participant's Testing Compensation for such Plan Year in accordance with the applicable procedures and requirements specified in Income Tax Regulations Section 1.401(k)-2(a)(6) or any applicable superseding guidance.

        (b)    <u>Calculation of Excess 401(k) Contributions</u>.  The amount of Excess 401(k) Contributions for Highly Compensated Employees for a Plan Year shall be calculated by the following method, under which the ADP of the Highly Compensated Employee with the highest ADP is reduced to the extent required to enable the Plan to satisfy the ADP test or to cause such Highly Compensated Employee's ADP to equal the ADP of the Highly Compensated Employee with the next highest ADP:

        (i)    the Deferral Contributions and/or Roth Contributions of the Highly Compensated Employee with the highest ADP shall be reduced; such reduction shall continue, as necessary, until such Highly Compensated Employee's ADP equals that (those) of the Highly Compensated Employee(s) with the second highest ADP;

        (ii)    following the application of paragraph (i), if it is still necessary to reduce Highly Compensated Employees' Deferral Contributions and/or Roth Contributions, then the Contributions of (or allocations on behalf of, if applicable) Highly Compensated Employees with the highest and second highest ADPs shall be reduced, as necessary, until such Employees' ADP equals that of the Highly Compensated Employee(s) with the third highest ADP;

        (iii)    following the application of paragraph (ii), if it is still necessary to reduce Highly Compensated Employees' Deferral Contributions and/or Roth Contributions, then the procedure, the beginning of which is described in paragraphs (i) and (ii) above, shall continue until no further reductions are necessary; and

US.322200570.24

(iv)     amounts determined pursuant to paragraphs (i) through (iii) above shall be combined. The resulting sum shall be the Excess 401(k) Contributions, and the portion of the total to be allocated to each affected Highly Compensated Employee shall be determined pursuant to paragraph (c) below.

(c)     Allocation of Excess 401(k) Contributions. The amount of Excess 401(k) Contributions to be allocated to a Highly Compensated Employee for a Plan Year shall be determined by the following method:

(i)     the Deferral Contributions and/or Roth Contributions of the Highly Compensated Employee(s) with the highest dollar amount of Deferral Contributions and/or Roth Contributions shall be reduced, as necessary, until either such Highly Compensated Employee's dollar amount of Deferral Contributions and/or Roth Contributions equals that of the Highly Compensated Employee(s) with the next highest dollar amounts of Deferral Contributions and/or Roth Contributions, or until no unallocated Excess 401(k) Contributions remain;

(ii)     following the application of paragraph (i), if unallocated Excess 401(k) Contributions remain, then Deferral Contributions and/or Roth Contributions of the Highly Compensated Employees with the highest and second highest dollar amount(s) of Deferral Contributions and/or Roth Contributions shall be reduced, as necessary, until either such Highly Compensated Employees' dollar amount of Deferral Contributions and/or Roth Contributions equal those of the Highly Compensated Employee(s) with the third highest dollar amount(s) of Deferral Contributions and/or Roth Contributions, or until no unallocated Excess 401(k) Contributions remain;

(iii)     following the application of paragraph (ii), if unallocated Excess 401(k) Contributions remain, then the procedure, the beginning of which is described in paragraphs (i) and (ii), shall continue until no further reductions are necessary; and

(iv)     Excess 401(k) Contributions in an amount equal to the reduction of Deferral Contributions and/or Roth Contributions determined in paragraphs (i) through (iii) above with respect to a Highly Compensated Employee shall be allocated to that Highly Compensated Employee and, as determined by the Administrator, distributed pursuant to paragraph (e) below.

(d)     Character of Excess 401(k) Contributions.  The Excess 401(k) Contributions of a Highly Compensated Employee shall be deemed to consist of Contributions and allocations as determined according to the following order:

(i)     first, the Highly Compensated Employee's Excess 401(k) Contributions shall be deemed to consist of Deferral Contributions and/or Roth Contributions , if any, which exceed the highest rate or amount at which Deferral Contributions and/or Roth Contributions are matched; provided, however, such Contributions shall be offset by any Excess Elective Deferrals distributable to the Employee pursuant to Section 5.2; and

(ii)     second, the Highly Compensated Employee's Excess 401(k) Contributions shall be deemed to consist of any Deferral Contributions and/or Roth Contributions and any Qualified Matching Contributions, each in proportion to the Highly Compensated Employee's total Deferral Contributions and/or Roth Contributions and Qualified Matching

Contributions for the Plan Year; provided, however, any Deferral Contributions and/or Roth Contributions characterized as Excess 401(k) Contributions under this paragraph shall be offset by any Excess Elective Deferrals distributable to the Employee pursuant to Section 5.2 and not taken into account under paragraph (a)(i) above.

(e)     Distribution of Excess 401(k) Contributions.  If, pursuant to paragraph (a)(ii) above, the Administrator elects to distribute Excess 401(k) Contributions, which shall then be treated as Annual Additions (adjusted for Earnings) to Highly Compensated Employees, then the Administrator shall make such distributions in accordance with the following timing restrictions:

(i)     on or before the date which falls two and one-half (2½) months after the last day of the Plan Year for which such Excess 401(k) Contributions were made, to avoid liability for the Federal excise tax and state excise tax, if applicable, which will be imposed on Excess 401(k) Contributions distributed after such date;

(ii)    in the event of a complete termination of the Plan during the Plan Year in which there are Excess 401(k) Contributions, such distributions shall be made as soon as administratively feasible after the date of termination of the Plan, but in no event later than the close of the twelve (12)-month period immediately following such termination; and

(iii)   in any event, such Excess 401(k) Contributions shall be distributed before the last day of the Plan Year next following the Plan Year for which such Excess 401(k) Contributions were made.

(f)     Compliance.  Any adjustments to the Non-Highly Compensated Employee Average ADP for the current or prior Plan Year shall be made in accordance with Code Section 401(k), and the Income Tax Regulations issued thereunder.

(g)     Adjustment for Earnings.  After the Administrator has determined the aggregate amount and character of Excess 401(k) Contributions to be distributed to a given Highly Compensated Employee, then that amount shall be adjusted for Earnings.  Earnings shall be calculated through the end of the Plan Year.  The Earnings allocable to Excess 401(k) Contributions shall be calculated by the Administrator using any reasonable method for computing the Earnings allocable to Excess 401(k) Contributions; provided, however, that the method shall not violate Code Section 401(a)(4), and that the method shall be used consistently for all similarly-situated Eligible Participants, for all corrective distributions under the Plan for the Plan Year, and for allocating Earnings to Eligible Participants' Accounts.

(h)     Matching Contributions Related to Excess 401(k) Contributions.  Any Employer Matching Contributions attributable to Excess 401(k) Contributions, plus any Earnings allocable thereto, shall be forfeited and applied as provided in Section 6.2.

(i)     Special Rules.

(i)     Computation of Testing Compensation.  For purposes of this Section, an Eligible Participant's Testing Compensation for the entire Plan Year shall be included,

38

DocuSign Envelope ID: C2054786-7C79-47F2-9475-ABDBBF643580

whether or not he or she made Deferral Contributions and/or Roth Contributions for the entire Plan Year.

(ii)      Coordination with Distribution of Excess Elective Deferrals.  After calculation of an amount to be distributed to a Participant pursuant to the procedures discussed in paragraphs (b) and (c) above, if the Participant in question has also made Excess Elective Deferrals during the calendar year ended within or coincident with the Plan Year, the amount actually distributed to that Participant shall be adjusted to take into account such Excess Elective Deferrals pursuant to Section 5.2.

(iii)      Aggregation of Plans.  For purposes of determining whether a plan satisfies the ADP test in Section 5.3(b), all elective contributions that are made under two or more plans that are aggregated for purposes of Code Section 401(a)(4) or 410(b) (other than Code Section 410(b)(2)(A)(ii)) shall be treated as made under a single plan.  If two (2) or more plans are permissively aggregated for purposes of Code Section 401(k), then the aggregated plans shall also satisfy Code Sections 401(a)(4) and 410(b) as though they were a single plan.  Two (2) or more plans may be aggregated in order to satisfy Code Section 401(k) only if they have the same plan year and use the same ADP testing method.

**5.5      Discrimination Testing of Employer Matching Contributions.**

(a)      Definitions.

(i)      Actual Contribution Percentage ("ACP").   "Actual Contribution Percentage" or "ACP" means:

(A)      with respect to each Eligible Participant, the Eligible Participant's Contribution Percentage Amount, divided by his or her Testing Compensation for that Plan Year;

(B)      if, however, (1) an Eligible Participant makes no Deferral Contributions and/or Roth Contributions, and as a result, no Employer Matching Contributions are made on behalf of such Eligible Participant for the Plan Year; and (2) no Qualified Nonelective Contributions are taken into account with respect to the Eligible Participant, then the ACP of the Eligible Participant shall be zero (0).

(ii)      Aggregate Limit.  "Aggregate Limit" means the sum of (A) one hundred twenty-five percent (125%) of the greater of the Average ADP of the Non-Highly Compensated Employees for the current Plan Year or the Average ACP of Non-Highly Compensated Employees under the Plan subject to Code Section 401(m) for the Plan Year beginning with or within the prior Plan Year of the cash or deferred arrangement, and (B) the lesser of two hundred percent (200%) or two (2) percentage points plus the lesser of such Average ADP or Average ACP.  If it would result in a larger Aggregate Limit, "lesser" is substituted for "greater" in (A) above, and "greater" is substituted for "lesser" after "two (2) plus the" in (B) above.

(iii)      Average ACP.  "Average ACP" means the average of the ACPs of the Eligible Participants in a group.

DocuSign Envelope ID: 62054786-7C79-47F2-9475-ABDBBF643580

(iv)     Contribution Percentage Amount.     "Contribution Percentage Amount" means the sum of the Employer Matching Contributions and Qualified Matching Contributions made under the Plan on behalf of an Eligible Participant for the Plan Year.  In addition, to the extent elected by the Administrator for purposes of calculating the ACP test, "Contribution Percentage Amount" may also include Qualified Nonelective Contributions, Deferral Contributions, Roth Contributions, and/or pre-tax and/or qualified nonelective contributions under Other Plans of the Employer (subject to such requirements as may be prescribed by the Secretary of the Treasury); provided, however, that the amount of Qualified Nonelective Contributions, Deferral Contributions, Roth Contributions, and/or pre-tax contributions under Other Plans of the Employer used in calculating the ADP test may not be used in calculating the ACP test.  Such Contribution Percentage Amount shall not include Employer Matching Contributions that are forfeited either to correct Excess Matching Contributions or because the Contributions to which they relate are Excess Elective Deferrals and the Employer Matching Contributions attributable thereto, or Excess 401(k) Contributions.

(v)     Excess Matching Contributions.  "Excess Matching Contributions" means with respect to any Plan Year, the excess of (A) the aggregate amount of Contributions actually taken into account in computing the Average ACP of Highly Compensated Employees for such Plan Year, over (B) the maximum amount of such Contributions permitted by the ACP test.

(b)     ACP Test.  One of the following tests shall be satisfied for each Plan Year:

(i)     the Average ACP for Eligible Participants who are Highly Compensated Employees for such Plan Year shall not exceed the current Plan Year's Average ACP for Eligible Participants who are Non-Highly Compensated Employees for the current Plan Year multiplied by one and twenty-five one-hundredths (1.25); or

(ii)     the Average ACP for Eligible Participants who are Highly Compensated Employees for such Plan Year shall not exceed the current Plan Year's Average ACP for Eligible Participants who are Non-Highly Compensated Employees for the current Plan Year multiplied by two (2); provided, however, that the Average ACP for Eligible Participants who are Highly Compensated Employees does not exceed the Average ACP for Eligible Participants who are Non-Highly Compensated Employees for the current Plan Year by more than two (2) percentage points.

(c)     Special Rules.

(i)     For purposes of this Section, the ACP for any Eligible Participant who is eligible to have a Contribution Percentage Amount allocated to his or her account under two (2) or more plans described in Code Section 401(a), or arrangements described in Code Section 401(k) that are maintained by the Employer, shall be determined as if the total of such Contribution Percentage Amount was made under each plan.  If a Highly Compensated Employee participates in two (2) or more cash or deferred arrangements that have different plan years, all cash or deferred arrangements ending with or within the same calendar year shall be treated as a single arrangement. Notwithstanding the foregoing, certain plans shall be treated as separate if mandatorily disaggregated pursuant to Code Section 401(m).

40

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

(ii)     In the event that this Plan satisfies the requirements of Code Section 401(m), 401(a)(4) or 410(b) only if aggregated with one or more other plans, or if one or more other plans satisfy the requirements of any such Code Section only if aggregated with this Plan, then this Section shall be applied by determining the Contribution Percentage of Eligible Participants as if all such plans were a single plan.  Any adjustments to the Non-Highly Compensated Employee Average ACP for the current Plan Year shall be made in accordance with Code Section 401(m) and the Income Tax Regulations issued thereunder.  Plans may be aggregated in order to satisfy Code Section 401(m) only if they have the same Plan Year.

(iii)    For purposes of determining the ACP test, Employer Matching Contributions and Qualified Nonelective Contributions are considered made for a Plan Year if made no later than the end of the twelve (12)-month period beginning on the day after the close of the Plan Year.

**5.6     Corrective Procedure for Discriminatory Matching Contributions**.

(a)     <u>Administrator's Procedures</u>.  The Administrator shall have the power to take any and all steps it deems necessary or appropriate to ensure compliance with the limitations described in Section 5.5, including, without limitation, the following:

(i)     to distribute vested Excess Matching Contributions to Highly Compensated Employees who received such allocations, pursuant to paragraph (e) below;

(ii)     to treat that portion of Excess Matching Contributions that consists of unvested allocations of Employer Matching Contributions to the Employer Matching Contributions Accounts of Highly Compensated Employees as amounts to be reallocated, pursuant to paragraph (d) below;

(iii)    to limit the amount of Employer Matching Contributions allocated to the Employer Matching Contributions Accounts of Highly Compensated Employees;

(iv)    to the extent that such Excess Matching Contributions were allocated with respect to Excess Elective Deferrals, to forfeit the Excess Matching Contributions that were so allocated, which forfeited amounts shall be held and administered in accordance with Section 6.2(a); and/or

(v)     allocating by the last day of the calendar year following the Plan Year tested, Qualified Nonelective Contributions to all or a subset of the Non-Highly Compensated Employees who are Eligible Participants for such Plan Year in an amount of up to five percent (5%) of each such Eligible Participant's Testing Compensation for such Plan Year in accordance with the applicable procedures and requirements specified in Income Tax Regulations Section 1.401(m)-2(a)(6) or any applicable superseding guidance.

(b)     <u>Timing</u>.  Notwithstanding any contrary provisions in this Plan, if, pursuant to paragraph (a)(i) or (ii) above, the Administrator elects to distribute or reallocate Excess Matching Contributions (adjusted for Earnings), then the Administrator shall take such action(s) on or before the date which falls two and one-half (2½) months after the last day of the Plan Year for which such Excess Matching Contributions were made, if the Employer wishes to avoid

liability for the Federal excise tax and state excise tax, if applicable, which will be imposed on Excess Matching Contributions distributed or reallocated after such date, but in any event, before the last day of the Plan Year next following the Plan Year for which such Contributions were made.

(c)     Determination of Amount of Excess Matching Contributions.  The amount of Excess Matching Contributions for Highly Compensated Employees for a Plan Year shall be determined by the following method, to enable the Plan to satisfy the ACP test:

(i)     first, the allocations of Contributions taken into account in determining the ACP ("ACP Allocations") of the Highly Compensated Employee with the highest ACP shall be reduced, as necessary, until such Employee's ACP equals those of the Highly Compensated Employee(s) with the second highest ACP;

(ii)     second, following the application of paragraph (i), if it is still necessary to reduce Highly Compensated Employees' ACP Allocations, then the Contributions of Highly Compensated Employees with the highest and second highest ACPs shall be reduced, as necessary, until each affected Employee's ACP equals that (those) of the Highly Compensated Employee(s) with the third highest ACP;

(iii)     third, following the application of paragraph (ii), if it is still necessary to reduce Highly Compensated Employees' ACP Allocations, then the procedure, the beginning of which is described in paragraphs (i) and (ii), shall continue until no further reductions are necessary; and

(iv)     fourth, amounts determined pursuant to paragraphs (i) through (iii) shall be combined.  The resulting sum shall be the Excess Matching Contributions, and the portion of the total to be allocated to each affected Highly Compensated Employee shall be determined pursuant to paragraph (d) below.

(d)     Allocation of Excess Matching Contributions.  The amount of Excess Matching Contributions to be allocated to a Highly Compensated Employee for a Plan Year shall be determined by the following method to enable the Plan to satisfy the ACP test:

(i)     first, the ACP Allocations of the Highly Compensated Employee(s) with the highest dollar amount of ACP Allocations shall be reduced, as necessary, until either such Employee's dollar amount of ACP Allocations equals those of the Highly Compensated Employee(s) with the second highest dollar amount of ACP Allocations or until no ACP Allocations remain;

(ii)     second, following the application of paragraph (i), if unallocated ACP Allocations remain, then ACP Allocations of Highly Compensated Employees with the highest and second highest dollar amount of ACP Allocations shall be reduced, as necessary, until either each affected Employee's dollar amount of ACP Allocations equals that (those) of the Highly Compensated Employee(s) with the third highest dollar amount of ACP Allocations, or until no ACP Allocations remain;

(iii)     third, following the application of paragraph (ii), if unallocated ACP Allocations remain, the procedure, the beginning of which is outlined in paragraphs (i) and (ii), shall continue until no further reductions are necessary, or until no further unallocated ACP Allocations remain; and

(iv)     fourth, Excess Matching Contributions in an amount equal to the reductions of ACP Allocations determined in paragraphs (i) through (iii) above with respect to a Highly Compensated Employee shall be allocated to that Highly Compensated Employee and, as determined by the Administrator, distributed pursuant to paragraph (e) below.

(e)     Distribution of Excess Matching Contributions.   After the procedure outlined in paragraph (d) above is completed, all amounts of any Excess Matching Contributions shall be forfeited (if forfeitable) or distributed (if distributable) to the respective Highly Compensated Employees to whose Accounts the Excess Matching Contributions were made. Excess Matching Contributions for each affected Highly Compensated Employee shall be forfeited (if forfeitable) or distributed (if distributable) from the following Accounts in the following order:

(i)     the Highly Compensated Employee's Matching Contributions Account;

(ii)     the Highly Compensated Employee's Qualified Nonelective Contributions Account;

(iii)     the Highly Compensated Employee's Qualified Matching Contributions Account;

(iv)     the Highly Compensated Employee's Deferral Account;

(v)     the Highly Compensated Employee's Roth Account.

(f)     Adjustment for Earnings.   After the Administrator has determined the aggregate amount and character of Excess Matching Contributions to be forfeited or distributed to a given Highly Compensated Employee, then that amount shall be adjusted for Earnings.  Earnings shall be calculated through the end of the Plan Year.  The Earnings allocable to Excess Matching Contributions shall be calculated by the Administrator using any reasonable method for computing the Earnings allocable to Excess Matching Contributions; provided, however, that the method shall not violate Code Section 401(a)(4), and that the method shall be used consistently for all similarly-situated Participants, for all corrective distributions under the Plan for the Plan Year, and for allocating Earnings to Participants' Accounts.

**5.7     Compliance Limits and Discrimination Testing.**

This Article shall be applied separately with respect to each group of Eligible Employees whose employment is covered by a particular Participating Employer who is not a member of the controlled group of corporations of the Company pursuant to Code Sections 414(b), (c) and (m). For purposes of the foregoing, when a Participating Employer is a member of the same controlled group of corporations of any other Participating Employer(s) pursuant to Code Sections 414(b),

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

(c) and (m), this Article shall be applied separately to such controlled group of Participating Employers and not separately to each such Participating Employer.

US.322200570.24

# ARTICLE VI

## VESTING AND FORFEITURES

**6.1    Vested Interest**.

    (a)    A Participant's interest in his or her Deferral Account, Roth Account, Catch-Up Account, After-Tax Account, Prior Plans After-Tax Account, Prior Plans Roth Account, Qualified Matching Contributions Account, Qualified Nonelective Contributions Account, and Rollover Account under this Plan shall be at all times fully vested and nonforfeitable.

    (b)    A Participant's interest in all of his or her Accounts shall be fully vested and nonforfeitable upon termination of the Plan pursuant to Section 12.2.

    (c)    A Participant's interest in his or her Employer Matching Account and Employer Discretionary Account, if any, shall be fully vested and nonforfeitable at any of the following times, provided that the Participant is employed by the Employer at such time:  the Participant's Normal Retirement Date, the Participant's Early Retirement Date if specified in an Appendix, the Participant's death, or the date the Participant ceases to be an Employee by reason of his or her Disability.

In all other cases, a Participant's interest in his or her Employer Matching Account, Employer Discretionary Account, and Prior Plans Matching Account (unless specified otherwise in an Appendix hereto), if any, shall be subject to the following vesting schedules:

If a Participant had <u>not</u> completed at least one (1) Year of Service on or before January 1, 2008:

| Years of Service | Vested Percentage |
|---|---|
| Less than 2 years | 0% |
| 2 years but less than 3 years | 50% |
| 3 years or more | 100% |

If a Participant completed at least one (1) Year of Service on or before January 1, 2008:

| Years of Service | Vested Percentage |
|---|---|
| Less than 1 year | 0% |
| 1 year but less than 2 years | 20% |
| 2 years but less than 3 years | 50% |
| 3 years or more | 100% |

    (d)    If the vesting schedules specified in paragraph (c) are subsequently amended, then in the case of an Employee who is a Participant as of the later of the date such amendment is adopted or the date it becomes effective, the nonforfeitable percentage (determined as of such date) of such Employee's Account balance will not be less than the percentage computed under the Plan without regard to such amendment.  In addition, if the amended vesting schedule provides less rapid vesting, if the Plan is amended in any way that directly or indirectly affects the computation of the Participant's nonforfeitable percentage, or if the Plan is deemed amended by

45

DocuSign Envelope ID: 62054786-7C79-47F3-9475-ABDBBF643580

an automatic change to a Top-Heavy vesting schedule, then each Participant who is credited with three (3) Years of Service and whose Account(s) would have vested more rapidly prior to the amendment, may irrevocably elect during the election period to have the nonforfeitable percentage of his or her Account(s), as applicable, calculated without regard to such amendment. For purposes of this Section, the election period shall begin the date the amendment is adopted, and shall end on the date sixty (60) days after the latest of:  (i) the date the amendment is adopted, (ii) the date the amendment becomes effective, or (iii) the date the Participant is issued written notice of the amendment by the Administrator or the Employer.

**6.2**    **Disposition of Forfeitures**.

(a)    Upon termination of employment of a Participant who was not fully vested in his or her Employer Matching Account or Employer Discretionary Account, the non-vested portion of his or her Employer Matching Account or Employer Discretionary Account shall not be forfeited until the earlier of:  (i) the date the Participant's number of consecutive one (1)-year Breaks in Service equals or exceeds the greater of five (5) years or the Participant's total number of Years of Service before his or her Break in Service, or (ii) the date the Participant receives a distribution of the vested portion of his or her Accounts.  If the former Participant is not reemployed by the Employer before he or she has a period of Break in Service described in the preceding sentence or receives such a distribution, then the non-vested portion of his or her Employer Matching Account or Employer Discretionary Account shall be forfeited.  Any amounts forfeited pursuant to this Section shall be applied, at the discretion of and in the order determined by the Company, to reduce Employer Contributions, to pay administrative expenses of the Plan in accordance with Section 11.2, and/or for any other purpose permitted under federal regulations or any other applicable authority.

(b)    If an amount of a Participant's Employer Matching Account has been forfeited in accordance with paragraph (a) above, that amount shall be subsequently restored to the Participant's Employer Matching Account or Employer Discretionary Account; provided, however, that (i) he or she is reemployed by the Employer before the Participant's number of consecutive one (1)-year Breaks in Service equals or exceeds the greater of five (5) years or the Participant's total number of Years of Service before his or her Break in Service, and (ii) he or she repays to the Plan during his or her period of reemployment and within five (5) years of his or her date of reemployment an amount in cash equal to the full amount distributed to him or her from the Plan on account of his or her termination of employment, other than the amount attributable to any Rollover Contributions; provided, however, that he or she may elect to repay to the Plan all or part of that amount as well.  Repayment shall be made in one lump sum.  A Participant who is reemployed before the time specified in paragraph (b)(i) above who had a vested benefit of zero (0), at the time of his or her termination shall be deemed to have repaid such distribution upon his reemployment.

(c)    In the event that any amounts to be restored by the Employer to a Participant's Employer Matching Account or Employer Discretionary Account have been forfeited under paragraph (a) above, those amounts shall be taken first from any forfeitures which have not as yet been applied against Employer Matching Contributions or Employer Discretionary Contributions and if any amounts remain to be restored, the Employer shall make a special

DocuSign Envelope ID: C2054786-7C79-47F2-9475-ABDBBF643580

Employer contribution equal to those amounts.  Any such restoration shall be made as soon as administratively feasible after the date of repayment.

      **6.3**    <u>**Special Vesting Formula**</u>.

      (a)    <u>Formula</u>.  If a distribution is made on behalf of a Participant at a time when he or she is less than one hundred percent (100%) vested in his or her Employer Matching Account or Employer Discretionary Contributions, then his or her vested interest in each such sub-Account at any Relevant Time shall not be less than an amount ("X") determined by the following formula:

$$X = P(AB + (R \times D)) - (R \times D)$$

      (b)    <u>Definitions</u>.  For purposes of this formula, the following terms apply:

      (i)    "P" is the vested percentage at the Relevant Time;

      (ii)    "AB" is the applicable Account balance at the Relevant Time;

      (iii)    "D" is the amount of the distribution;

      (iv)    "R" is the ratio of the separate Account balance at the Relevant Time to the separate Account balance after the distribution; and

      (v)    The "Relevant Time" is the time under the Plan when the Participant's vested portion may not increase.

US.322200570.24

# ARTICLE VII

## DISTRIBUTION OF ACCOUNTS

**7.1**     **Normal Retirement**.   A Participant who terminates employment with the Employer on or after his or her Normal Retirement Date may elect to have his or her vested Account balance distributed in accordance with Sections 7.7 through 7.10 or, if applicable, the Appendices.

**7.2**     **Termination of Employment**.  Following a Participant's Severance Date, the Participant may elect to have his or her vested Account balance distributed in accordance with Sections 7.7 through 7.10.  Effective January 1, 2009, a Participant who is on active military duty for a period in excess of thirty (30) days will be deemed to have a Severance Date on the thirty-first (31st) day of such active military service and such Participant may then elect to have his or her Deferral Account and Roth Account distributed in accordance with Sections 7.7 through 7.10. If such Participant makes this distribution election, however, then he or she shall be prohibited from making Deferral Contributions and Roth Contributions for a period of six (6) months from the date of such distribution.

**7.3**     **Disability**.  Except as provided in an Appendix hereto, the Plan does not permit in-service distributions upon Disability.

**7.4**     **Death Benefits**.  If a Participant dies before the entire vested balance of his or her Account has been distributed, then the vested balance in his or her Account shall be paid to the Participant's Beneficiary in accordance with Sections 7.10 through 7.11.   The Participant's Beneficiary is determined in accordance with Section 7.6.   Notwithstanding anything to the contrary in the Plan, in the case of a Participant who, on or after January 1, 2007, dies while performing Qualified Military Service, the survivors of the Participant shall be entitled to any additional benefits provided under the Plan had the Participant resumed and then terminated employment on account of death.  For this purpose, the term "Qualified Military Service" means any service in the uniformed services (as defined in chapter 43, title 38, United States Code) by any individual as if such individual is entitled to reemployment rights under such chapter with respect to such service.

**7.5**     **Change to a Leased Employee or Other Ineligible Class**.  If a Participant experiences a change in employment status to that of a Leased Employee or otherwise ceases to be an Eligible Employee and he or she continues to work for any Employer, such change will not be treated as a severance from employment with the Employer for purposes of receiving a distribution under the Plan.

**7.6**     **Beneficiary Designation**.

(a)     Married Participants.  If the Participant is legally married (as determined under applicable law), then the Participant's Beneficiary shall be his or her Surviving Spouse. However, the Participant may designate a Beneficiary other than his or her Spouse (in accordance with the Administrator's procedures at such time); provided, however, that:  (i) the Participant's Spouse consents to such designation and to the form thereof (in accordance with the

Administrator's procedures at such time); (ii) such Beneficiary designation may not be changed without the consent of his or her Spouse ("Spousal Consent") (or the consent of the Spouse expressly permits changes in the beneficiary designation by the Participant without any requirement of further consent by the Spouse); and (iii) the Spouse's consent acknowledges the effect of such Beneficiary designation and is witnessed by a Plan representative or a notary public (unless such witness is no longer required by applicable law). Such Spousal Consent shall not be required if it is established to the satisfaction of the Administrator that the consent required under the preceding sentence cannot be obtained because there is no Spouse, the Spouse cannot be located, or such other circumstances as the Secretary of the Treasury may by Income Tax Regulations (or other binding authority) prescribe. Any Spousal Consent or the establishment that Spousal Consent cannot be obtained shall only apply to the particular Spouse involved. The legal marriage of a Participant (as determined pursuant to the Code, ERISA, and applicable Income Tax Regulations and Department of Labor Regulations) shall nullify any Beneficiary designation made by the Participant prior to such marriage.

(b)     Default Beneficiary. If, at the time of the Participant's death, the Participant has no Surviving Spouse or designated Beneficiary, then the Participant's Beneficiary shall be the individual representative of the Participant's estate.

(c)     Contingent Beneficiary. If a Beneficiary who is entitled to payment under this Section dies before receiving distribution of the entire amount to which he or she is entitled, then any amount remaining shall be payable to the contingent Beneficiary named by the Participant pursuant to the requirements of this Section. If there is no such contingent Beneficiary, then the remaining portion of the Participant's vested Account shall be payable to the individual representative of the Beneficiary's estate.

(d)     Bound by Plan. A Participant's Beneficiary, contingent Beneficiary and any Beneficiary's beneficiary shall be bound by the terms and conditions of the Plan. The designations, consents and the like required pursuant to this Section shall be executed in accordance with the Administrator's procedures at such time.

(e)     No Automatic Nullification of Beneficiary on Divorce. Effective January 1, 2022, a Participant's divorce from his or her spouse subsequent to the Participant's designation of such divorced spouse as the Participant's Beneficiary shall not automatically revoke the Beneficiary designation, and such designation of the divorced spouse shall remain in effect until the Participant executes a new Beneficiary designation in accordance with the provisions of the Plan. The provisions of this paragraph (e) shall be applied in a similar manner with respect to any domestic partner of a Participant.

(f)     Prior Plan Designation. Any Beneficiary designation of a Participant in effect under a Prior Plan that has been merged into this Plan, as detailed in the Appendices hereto, shall not remain in effect under this Plan, and the Participant's Beneficiary with respect to any account balances under a Prior Plan shall be determined in accordance with this Section 7.6.

**7.7     Form of Distribution**. Distributions shall be in the form of a single lump sum cash distribution. Notwithstanding the foregoing, distributions from a Participant's Account, to the extent that at the time of his or her distribution all or any portion of such Account is invested in

Company Stock, may, at the election of the Participant, be in the form of whole shares of Company Stock, with any fractional shares distributed in the form of cash.

**7.8    Commencement of Distribution.**

(a)    Subject to the requirements of this Article VII, following a Participant's Severance Date, the Participant's vested Account balance shall be distributed in accordance with the Administrator's procedures, and shall be subject to the following:

(i)    if the Participant's vested Account balance does not exceed One Thousand Dollars ($1,000) at the time of the distribution, and if the Participant does not elect to have such distribution paid directly to an Eligible Retirement Plan specified by the Participant in a Direct Rollover or to receive the distribution directly in accordance with this Article VII, then the Participant shall receive a lump sum distribution of the entire vested portion of such Account balance and the nonvested portion shall be treated as a forfeiture;

(ii)    if the Participant's vested Account balance exceeds One Thousand Dollars ($1,000) but does not exceed Five Thousand Dollars ($5,000) at the time of the distribution, and if the Participant does not elect to have such distribution paid directly to an Eligible Retirement Plan specified by the Participant in a Direct Rollover or to receive the distribution directly in accordance with this Article VII, then the Administrator will pay the distribution in a Direct Rollover to an individual retirement plan designated by the Administrator, and the nonvested portion shall be treated as a forfeiture; or

(iii)    if the Participant's vested Account balance exceeds Five Thousand Dollars ($5,000) at the time of the distribution, then the Participant must consent, in writing, prior to the distribution.

(b)    If consent is required for a distribution, then the Participant must consent to the distribution before it may be made and within the one hundred eighty (180)-day period ending on the first day on which all of the events have occurred that entitle the Participant to such benefit (the "Benefit Starting Date"). If the Participant consents to the distribution, then such distribution shall include the Participant's entire vested Account balance. If the Participant does not consent to the distribution, then the Participant's vested Account balance shall be held in the Trust until the maximum period required in accordance with paragraphs (c) and (e) below. If consent to a distribution is required hereunder, then at least thirty (30) days and not more than one hundred eighty (180) days prior to the Benefit Starting Date, the Administrator shall provide the Participant with a notice of the right to elect an immediate distribution or the right to defer a distribution until the Participant's Normal Retirement Date.

(c)    Distribution of a Participant's Account shall commence no later than sixty (60) days following the close of the Plan Year in which occurs the latest of the following paragraph (i), (ii) or (iii); provided, however, that the Participant must file a claim with the Administrator before any benefits are paid:

(i)    the date the Participant attains Normal Retirement;

(ii)     the tenth (10th) anniversary of the date on which the Participant first commences participation in the Plan; or

(iii)     the Participant's Severance Date.

With the exception of distributions made pursuant to paragraphs (a)(i) and (a)(ii) above, the failure of a Participant to consent to the distribution of a benefit that is immediately distributable under this Section, shall be deemed to be an election to defer commencement of a payment of any benefit to the latest possible date pursuant to this paragraph (c) or paragraph (e) below, as applicable.

(d)     Notwithstanding anything to the contrary in the Plan, distribution of each Participant's vested Account balance shall begin no later than the Participant's Required Beginning Date, regardless of whether the Participant has consented to such a distribution.

(e)     If a distribution is one for which Code Sections 401(a)(11) and 417 do not apply, then such distribution may commence less than thirty (30) days after the notice required under Income Tax Regulations Section 1.411(a)-11(c) is given; provided, however, that:  (i) the Administrator informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option); and (ii) the Participant, after receiving the notice, affirmatively elects a distribution and waives the thirty (30)-day period by notice (made in accordance with the Administrator's procedures at such time).

**7.9     Special Rule for Deferral Contributions, Roth Contributions, Catch-Up Contributions, Qualified Matching Contributions and Qualified Nonelective Contributions.** A Participant's Deferral Account, Roth Account, Catch-Up Account, Qualified Matching Contributions Account and Qualified Nonelective Contributions Account, including Earnings thereon, shall also, as determined by the Administrator, be eligible for distribution upon the Participant's "severance from employment" with the Employer, within the meaning of Code Section 401(k)(2)(B)(i)(I).  However, such a distribution shall be subject to the other provisions of the Plan regarding distributions, other than provisions that require a Severance Date (within the meaning of Section 2.54) before such amounts may be distributed.

**7.10     Direct Rollovers and Withholding.**

(a)     **Definitions.**

(i)     **Direct Rollover.**  "Direct Rollover" means an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan for the benefit of a Distributee.

(ii)     **Distributee.**  "Distributee" means:  (i) a Participant; (ii) the Surviving Spouse of a deceased Participant; (iii) a designated Beneficiary within the meaning of Code Section 401(a)(9)(E) who is not the Surviving Spouse; or (iv) the Spouse or former Spouse who is the Alternate Payee under a Qualified Domestic Relations Order as defined in Code Section 414(p) with regard to the interest of such Spouse or former Spouse.

(iii)     **Eligible Retirement Plan.**  "Eligible Retirement Plan" means:

51

(A)    with respect to any Distributee, a qualified trust described in Code Section 401(a), an individual retirement account described in Code Section 408(a), an individual retirement annuity (other than an endowment contract) described in Code Section 408(b), an annuity contract described in Code Section 403(b) or an eligible plan under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred to such plan from this Plan and a Roth individual retirement described in Code Section 408A;

(B)    in addition to paragraph (A) above, and solely with respect to any after-tax Employee contributions that are distributed from the Plan, an Eligible Retirement Plan means a qualified defined contribution plan described in Code Section 401(a), an individual retirement account described in Code Section 408(a), an individual retirement annuity (other than an endowment contract) described in Code Section 408(b) that agrees to separately account for amounts transferred into such plan from the Plan, including separately accounting for the portion of such distribution which is includable in gross income and the portion of such distribution which is not so includible; and

(C)    if any portion of an Eligible Rollover Distribution is attributable to payments or distributions from a Prior Plans Roth Account, an 'Eligible Retirement Plan' with respect to such portion shall include only another designated Roth account or a Roth IRA.

(iv)    <u>Eligible Rollover Distribution</u>.  "Eligible Rollover Distribution" means any distribution of all or any portion of the balance credited to the Account of a Distributee, except that an Eligible Rollover Distribution shall not include:  (A) any distribution that is one of a series of substantially equal periodic payments (made not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated Beneficiary, or for a specified period of ten (10) years or more; (B) any distribution to the extent such distribution is required under Code Section 401(a)(9); (C) the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to Employer securities) other than any amounts that are After-Tax Contributions; and (D) any amounts distributed as a result of a hardship withdrawal in accordance with Section 8.1.

Notwithstanding the foregoing, effective for distributions on or after July 29, 2016, an 'Eligible Rollover Distribution' shall include any portion of a distribution attributable to a Roth Account and/or Prior Plans Roth Account that is not includible in gross income, to the extent that either (A) such portion is transferred in a direct trustee-to-trustee transfer to a qualified trust or to an annuity contract described in Code Section 403(b) and such trust or contract provides for separate accounting for amounts so transferred (and earnings thereon), including separate accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible; or (B) such portion is transferred to an individual retirement account described in Code Section 408(a) or an individual retirement annuity (other than an endowment contract) described in Code Section 408(b).  In the case of a transfer described in clause (A) or (B) of this paragraph, the amount transferred shall be

52

treated as consisting first of the portion of such distribution that is includible in gross income (determined without regard to the effect of the direct rollover).

(b)　　__General Rule__.  If the Distributee of any Eligible Rollover Distribution from the Plan elects to have all or a specified portion of the Eligible Rollover Distribution paid directly to an Eligible Retirement Plan, and specifies the Eligible Retirement Plan to which the Eligible Rollover Distribution is to be paid, then the Eligible Rollover Distribution shall be paid to that Eligible Retirement Plan in a Direct Rollover.

(c)　　__Non-Spouse Designated Beneficiary__.  An Eligible Rollover Distribution shall include a distribution to a designated beneficiary within the meaning of Code Section 401(a)(9)(E) who is not the Participant's Surviving Spouse (a "Non-Spouse Designated Beneficiary") and who elects, at the time and in the manner prescribed by the Administrator, to have all or any portion of such distribution that meets the requirements of this Section and the Plan paid to an individual retirement account described in Code Section 408(a) or individual retirement annuity described in Code Section 408(b) (other than an endowment contract) established on behalf of the Non-Spouse Designated Beneficiary and treated as an inherited individual retirement account or annuity in accordance with Code Section 402(c)(11).  Such a distribution must satisfy the requirements for treatment as an Eligible Rollover Distribution under this Section, other than the requirement that it be distributed to a Distributee, as defined in paragraph (a)(ii).  If the Non-Spouse Designated Beneficiary is a trust, then such trust may also qualify for a direct rollover to an inherited individual retirement account or annuity; provided, however, that the beneficiaries of such trust otherwise meet the requirements to be designated beneficiaries under Code Section 401(a)(9)(E).  Any distribution made pursuant to this Section, shall not be subject to the direct rollover requirements of Code Section 401(a)(31), the notice requirements of Code Section 402(f), or the mandatory withholding requirements of Code Section 3405(c)  If a Non-Spouse Designated Beneficiary receives a distribution from the Plan, then that distribution is not eligible for the sixty (60)-day rollover rule, which is available to a Beneficiary who is a Spouse.  The Administrator may establish rules and procedures with respect to the determination as to whether a trust is a Non-Spouse Designated Beneficiary under this Section.

**7.11**　　__Minimum Distribution Requirements__.

(a)　　__General Rules__.

(i)　　The requirements of this Section will take precedence over any inconsistent provisions of the Plan.

(ii)　　All distributions required under this Section will be determined and made in accordance with the Income Tax Regulations under Code Section 401(a)(9).

(iii)　　Notwithstanding the other provisions of this Section, distributions may be made under a designation made before January 1, 1984, in accordance with Section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act (TEFRA) and the provisions of the Plan that relate to Section 242(b)(2) of TEFRA.

(iv)　　Notwithstanding anything to the contrary herein, a Participant or Beneficiary who would have been required to receive a required minimum distribution under this

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

Section with respect to 2009 (a "2009 RMD") but for the enactment of Code Section 401(a)(9)(H), and who would have satisfied such requirement by receiving a required minimum distribution in accordance with the provisions of this Section, shall not receive such 2009 RMD (and the five (5)-year period specified in Section 7.11 shall be determined without regard to the 2009 calendar year) unless such Participant or Beneficiary elects in writing to receive such 2009 RMD in accordance with such rules as may be prescribed by the Administrator. In addition, notwithstanding anything to the contrary herein, and solely for the purposes of applying the direct rollover provisions of Section 7.9, any 2009 RMD that a Participant or Beneficiary shall elect to receive in accordance with this Section shall be treated as an Eligible Rollover Distribution.

(v)     Notwithstanding anything herein to the contrary, a Participant or Beneficiary who would have been required to receive a required minimum distribution in 2020 (or paid in 2021 for the 2020 calendar year for a Participant with a required beginning date of April 1, 2021) but for the enactment of Code Section 401(a)(9)(I) (a "2020 RMD"), and who would have satisfied that requirement by receiving distributions in accordance with the provisions of this Section 7.11, shall not receive such 2020 RMD unless such Participant elects to receive such 2020 RMD in accordance with such rules as may be prescribed by the Plan Administrator. In addition, notwithstanding anything to the contrary herein, and solely for the purposes of applying the direct rollover provisions of Section 7.9, any 2020 RMD that a Participant or Beneficiary elects to receive in accordance with this paragraph shall be treated as an Eligible Rollover Distribution only to the extent such distribution would be an Eligible Rollover Distribution in the absence of Code Section 401(a)(9)(I). Notwithstanding anything herein to the contrary, a Participant or Beneficiary shall be given an opportunity to make an election as to whether or not to receive such distributions.

(b)     <u>Definitions</u>.

(i)     <u>Designated Beneficiary</u>.   "Designated Beneficiary" means the individual who is designated as the Participant's Beneficiary under Sections 2.5 and 7.6 and who is the Participant's designated beneficiary under Code Section 401(a)(9) and Income Tax Regulations Section 1.401(a)(9)-4.

(ii)     <u>Distribution Calendar Year</u>. "Distribution Calendar Year" means a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year that contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first Distribution Calendar Year is the calendar year in which distributions are required to begin under paragraph (c)(ii). The required minimum distribution for the Participant's first Distribution Calendar Year will be made on or before the Participant's Required Beginning Date. The required minimum distribution for other Distribution Calendar Years, including the required minimum distribution for the Distribution Calendar Year in which the Participant's Required Beginning Date occurs, will be made on or before December 31 of that Distribution Calendar Year.

(iii)     <u>Five Percent Owner</u>. "Five Percent Owner" means a Participant who, for purposes of this Section, is a five percent owner as defined in Code Section 416(i) (determined in accordance with Code Section 416 but without regard to whether the Plan is Top-

US.322200570.24

Heavy) at any time during the Plan Year ending with or within the calendar year in which such Participant attains age sixty-six and one-half (66½) or any subsequent Plan Year.

(iv)   <u>Life Expectancy</u>.  "Life Expectancy" means life expectancy as computed by use of the Single Life Table in Section 1.401(a)(9)-9 of the Income Tax Regulations.

(v)   <u>Participant's Account Balance</u>.  "Participant's Account Balance" means the Participant's Account balance as of the last Valuation Date in the calendar year immediately preceding the Distribution Calendar Year ("Valuation Calendar Year") increased by the amount of any Contributions made and allocated or forfeitures allocated to the Account balance as of dates in the Valuation Calendar Year after the Valuation Date and decreased by distributions made in the Valuation Calendar Year after the Valuation Date.  The Account balance for the Valuation Calendar Year includes any amounts rolled over or transferred to the Plan either in the Valuation Calendar Year or in the Distribution Calendar Year if distributed or transferred in the Valuation Calendar Year.

(vi)   <u>Required Beginning Date</u>.  Effective January 1, 2020, "Required Beginning Date" means:

(A)   <u>for Five Percent Owners</u>, the first day of April following the calendar year in which the Participant attains age 72 (or age seventy and one-half (70½) if the Participant reached age 70½ before January 1, 2020).  Once begun, distributions to a Five Percent Owner under this Section must continue to be distributed, even if the Participant ceases to be a Five Percent Owner in a subsequent year.

(B)   <u>for Non-Five Percent Owners</u>, the first day of April of the calendar year following the later of the calendar year in which the Participant attains age 72 (or age seventy and one-half (70½) if the Participant reached age 70½ before January 1, 2020) or the calendar year in which occurs the Participant's Severance Date.

(c)   <u>Time and Manner of Distribution</u>.

(i)   <u>Required Beginning Date</u>.  The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's Required Beginning Date.

(ii)   <u>Death of Participant Before Distributions Begin</u>.  Effective January 1, 2020, if the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

(A)   If the Participant's Surviving Spouse is the Participant's sole Designated Beneficiary, then, except as may be provided in paragraph (e)(ii), distributions to the Participant's Surviving Spouse will begin by December 31st of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 72 (or age seventy and one-half (70½) if the Participant reached age 70½ before January 1, 2020), if later.

55

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

(B)     If the Participant's Surviving Spouse is not the Participant's sole Designated Beneficiary, then, except as may be provided in paragraph (e)(ii), distributions to the Designated Beneficiary will begin by December 31st of the calendar year immediately following the calendar year in which the Participant died.

(C)     If there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest will be distributed by December 31st of the calendar year containing the fifth (5th) anniversary of the Participant's death.

(D)     If the Participant's Surviving Spouse is the Participant's sole Designated Beneficiary and the Participant's Surviving Spouse dies after the Participant but before distributions to the Participant's Surviving Spouse begin, this paragraph (c)(ii), other than paragraph (c)(ii)(A), will apply as if the Participant's Surviving Spouse were the Participant.

For purposes of this paragraph (c)(ii) and paragraph (e), unless paragraph (c)(ii)(D) applies, distributions are considered to begin on the Participant's Required Beginning Date. If paragraph (c)(ii)(D) applies, distributions are considered to begin on the date distributions are required to begin to the Participant's Surviving Spouse under paragraph (c)(ii)(A). If distributions under an annuity purchased from an insurance company irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's Surviving Spouse before the date distributions are required to begin to the Participant's Surviving Spouse under paragraph (c)(ii)(A)), the date distributions are considered to begin is the date distributions actually commence.

(iii)     <u>Forms of Distribution</u>.     Unless the Participant's interest is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the Required Beginning Date, as of the first Distribution Calendar Year distributions will be made in accordance with paragraphs (d) and (e). If the Participant's interest is distributed in the form of an annuity purchased from an insurance company, distributions thereunder will be made in accordance with the requirements of Code Section 401(a)(9) and the Income Tax Regulations.

(d)     <u>Required Minimum Distributions During Participant's Lifetime</u>.

(i)     <u>Amount of Required Minimum Distribution for Each Distribution Calendar Year</u>.  During the Participant's lifetime, the minimum amount that will be distributed for each Distribution Calendar Year is the lesser of:

(A)     the quotient obtained by dividing the Participant's Account Balance by the distribution period in the Uniform Lifetime Table set forth in Section 1.401(a)(9)-9 of the Income Tax Regulations, using the Participant's age as of the Participant's birthday in the Distribution Calendar Year; or

(B)     if the Participant's sole Designated Beneficiary for the Distribution Calendar Year is the Participant's Spouse, the quotient obtained by dividing the Participant's Account Balance by the number in the Joint and Last Survivor Table set forth in Section 1.401(a)(9)-9 of the Income Tax Regulations, using the Participant's and his or her

56

DocuSign Envelope ID: C2054786-7C79-47F2-9475-ABDBBF643580

Spouse's attained ages as of the Participant's and his or her Spouse's birthdays in the Distribution Calendar Year.

   (ii) <u>Lifetime Required Minimum Distributions Continue Through Year of Participant's Death</u>.  Required minimum distributions will be determined under this paragraph (d) beginning with the first Distribution Calendar Year and up to and including the Distribution Calendar Year that includes the Participant's date of death.

  (e) <u>Required Minimum Distributions After Participant's Death</u>.

   (i) <u>Death On or After Date Distributions Begin</u>.

    (A) <u>Participant Survived by Designated Beneficiary</u>.

     (1) If the Participant dies on or after the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the longer of the remaining Life Expectancy of the Participant or the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as follows:

     a. The Participant's remaining Life Expectancy is calculated using the age of the Participant in the year of death, reduced by one (1) for each subsequent year.

     b. If the Participant's Surviving Spouse is the Participant's sole Designated Beneficiary, the remaining Life Expectancy of the Participant's Surviving Spouse is calculated for each Distribution Calendar Year after the year of the Participant's death using the Participant's Surviving Spouse's age as of the Participant's Surviving Spouse's birthday in that year.  For Distribution Calendar Years after the year of the Participant's Surviving Spouse's death, the remaining Life Expectancy of the Participant's Surviving Spouse is calculated using the age of the Participant's Surviving Spouse as of the Participant's Surviving Spouse's birthday in the calendar year of the Participant's Surviving Spouse's death, reduced by one (1) for each subsequent calendar year.

     c. If the Participant's Surviving Spouse is not the Participant's sole Designated Beneficiary, the Designated Beneficiary's remaining Life Expectancy is calculated using the age of the Beneficiary in the year following the year of the Participant's death, reduced by one (1) for each subsequent year.

    (B) <u>No Designated Beneficiary</u>.  If the Participant dies on or after the date distributions begin and there is no Designated Beneficiary as of September 30 of the year after the year of the Participant's death, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the Participant's remaining Life Expectancy calculated using the age of the Participant in the year of death, reduced by one (1) for each subsequent year.

US.322200570.24

(ii)    <u>Death Before Date Distributions Begin</u>.

(A)    <u>Participant Survived by Designated Beneficiary</u>.  If the Participant dies before the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as provided in paragraph (e)(i) above.

(B)    <u>No Designated Beneficiary</u>.  If the Participant dies before the date distributions begin and there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth (5th) anniversary of the Participant's death.

(C)    <u>Death of Participant's Surviving Spouse Before Distributions to Participant's Surviving Spouse Are Required to Begin</u>.  If the Participant dies before the date distributions begin, the Participant's Surviving Spouse is the Participant's sole Designated Beneficiary, and the Participant's Surviving Spouse dies before distributions are required to begin to the Participant's Surviving Spouse under paragraph (c)(ii)(A), this paragraph (e)(ii) will apply as if the Participant's Surviving Spouse were the Participant.

**7.12**    **<u>Distribution to Minor or Incompetent</u>**.  If any individual to whom a benefit is payable under the Plan is a minor, or if the Administrator determines that any individual to whom a benefit is payable under the Plan is incompetent to receive such payment or to give a valid release thereof, then the Administrator may direct that such distribution be paid to the legal guardian, or, if none, to a parent of such minor or incompetent, or a responsible adult with whom the minor or incompetent resides, or to a custodian for a minor under the Uniform Transfers to Minors Act (or other statutes of similar relevance), if permitted by the laws of the state in which the minor or incompetent resides.  Payment to the legal guardian, parent or custodian of a minor Beneficiary shall fully discharge the Trustee, the Administrator, the Employer, and the Plan from liability on account thereof.

**7.13**    **<u>Location of Participant or Beneficiary Unknown</u>**.  If a Participant or Beneficiary who is entitled to a distribution cannot be located and the Administrator has made reasonable efforts (in accordance with Department of Labor guidelines and Internal Revenue Service guidelines, as applicable) to locate the Participant or Beneficiary, then the Participant's or Beneficiary's interest shall be forfeited and used in the manner provided in Section 6.2(a).  If the Participant or Beneficiary makes a claim for the Account (such claim shall be made in accordance with the Administrator's procedures at such time) subsequent to the forfeiture, then the Employer shall cause the Account to be reinstated, without interest.

**7.14**    **<u>Distributions Related to Military Service</u>**.

(a)    <u>Limit</u>.  Notwithstanding anything to the contrary in the Plan, in the case of a Participant who, on or after January 1, 2007, dies while performing Qualified Military Service, the survivors of the Participant shall be entitled to any additional benefits provided under the Plan

DocuSign Envelope ID: C2054786-7C79-47F2-9475-A9DBBF643580

determined as if the Participant had resumed employment on the day before his or her death and then terminated employment on account of death.

(b)    <u>Financial Need</u>.  Notwithstanding anything to the contrary in the Plan, a Participant who is on active military duty (as defined in Chapter 43 of Title 38 of the United States Code) for a period of thirty (30) days or longer shall be deemed to have severed from employment solely for such purposes hereunder and shall be entitled to request a distribution of his or her vested Account balance in accordance with this Article VII; provided, however, that if such Participant receives a distribution of all or any portion of his or her vested Account balance pursuant to this paragraph while still in actual employment, then such Participant may not elect to make any Deferral Contributions or Roth Contributions to the Plan during the six (6)-month period beginning on the date of such distribution.

(c)    Effective as of January 1, 2008, if a Participant is a member of a reserve component (as defined in section 101 of Title 37, United States Code) and by virtue of such status, the Participant is called or ordered to active duty for a period in excess of 179 days or for an indefinite period after September 11, 2001, then the following shall apply:

(i)    The Participant shall be permitted at any time during the period beginning on the date of such order or call and ending at the close of active duty, a withdrawal of all or any portion of the Participant's Deferral Account and/or Roth Account without violating the distribution restrictions of Code Section 401(k)(2)(B)(i) (a "Qualified Reservist Distribution").

(ii)    Any Participant who receives a Qualified Reservist Distribution may, at any time within the two (2)-year period beginning on the date after his or her active duty ends, make one or more contributions to the Plan to repay all or any portion of such Qualified Reservist Distribution.  The dollar limitations under Code Section 402(g) and Section 4.3 shall not apply with respect to such repayment(s).

59

DocuSign Envelope ID: 62054786-7C79-47F2-9475-ABDBBF643580

## ARTICLE VIII

### HARDSHIPS, LOANS, IN-SERVICE WITHDRAWALS

**8.1**   **Hardship Withdrawals**.

(a)   <u>Procedures</u>.  Upon hardship of an Eligible Participant (as set forth in this Section), that Eligible Participant may, under the direction of the Administrator, make a withdrawal from the Participant's Deferral Account, Roth Account and Catch-Up Account, including Earnings thereon, and effective on and after January 1, 2023, from any vested amounts in the Eligible Participant's Account.  An Eligible Participant shall be entitled to a hardship withdrawal only if he or she is an Employee and if the withdrawal is on account of an immediate and heavy financial need of the Participant (as defined in paragraph (b) below).  The Participant shall furnish the Administrator with satisfactory proof, as determined by the Administrator, that the hardship withdrawal meets the requirements of paragraphs (b) and (c) below; provided, however, that effective January 1, 2020, the Participant must represent that he or she has insufficient cash or other assets reasonably available to satisfy his or her financial need, and the Administrator may rely on this representation unless the Administrator has actual knowledge to the contrary.

(b)   <u>Financial Need</u>.  An immediate and heavy financial need shall be deemed to include any one or more of the following:

(i)   expenses incurred (or to be incurred) by the Participant, the Participant's Spouse, Beneficiary, or any dependent of the Participant (as described in Code Section 152, without regard to Code Sections 152(b)(1), 152(b)(2) and 152(d)(1)(B)) for medical care described in Code Section 213(d) (determined without regard to whether the expenses exceed seven and one-half percent (7½%) of adjusted gross income) or amounts necessary to secure medical care;

(ii)   costs (excluding mortgage payments) relating to the purchase of a principal residence for the Participant;

(iii)   payment of tuition and related educational fees (including room and board), for up to the next twelve (12) months of post-secondary education for the Participant, his or her Spouse, Beneficiary, or dependent (as defined in Code Section 152, without regard to Code Sections 152(b)(1), 152(b)(2) and 152(d)(1)(B));

(iv)   payments necessary to prevent the eviction of the Participant from his or her principal residence or foreclosure on the mortgage or deed of trust on that principal residence;

(v)   payments for burial or funeral expenses for the Participant's deceased parent, Beneficiary, Spouse, children or dependents (as defined in Code Section 152, with regard to Code Section 152(d)(1)(B));

(vi)   expenses for the repair of damage to the Participant's principal residence that would qualify for the casualty deduction under Code Section 165 (determined

US.322200570.24

without regard to whether the loss exceeds ten percent (10%) of adjusted gross income and without regard to whether the loss is the result of a federally-declared disaster);

(vii)    expenses and losses (including loss of income) incurred by the Participant on account of a disaster declared by the Federal Emergency Management Agency (FEMA) provided the Participant's principal residence or principal place of employment at the time of the disaster was located in an area designated by FEMA for individual assistance with respect to the disaster; or

(viii)    the inability of the Participant to meet such other expenses, debts or other obligations recognized by the Department of Treasury or Internal Revenue Service as giving rise to immediate and heavy financial need for purposes of Code Section 401(k).

(c)    Requirements.  A distribution shall be considered as necessary to satisfy an immediate and heavy financial need of the Participant only if the Participant has obtained all distributions (including the total amount available under Sections 8.3 and 8.4), other than hardship withdrawals, under all plans maintained by the Employer.

For hardship withdrawals taken on or after January 1, 2019, Participants may continue to make Deferral Contributions, Roth Contributions, and Catch-Up Contributions under this Plan and elective contributions and employee contributions under all other plans of the Employer after receipt of a hardship withdrawal.  In addition, any suspension of Deferral Contributions, Roth Contributions, and Catch-Up Contributions as a result of a Participant's hardship withdrawal taken prior to January 1, 2019 that remains in effect on December 31, 2018 shall terminate as of January 1, 2019, regardless of whether or not such suspension was in effect for six months after such withdrawal, and Deferral Contributions, Roth Contributions, and Catch-Up Contributions for such a Participant will resume in accordance with the Participant's election, if any, after such suspension is removed in accordance with the Plan's procedures.

(d)    Amount.  The amount of the withdrawal shall not exceed the amount of an immediate and heavy financial need.  This may include amounts necessary to pay any Federal, state and local income taxes or penalties reasonably anticipated to result from the withdrawal, as determined by the Administrator.  The Administrator may establish a minimum amount for a hardship withdrawal.

(e)    Allocation.  The amount of the withdrawal shall be allocated among the Participant's investment funds in proportion to the value of the Participant's Accounts from which the withdrawal is made in each investment as of the date of the withdrawal.

**8.2    Loans.**

(a)    Procedures.  The Administrator may direct the Trustee to make loans to Participants who are Employees and to parties-in-interest (as defined in ERISA Section 3(14)) with respect to the Plan who are non-Employee Participants or Beneficiaries of deceased Participants (a "Loan Applicant"); provided, however, that:

(i)    such loans are available on a reasonably equivalent basis;

(ii)     such loans are not made available to Highly Compensated Employees, officers or shareholders in an amount greater than the amount made available to other Employees;

(iii)    such loans bear a reasonable rate of interest;

(iv)    such loans are adequately secured; and

(v)     a Loan Applicant's aggregate outstanding loans shall not exceed the lesser of (A) fifty percent (50%) of the present value of the Loan Applicant's vested Account, or (B) Fifty Thousand Dollars ($50,000) reduced by the excess, if any, of (1) the highest principal amount of the Loan Applicant's aggregate outstanding loans (including defaulted loans) under all tax-qualified plans of the Employer at any time during the immediately preceding twelve (12) months, over the aggregate principal amount outstanding under such loans on the date the new loan is made, plus (2) the amount of unpaid accrued interest on a defaulted loan.  Notwithstanding the foregoing, for a Participant who is a Qualified Individual, for any loan made from April 30, 2020, through September 22, 2020, the maximum loan amount determined under this subsection (a) shall be determined by substituting 100% for 50% in subsection (A) and by substituting $100,000 for $50,000 in subsection (B), as determined by the Administrator in accordance with such procedures as may be established by the Administrator and the CARES Act and other guidance issued thereunder.

(b)     Foreclosure.  In the event of default, foreclosure on the note and attachment of security shall not occur until a distributable event occurs under the Plan.

(c)     Security.  Notwithstanding any contrary provision of this Plan, the portion of the Loan Applicant's eligible vested Account balance used as a security interest held by the Plan by reason of a loan outstanding to the Loan Applicant shall be taken into account for purposes of determining the amount of the Loan Applicant's vested Account balance payable at the time of distribution, but only if the reduction is used as repayment of the loan.

(d)     Applicable Law.  All such loans shall be subject to ERISA, the Code, and such terms and conditions not inconsistent therewith (and subject to this Section), as determined by the Administrator.

(e)     Policies.  The Administrator shall adopt policies and guidelines which establish and detail the terms of Plan loans hereunder, and which shall be deemed a part of this Plan.  The Administrator may amend such policies and guidelines from time to time.

**8.3**     **In-Service Withdrawals At and After Age Fifty-Nine and One-Half (59½)**.  A Participant may withdraw all or a portion of his or her vested Account balance at any time subsequent to his or her attainment of age fifty-nine and one-half (59½).  Any such withdrawal shall be a cash lump sum in the amount specified by the Participant, up to the value of his or her vested Account balance; provided, however, that to the extent that at the time of his or her withdrawal under this Section all or any portion of such Account is invested in Company Stock, such distribution may, at the election of the Participant, be in the form of whole shares of Company Stock, with any fractional shares distributed in the form of cash.

DocuSign Envelope ID: G2054786-7C79-47F2-9475-ABDBBF643580

**8.4**     **In-Service Withdrawals from Rollover Contributions Account**.

(a)     A Participant may withdraw all or a part of his or her Rollover Contributions Account at any time, subject to any requirements of the Administrator.  Any such withdrawal shall be a cash lump sum in the amount specified by the Participant, up to the value of his or her Rollover Contributions Account balance; provided, however, that to the extent that at the time of his or her withdrawal under this Section all or any portion of such Account is invested in Company Stock, such distribution may, at the election of the Participant, be in the form of whole shares of Company Stock, with any fractional shares distributed in the form of cash.

(b)     Payments shall be made in such order as the Administrator shall determine. Notwithstanding the foregoing, except as permitted by Income Tax Regulations Section 1.411(d)-4, amounts attributable to elective contributions (as defined in Income Tax Regulations Section 1.401(k)-6), including amounts treated as elective contributions that are transferred from another tax-qualified plan to this Plan in a plan-to-plan transfer shall be subject to the distribution limitations provided for in Income Tax Regulations Section 1.401(k)-1(d).

**8.5**     **Coronavirus-Related Distributions**.   A Participant who is a Qualified Individual may elect, in accordance with procedures established by the Plan Administrator, to withdraw a portion of his or her Account during the period beginning on April 6, 2020, and ending on December 30, 2020 as a "Coronavirus-Related Distribution" (within the meaning of Section 2202(a)(4)(A) of the CARES Act); provided, however, that the amount of any such Coronavirus-Related Distribution(s) may not exceed the lesser of: (a) $100,000 (in the aggregate, taking into account all such Coronavirus-Related Distributions under all eligible retirement plans in which he or she participates, as certified by the Participant in accordance with administrative procedures), or (b) the balance of the Participant's vested Account.   A Participant who (i) received a Coronavirus-Related Distribution from the Plan or any other plan or arrangement and (ii) is otherwise eligible to make a Rollover Contribution to the Plan, may elect to make one or more contributions to the Plan in an aggregate amount not to exceed the amount of such Coronavirus-Related Distributions during the three-year period beginning on the day after the date the Participant received the Coronavirus-Related Distribution, to the extent permitted under the CARES Act and any reasonable procedures established by the Plan Administrator.  Any such contributions shall be credited to the Participant's Rollover Contribution Account, shall be deemed to have been transferred to the Plan within 60 days of the date the Coronavirus-Related Distribution was received by the Participant, and shall be treated in the same manner as Rollover Contributions under the Plan.  The tax treatment, reporting, and administration for any such coronavirus-related distribution shall be determined by the Plan Administrator in accordance with the CARES Act, Notice 2020-50 and any subsequent guidance issued by the Internal Revenue Service, and any procedures established by the Plan Administrator.

US.322200570.24

DocuSign Envelope ID: C2054786-7C79-4FF2-9475-ABDBBF643580

# ARTICLE IX

## ADMINISTRATION

**9.1**     **Powers of the Administrator**.  In addition to the powers described in Section 9.2 and all other fiduciary powers of the Administrator specified elsewhere in the Plan or the Trust Agreement, the Administrator shall be responsible for the administration and interpretation of the Plan and for carrying out its provisions, and shall have such powers as may be necessary or appropriate to discharge its duties hereunder, including, without limitation, the following:

(a)     to file, or cause to be filed, all reports and to distribute to Participants and Beneficiaries information required under ERISA;

(b)     to monitor the Plan's compliance with the limitations of Article V (to the extent applicable) and to maintain such records as it deems necessary or appropriate to demonstrate compliance with Article V;

(c)     to prescribe such procedures as the Administrator deems necessary or appropriate to be followed by Participants, Beneficiaries and Alternate Payees, including, without limitation, designation of Beneficiaries, loans, hardships, Qualified Domestic Relations Orders, rollovers, determinations of eligibility and investment elections;

(d)     to make a determination as to the right of any Participant, Beneficiary (or contingent Beneficiary) or other affected individual to eligibility or a benefit (including the form and manner of such election, direction, consent, and/or Beneficiary designation) in accordance with the Plan;

(e)     to request and receive such information as is necessary or appropriate for the proper administration of the Plan, including, without limitation, such information as the Administrator may require to determine each employee's eligibility to participate in the Plan and the benefits payable to each Participant or his or her Beneficiary (or contingent Beneficiary);

(f)     to direct the Trustee as to the method in which, and individuals to whom, Plan assets shall be distributed;

(g)     to establish a funding policy and, if deemed appropriate, an investment policy;

(h)     to select and withdraw from investment funds or vehicles;

(i)     to appoint (and change) an administrator for Plan loans (the "Loan Administrator") who may establish and amend the Plan's loan procedures and guidelines as may be necessary or appropriate from time to time, and who may delegate certain duties and responsibilities to implement those procedures and guidelines;

(j)     to receive and review reports on the financial condition of the Trust and statements of the receipts and disbursements of the Trust from the Trustee;

US.322200570.24

(k)     to appoint or employ one or more Investment Managers (as defined in ERISA Section 3(38), without regard to subparagraph (A)) to render investment advice with respect to all or any part of the assets of the Plan (and related Trust) for which the Administrator has investment discretion;

(l)     to employ agents, attorneys, accountants, actuaries, registered investment advisers, or other persons and allocate or delegate to them such powers, rights, and duties as the Administrator considers necessary or advisable to properly carry out the design, operation, or administration of the Plan; and

(m)     to arrange for the purchase of a bond under ERISA Section 412.

**9.2     Absolute Discretion of the Administrator**.  The Administrator shall, in its sole and absolute discretion, construe and interpret the terms and provisions of the Plan and to do all things necessary or appropriate to effect the intent and purpose thereof whether or not such powers are specifically set forth in the Plan and Trust Agreement, including any issue arising out of, relating to, or resulting from the administration and operation of the Plan.  Such construction and/or interpretation shall be final, conclusive and binding on all persons, entities and parties, including, without limitation, any Participating Employer, Eligible Participant, Participant, employee, Eligible Employee, Beneficiary (or contingent Beneficiary), Alternate Payee, or successors or assigns thereto, and shall be given the maximum possible deference allowed by law.  When making a determination or calculation, the Administrator shall, in its sole and absolute discretion, be entitled to rely upon information furnished by Participating Employers, third-party administrators, Trustees, Participants, Beneficiaries (or contingent Beneficiaries), Alternate Payees, Employees, or other individuals or entities, including those acting on behalf of such persons, entities or parties.

**9.3     Plan Sponsor, Administrator and Committee**.

(a)     <u>Plan Sponsor</u>.  The Company is the sponsor and settlor of the Plan.  Any reference or discussion in the Plan to settlor (*i.e.*, non-fiduciary) functions, duties or responsibilities shall be interpreted to mean the Company in its role as settlor of the Plan.  The Board has delegated the Company's duties and responsibilities as the sponsor and settlor of the Plan to any executive officer of the Company; provided, however, that such executive officer does not also serve as a member of the Committee.

(b)     <u>Establishment of Committee</u>.  The Board on behalf of the Company has established and assigned to the Committee the duties of the Administrator under the Plan.  The Board has appointed the Company's Chief Financial Officer as the Chairperson of the Committee.  As such, the Chairperson shall maintain, compose and operate the Committee in such manner as he or she determines.  An individual may be a member of the Committee regardless of whether such individual is or may be a Participant in the Plan.  The Committee shall operate in accordance with its bylaws.

(c)     <u>Duties of Committee</u>.  The Committee shall elect a secretary who may be, but need not be, one of the members of the Committee.  The Committee may retain counsel, recordkeepers, auditors, consultants, and advisors and provide for such clerical, accounting, and consulting services as it may require in carrying out the provisions of the Plan and applicable law;

and may allocate among itself or delegate to other persons all or such portion of its duties under the Plan, other than those granted to the Trustee under the Trust Agreement, as the Committee shall decide. The Committee's discretionary duties shall include (but not be limited to) the following:

> (i) responsibility for the administration and interpretation of the Plan as further described in this Article and accounting for the Plan;

> (ii) responsibility for reporting and disclosure as required by ERISA, and assuring compliance with the reporting and disclosure requirements of ERISA, including all financial reports and financial disclosure requirements;

> (iii) responsibility for and adoption of a program for the administration of the Plan;

> (iv) establishment and maintenance of all Plan documents;

> (v) implementation of a claims procedure for the Plan subject to ERISA, as outlined in Article XIV; and

> (vi) correction of any mistakes and curing of any defects in the administration of the Plan.

> (d) [RESERVED]

> (e) No Payment. No fee or compensation shall be paid to any member of the Committee who is an Employee for his or her services as a member of the Committee; provided, however, each such Committee member shall be entitled to reimbursement for any reasonable expenses incurred in connection with his or her duties as a Committee member.

> (f) Term as Committee Member. The Board may remove the Chairperson at any time, for any reason. Any member of the Committee, other than the Chairperson, may resign at any time, for any reason, by delivering his or her written notice of resignation to the Chairperson and the Secretary of the Committee, which shall be effective prospectively (unless otherwise agreed to by the Chairperson). If a member of the Committee who is an Employee of the Employer ceases his or her employment with the Employer, then he or she shall be deemed to have resigned from the Committee as of the same date as his or her cessation of employment, unless otherwise mutually agreed to by the Chairperson and that Committee member.

> (g) Procedures. The Chairperson of the Committee shall establish procedures for the Committee, including the appointment of members, and the time and place for its meetings. The Secretary shall be responsible for keeping minutes of all meetings. A majority of the members of the Committee shall constitute a quorum for the transaction of business at a meeting of the Committee. Any action of the Committee may be taken upon affirmative vote of a majority of the members of the Committee present at a meeting or, at the direction of its Chairperson, without a meeting, by mail (electronic or otherwise), telephone or facsimile; provided, however, that all members of the Committee are informed by mail (electronic or otherwise), telephone or facsimile of their right to vote on the proposal(s) and of the outcome of the vote(s) thereon.

**9.4**     **Participant-Directed Accounts**.

      (a)     <u>Participant-Directed Investments</u>.   The Plan is intended to provide participant-directed investments that are designed so that the Plan satisfies the requirements under ERISA Section 404(c). Each Participant shall have the right to direct the investment of his or her Accounts among such investments as are authorized by the Administrator, subject to such procedural guidelines as the Administrator shall establish from time to time. The Administrator shall establish such procedures as it may deem appropriate or necessary for the Participants to direct the investment of their respective Account balances in accordance with this Section and the Plan. Notwithstanding the foregoing, Company Stock is a frozen investment under the Plan. Accordingly, any Participant who holds Company Stock in his or her Account may continue to hold such Company Stock or elect to liquidate any or all of his or her Company Stock in accordance with the Company's insider trading policy. However, such Participant shall not be able to reinvest any Account balance to Company Stock once he or she has liquidated the Company Stock.

      (b)     <u>Default Investments</u>. To the extent that a Participant has not directed among such investments as are then-available under the Plan at the time of contribution (including any Deferral Contribution occurring as a result of automatic enrollment pursuant to Section 4.3(b)) or to the extent that such directions have ceased to be operative, then such amount shall then be invested in accordance with the default fund selected by the Administrator, from time to time, until such time as that Participant makes a specific investment direction.

**9.5**     **Domestic Relations Orders**.

      (a)     <u>Definitions</u>.

      (i)     <u>Alternate Payee</u>.   "Alternate Payee" means any Spouse, former Spouse, child or other dependent (within the meaning of Code Section 152) of a Participant who is recognized by a Domestic Relations Order as having a right to receive any immediate or deferred payment of all or a portion of the balance credited to a Participant's Account under the Plan.

      (ii)     <u>Domestic Relations Order or Order</u>. "Domestic Relations Order" or "Order" means any judgment, decree or order (including approval of a property settlement agreement) which provides or otherwise conveys, pursuant to applicable state domestic relations laws (including community property laws), child support, alimony payments or marital property rights to an Alternate Payee.

      (iii)     <u>Qualified Domestic Relations Order (QDRO)</u>. "Qualified Domestic Relations Order" or "QDRO" means any Domestic Relations Order that meets the following requirements:

      (A)     such Order establishes (or otherwise recognizes the existence of) the right of an Alternate Payee to receive all or a portion of the vested balance credited to a Participant's Account under the Plan;

      (B)     such Order specifies (1) the name and last known mailing address of the Participant, (2) the name and last known mailing address of each Alternate Payee covered by such Order, (3) the amount or percentage of the Participant's vested Account balance

under the Plan payable to each such Alternate Payee or the manner in which such amount or percentage is to be calculated, and (4) any other requirement set forth in ERISA Section 206(d)(3) or Code Section 414(p); and

(C)      such Order does not require the Plan to (1) provide any type or form of benefit or option not otherwise available to the Participant under the Plan, (2) provide increased benefits not otherwise payable to the Participant under the Plan, or (3) pay benefits to an Alternate Payee which are required to be paid to another Alternate Payee pursuant to any Qualified Domestic Relations Orders previously issued with respect to the Participant's Account under the Plan.

(b)      <u>QDRO Procedures</u>.   The Administrator shall establish reasonable procedures for determining the qualified status of Domestic Relations Orders and for effecting distributions pursuant to all such Orders that are determined to be Qualified Domestic Relations Orders.

(c)      <u>Hold Procedures</u>.   Notwithstanding Plan provisions to the contrary, the Administrator may place a hold at any time on all or a portion of a Participant's Account, at such time and for such reasonable period of time as the Administrator may determine, if the Administrator receives written notice that:  (1) a Domestic Relations Order is being sought by the Participant, his or her Spouse, former Spouse, child or other dependent (within the meaning of Code Section 152); and (2) the Participant's Account is likely to be a source of payment under such Order.  For purposes of this paragraph, a "hold" means that withdrawals, loans or other distributions may be restricted in part or entirely with respect to a Participant's Account.  The Administrator shall notify a Participant if a hold is placed upon his or her Account and, if so, the extent to which such hold is in effect pursuant to this paragraph.

(d)      <u>Notification</u>.      Upon receipt of a Domestic Relations Order, the Administrator shall promptly notify the affected Participant and each Alternate Payee of the receipt of such Order and the procedures for determining whether such Order satisfies the requirements for recognition as a Qualified Domestic Relations Order.  Within a reasonable time after providing such notification, the Administrator shall, pursuant to such procedures, determine whether the Order is a Qualified Domestic Relations Order and shall notify the Participant and each Alternate Payee (and/or his or her representative, as applicable) of such determination.

(e)      <u>Alternate Payee Accounts</u>.  If the Administrator determines, within eighteen (18) months after the date the first payment to the Alternate Payee would otherwise be required to be made pursuant to the terms of the Order, that such Order is a Qualified Domestic Relations Order, then the Administrator shall establish a separate Account for the amount to be allocated to the Alternate Payee pursuant to the Order, and such Alternate Payee shall then be treated as a Participant for purposes of such Account.  In addition, a separate Account may be established during the period of time the Administrator is determining whether a domestic relations order qualifies as a QDRO.  Such a separate Account shall be valued and accounted for in the same manner as any other Account.

(i)      <u>Distribution Pursuant to QDROs</u>.  If a QDRO so provides, the portion of a Participant's Account payable to an Alternate Payee may be distributed, in a form

68

DocuSign Envelope ID: C2054786-7C79-4FF3-9475-ABDBBF643580

permissible under Article VII, to the Alternate Payee at the time specified in the QDRO, regardless of whether the Participant is entitled to a distribution from the Plan at such time.

(ii)     Participant Loans.  Except to the extent required by law, an Alternate Payee, on whose behalf a separate Account has been established, shall not be entitled to borrow from such Account pursuant to Section 8.2.  If a QDRO specifies that the Alternate Payee is entitled to any portion of the Account of a Participant who has an outstanding loan balance, all outstanding loans shall generally, to the extent permitted by law, continue to be held in the Participant's Account and shall not be divided between the Participant's and Alternate Payee's Accounts.

(iii)     Investment Direction.     Where a separate Account has been established on behalf of an Alternate Payee and has not yet been distributed, the Alternate Payee may direct the investment of such Account in the same manner as if he or she were a Participant.

(f)     Order Not a QDRO.  If the Administrator determines, within the eighteen (18)-month period provided under paragraph (e) above, that such Order is not a Qualified Domestic Relations Order or, if the qualified status of such Order cannot be determined prior to the expiration of such eighteen (18)-month period, then the Administrator shall remove any restrictions placed on the Participant's Accounts that were imposed in connection with the Order.  The Account shall remain part of the Trust and shall not be distributed until the Participant becomes entitled to benefits under the Plan in accordance with the provisions of Article VII or any applicable Appendix.  Should there be a subsequent determination that the Order is in fact a Qualified Domestic Relations Order, then such determination shall be applied on a prospective basis only.

US.322200570.24

## ARTICLE X

## LEAVES OF ABSENCE AND TRANSFERS

**10.1**   **Military Leave of Absence**.  An Employee who leaves the employment of the Employer for military service in the Armed Forces of the United States, as defined in the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended from time to time and the regulations issued thereunder ("USERRA"), shall, for all purposes of the Plan, be considered as having been in the employment of the Employer, with the time of the Participant's service in the military credited to his or her service under the Plan; provided, however, that upon such Employee being discharged from the military service of the United States, the Employee must take all appropriate action to be entitled to, and to be otherwise eligible for, re-employment rights, as provided by USERRA or any similar law from time to time in force.  Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service credit with respect to qualified military service shall be provided in accordance with Code Section 414(u).  In the case of a Participant who, on or after January 1, 2007, dies while performing such military service, the survivors of the Participant shall be entitled to any additional benefits provided under the Plan had the Participant resumed and then terminated employment on account of death.

**10.2**   **Other Leaves of Absence**.  For all purposes of this Plan and notwithstanding anything to the contrary in the Plan, an Employee on an Employer-approved leave of absence not described in Section 10.1 shall be considered as having continued in the employment of the Employer for the authorized period of such leave, as determined by the Employer.

**10.3**   **Transfers**.

(a)     In the event that:

(i)     a Participant is transferred to employment with an Employer that is not a Participating Employer, or to employment with a Participating Employer in a status other than as an Eligible Employee;

(ii)     an individual is transferred from employment with an Employer that is not a Participating Employer or from other employment to an Employer that is a Participating Employer;

(iii)     an individual is transferred from service with a Participating Employer in a status other than as an Eligible Employee to employment with another Participating Employer as an Eligible Employee; or

(iv)     an individual terminates his or her employment with an Employer that is not a Participating Employer, and is subsequently employed by a Participating Employer as an Eligible Employee;

(b)     then the following provisions shall apply:

(i)     any transfer to employment with:  (A) an Employer that is not a Participating Employer, or (B) a Participating Employer, but not as an Eligible Employee, shall

70

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

not be considered a termination of employment with the Employer, and such transferred individual shall continue to be entitled to the benefits provided under the Plan, as modified by this Section;

(ii)    any employment with an Employer that is not a Participating Employer or with a Participating Employer not as an Eligible Employee will be deemed to be employment by the Employer;

(iii)    amounts earned from an Employer at a time when it is not a Participating Employer, or from the Employer when he or she is not an Eligible Employee shall not constitute Deferral Compensation hereunder;

(iv)    no service for an Employer at a time when such individual is not an Employee shall be counted for purposes of eligibility and vesting hereunder, unless agreed to by the Company or required pursuant to an agreement entered into by the Employer and the Internal Revenue Service;

(v)    termination of employment with an Employer that is not a Participating Employer by an individual entitled to benefits under this Plan (other than to transfer to employment with another Employer) shall be considered as termination of employment with the Employer; and

(vi)    all other terms and conditions of this Plan shall fully apply to such individual and to any benefits to which he or she may be entitled hereunder.

US.322200570.24

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

# ARTICLE XI

## TRUST

**11.1** **Trust Agreement**.  The Administrator may at any time and from time to time select and appoint a Trustee to hold all or a portion of the assets of the Trust, and the Administrator (and the Company, as applicable) shall enter into a Trust Agreement with such Trustee.  The Administrator (and the Company, as applicable) may amend and/or restate the Trust Agreement, from time to time.  The Trust Agreement shall be a part of the Plan.

**11.2** **Fees and Expenses**.

(a)     All fees and expenses of the Administrator, the Company, each Participating Employer, and/or the Trustee incurred in the performance of each of their duties hereunder or under the Trust may, to the fullest extent permitted by law (and, with regard to the Trustee, to the extent permitted by the Trust Agreement), be charged against Participants' Accounts in such manner as the Administrator reasonably determines, unless the Company or a Participating Employer pays such fees and expenses.

(b)     In accordance with the rules and procedures established by the Administrator, each Participant's (or, if applicable, Beneficiary's) Account may be charged for fees and expenses for the following:  (i) the processing and maintaining of a loan pursuant to Section 8.2; (ii) the processing of an in-service withdrawal pursuant to Section 8.1, 8.3, or 8,4; (iii) the processing of a required minimum distribution pursuant to Section 7.11; (iv) a determination by the Administrator of a domestic relations order as a Qualified Domestic Relations Order at the time of implementation; or (v) for other Plan-related matters as may be specified by the Administrator from time to time.

**11.3** **Funding Policy**.  The Administrator shall cause the Participating Employers to contribute to the Plan for each Plan Year the appropriate amount determined in accordance with the terms and provisions of the Plan; provided, however, that this obligation shall cease whenever the Plan is terminated.  In the case of any partial termination of the Plan, this obligation shall cease with respect to those Participants who are affected by such partial termination.

US.322200570.24

# ARTICLE XII

## AMENDMENT, TERMINATION OR MERGER

**12.1    Amendment**.

(a)      The Company, by action of the Board taken at a meeting either held in person, or by telephone or other electronic means, or by unanimous written consent in lieu of a meeting, shall have full power and authority to amend the provisions of the Plan for any reason, at any time, either prospectively or retroactively, to such extent and in such manner as the Company shall deem advisable, in accordance with its normally established procedures.  The Company may delegate such power, in whole or in part, to one or more individuals or committees (comprised of its officers or other managerial personnel of the Employer).

(b)      The Board delegates to any executive officer of the Company (provided that such officer is not a member of the Committee at such time) the power and authority to approve and execute any amendment to the Plan if such amendment:

(i)      is required or designed to bring the Plan into compliance with the Code, ERISA or other applicable law; or

(ii)      is designed to facilitate administration, improve the operation or clarify any provision of the Plan; or

(iii)      is not reasonably expected to have a significant negative financial impact on the Company (unless otherwise required by a change in applicable law); or

(iv)      specifies whether an entity is or is not a Participating Employer under the Plan.

(c)      An amendment shall become effective, in accordance with its terms, as to all Participants and all other persons having or claiming an interest under the Plan, upon the effective date specified in the instrument evidencing such amendment.  However, no such amendment shall operate to:  (i) cause any part of the Trust to revert to or to be recoverable by a Participating Employer or to be used for, or diverted to, purposes other than the exclusive benefit of Participants and their Beneficiaries (or for defraying the reasonable administrative expenses of the Plan); (ii) reduce the then outstanding balances in the Accounts of Participants; (iii) change the duties, responsibilities or liabilities of the Trustee hereunder without the written consent of such Trustee; or (iv) affect, reduce or eliminate any benefits which are protected benefits pursuant to Code Section 411(d)(6) ("Protected Benefits"), except as permitted under Income Tax Regulations Section 1.411(d)-4.

**12.2    Termination of Plan**.

(a)      The Company may terminate this Plan at any time for any reason by resolution adopted by the Board, but the Trust may neither thereby be diverted from the exclusive benefit of the Participants, their Beneficiaries, survivors or estates (other than for defraying the reasonable administrative expenses of the Plan), nor revert to a Participating Employer.

US.322200570.24

DocuSign Envelope ID: C2054786-7C79-47F2-9475-A8DBBF643580

      (b)     Upon termination of the Plan (as determined by the Company) or the complete discontinuance of Employer Contributions under the Plan (as determined by the Administrator), the Accounts of each Participant shall be nonforfeitable.  The Administrator shall distribute each Participant's Accounts to the Participant pursuant to Article VII as soon as administratively feasible after the termination.

      (c)     Upon a partial termination of the Plan (as determined by the Company or the Administrator, as applicable) the Accounts of each affected Participant shall be nonforfeitable.

**12.3**    **Merger**.

      (a)     The Administrator shall have the full power and authority to effect from time to time, upon such terms and conditions deemed appropriate, the merger of any and all tax-qualified defined contribution plans (and related tax-exempt trusts) maintained by entities acquired by the Company into the Plan and Trust, and to take any and all such actions, and prepare, execute, and deliver all such documents as may be necessary or advisable to effect any and all such plan and related trust mergers from a fiduciary standpoint.

      (b)     Nothing contained herein shall prevent the merger or consolidation of the Plan with, or transfer of assets or liabilities of the Plan to, another plan meeting the requirements of Code Section 401(a) or the transfer to the Plan of assets or liabilities of another such plan so qualified under the Code.  Any such merger, consolidation or transfer shall be accompanied by the transfer of such existing records and information as may be necessary or appropriate to properly allocate such assets among Participants, including, without limitation, any tax or other information necessary for the Participants or persons administering the plan that is receiving such assets.  The terms of such merger, consolidation or transfer must be such that (if the Plan had then terminated), the requirements of this Article would be satisfied and each Participant (or, if applicable, his or her Beneficiary or an Alternate Payee) would receive a benefit immediately after the merger, consolidation or transfer equal to or greater than the benefit he or she would have received if the Plan had terminated immediately before the merger, consolidation or transfer.  Notwithstanding any provision in this Plan to the contrary, any amounts transferred to the Plan as a result of such merger, consolidation or transfer shall, to the extent the benefits accrued under the transferor plan are protected benefits under Code Section 411(d)(6) ("Protected Benefits") be preserved under this Plan, and shall not in any way be affected, reduced or eliminated, except as permitted under Income Tax Regulations Section 1.411(d)-4.

US.322200570.24

# ARTICLE XIII

## ADOPTION OF PLAN BY RELATED ENTITIES

**13.1** <u>**Adoption of the Plan**</u>. An Employer or affiliate of the Company shall become a Participating Employer with the approval of the Company in accordance with the following:

(a) An entity that is a member of the Company's controlled group of corporations (pursuant to Code Section 414(b)) shall automatically become a Participating Employer as soon as reasonably practicable after joining the Company's controlled group of corporations (pursuant to Code Section 414(b)) unless the Company determines that such Employer shall not be covered by the Plan. Any such Employers that are not Participating Employers are listed in Appendix A, as may be informally amended from time to time; and

(b) Any affiliate of the Company that is not a member of the Company's controlled group of corporations (pursuant to Code Section 414(b)) shall not become a Participating Employer unless specifically authorized pursuant to corporate action by the Company or by a Plan amendment. Any such affiliates that are Participating Employers are listed in Appendix A, as may be informally amended from time to time.

A Participating Employer must evidence its adoption of the Plan by either a corporate action or by commencement of Deferral Contributions and/or Roth Contributions on behalf of its Eligible Employees who elect to participate in the Plan with the consent of the Company. A Participating Employer agrees that by its participation in the Plan it shall be bound by all provisions of the Plan, the Trust Agreement, and other agreements, practices, and policies relating to the Plan. Notwithstanding the foregoing, all subsidiaries or groups of employees based outside the U.S. shall not be eligible to participate in the Plan without being specified in Appendix A.

**13.2** <u>**Withdrawal**</u>. A Participating Employer may withdraw from the Plan at any time for any reason subject to the approval of the Company and, as applicable, the Administrator. If the Participating Employer has or establishes a new qualified retirement plan for the benefit of such Participants, the Participating Employer may, subject to approval of the Company, initiate a trustee-to-trustee transfer to such other plan of such assets and liabilities as the Trustee determines, in its discretion, to be attributable to Participants who are or were Employees of the Participating Employer. Notwithstanding anything herein to the contrary, no assets of the Trust to be used for or diverted to purposes other than for the exclusive benefit of Participants and Beneficiaries (or for defraying the reasonable administrative expenses of the Plan).

# ARTICLE XIV

## CLAIMS PROCEDURE

**14.1** **Right to File Claim**. Every Participant or Beneficiary (or his or her representative who is authorized in writing by the Participant or Beneficiary to act on his or her behalf) (hereinafter collectively, "Claimant") shall be entitled to file with the Administrator (and subsequently with the individual(s) or entity designated to review claims appealed after being initially denied by the Administrator (the "Review Panel")) a written claim for benefits under the Plan. The Administrator and Review Panel shall each be able to establish such rules, policies and procedures, consistent with ERISA and the Plan, as it may deem necessary or appropriate in carrying out its duties and responsibilities under this Article. In the case of a denial of the claim or appeal, the Administrator or Review Panel, as applicable, shall provide the Claimant with a written or electronic notification that complies with Department of Labor Regulations Section 2520.104b-1(c)(1) and/or subsequent guidance.

**14.2** **Denial of Claim**.

(a) If a claim is denied by the Administrator, in whole or in part, then the Claimant shall be furnished with a denial notice that shall contain the following:

(i) specific reason(s) for the denial;

(ii) reference to the specific Plan provision(s) on which the denial is based;

(iii) a description of any additional material or information necessary for the Claimant to perfect the claim, and an explanation of why the material or information is necessary; and

(iv) an explanation of the Plan's claims review procedure and the time limits applicable to such procedures, including a statement of the Claimant's right to bring a civil action under ERISA Section 502(a) following a denial on review (as set forth in Section 14.3 below).

(b) The denial notice shall be furnished to the Claimant no later than ninety (90) days after receipt of the claim by the Plan, unless the Administrator determines that special circumstances require an additional 90-day extension of time for processing the claim. If the Administrator determines that an extension of time for processing is required, then notice of the extension shall be furnished to the Claimant prior to the termination of the initial ninety (90)-day period. In no event shall such extension exceed a period of ninety (90) days from the end of such initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the benefits determination.

In the event that an extension is needed due to a Claimant's failure to submit information necessary to decide a claim, the period for making the benefit determination shall be tolled from the date on which the notification of the extension is sent to the Claimant until the date on which the Claimant responds to the request for additional information.

**14.3    Claim Review Procedure**.

(a)    The Claimant may request review of the denial at any time by appealing to the Administrator and/or Review Panel within sixty (60) days following the date the Claimant received notice of the denial of his or her claim.  The Administrator and/or Review Panel shall afford the Claimant a full and fair review of the decision denying the claim and, shall:

(i)    provide the Claimant with the opportunity to submit written comments, documents, records and other information relating to the claim for benefits;

(ii)    provide that the Claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information (other than documents, records and other information that is legally privileged) relevant to the Claimant's claim for benefits; and

(iii)    provide for a review that takes into account all comments, documents, records and other information submitted by the Claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(b)    If the claim is subsequently also denied by the Review Panel, in whole or in part, then the Claimant shall be furnished with a denial notice that shall contain the following:

(i)    specific reason(s) for the denial;

(ii)    reference to the specific Plan provision(s) on which the denial is based;

(iii)    a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits;

(iv)    an explanation of the Plan's claims review procedure and the time limits applicable to such procedures, including a statement of the Claimant's right to bring a civil action under ERISA Section 502(a) following the denial on review.

(c)    The decision on review shall be issued within sixty (60) days following receipt of the request for review.  The period for decision may, however, be extended for an additional sixty (60) days after such receipt if the Review Panel determines that special circumstances require extension.  Notice of the extension shall be furnished to the Claimant prior to the expiration of the initial sixty (60)-day period.  In no event shall such extension exceed a period of sixty (60) days from the end of such initial period.  The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the benefits determination.

In the event that an extension is needed due to a Claimant's failure to submit information necessary to decide a claim on review, the period for making the appeal determination shall be

tolled from the date on which the notification of the extension is sent to the Claimant until the date on which the Claimant responds to the request for additional information,

**14.4** **Special Procedure for Claims Due to Disability**.

(a)    To the extent an application for accelerated vesting (and, if applicable, any right provided in an Appendix hereto) as a result of an alleged disability ("Disability Benefits") requires the Administrator or the Review Panel, as applicable, to make a determination of Disability Benefits under the terms of the Plan, then such determination shall be subject to all of the general rules described in this Article, except as they are expressly modified by this Section.

(b)    If the Claimant's claim is for Disability Benefits, then the initial decision on a claim for Disability Benefits will be made within forty-five (45) days after the Plan receives the Claimant's claim, unless special circumstances require additional time, in which case the Administrator will notify the Claimant before the end of the initial forty-five (45)-day period of an extension of up to thirty (30) days.  If necessary, the Administrator may notify the Claimant, prior to the end of the initial thirty (30)-day extension period, of a second extension of up to thirty (30) days.  If an extension is due to the Claimant's failure to supply the necessary information, then the notice of extension will describe the additional information and the Claimant will have forty-five (45) days to provide the additional information.   Moreover, the period for making the determination will be delayed from the date the notification of extension was sent out until the Claimant responds to the request for additional information.  No additional extensions may be made, except with the Claimant's voluntary consent.  The contents of the notice shall be the same as described in Section 14.2(a) above.  If a Disability Benefit claim is denied in whole or in part, then the Claimant will receive notification, as described in Section 14.2.

(c)    In addition to the information listed in Section 14.2(a), the denial notice to the Claimant shall also include the following:

(i)    If an internal rule, guideline, protocol or similar criterion is relied upon in making the adverse determination, either a copy of that document or a statement that such document was relied upon and will be provided free of charge to the Claimant upon request (to the extent not legally-privileged) or, if none exists, a statement that no specific internal rule, guideline, protocol, or other similar criterion exists which could have been relied upon in making the adverse determination;

(ii)    If the Claimant's claim was denied based on a medical necessity or experimental treatment or similar exclusion or limit, a statement either explaining the decision or indicating that an explanation will be provided to the Claimant free of charge upon request;

(iii)    A discussion of the decision, including an explanation of the basis for disagreeing with or not following: (A) the views presented by the Claimant to the Administrator of health care professionals treating the Claimant and vocational professionals who evaluated the Claimant; (B) the views of medical or vocational experts whose advice was obtained on behalf of the Administrator in connection with a Claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination; and (C) a disability

78

determination regarding the Claimant presented by the Claimant to the Administrator made by the Social Security Administration;

(iv)    A statement that the Claimant is entitled to receive upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits.

(d)    Any Claimant whose application for Disability Benefits is denied in whole or in part, may appeal the denial by submitting to the Review Panel a request for a review of the application within one hundred eighty (180) days after receiving notice of the denial.  The request for review shall be in the form and manner prescribed by the Review Panel.  In the event of such an appeal for review, the provisions of Section 14.3(a) regarding the Claimant's rights and responsibilities shall apply.  Additionally, the Review Panel will identify any medical or vocational expert whose advice was obtained on behalf of the Review Panel in connection with the denial, without regard to whether the advice was relied upon in making the Disability Benefit determination.  The entity or individual appointed by the Review Panel to review the claim will consider the appeal de novo, without any deference to the initial Disability Benefit denial.  The review will not be conducted by any person who participated in the initial Disability Benefit denial or who is the subordinate of a person who participated in the initial Disability Benefit denial.

(e)    If the initial Disability Benefit denial was based in whole or in part on a medical judgment, then the Review Panel will consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment, and who was neither consulted in connection with the initial Disability Benefit determination, nor is the subordinate of any person who was consulted in connection with that determination.  In the event of notifying the Claimant of an adverse determination on review, the Review Panel will include in the notice either an explanation of the clinical basis for the determination, applying the terms of the Plan to the Claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

(f)    A decision on review shall be made promptly, but not later than forty-five (45) days after receipt of a request for review, unless special circumstances require an extension of forty-five (45) days  for processing.  If an extension is required, the Claimant will be notified before the end of the initial forty-five (45)-day period that an extension of time is required and the anticipated date that the review will be completed.  A decision will be given as soon as possible, but not later than ninety (90) days after receipt of a request for review.  If an extension is due to the Claimant's failure to supply the necessary information, then the notice of extension will describe the additional information and the Claimant will have forty-five (45) days to provide the additional information.  Moreover, the period for making the determination will be delayed from the date the notification of extension was sent out until the Claimant responds to the request for additional information.

(g)    Before an adverse benefit determination on review involving a determination of Disability is issued, the Claimant shall be provided, free of charge, as soon as possible and sufficiently in advance of the date on which such notice is required to be provided: (i) any new or additional evidence considered, relied upon or generated by the Plan, the insurer or other person making the benefit determination in connection with claim; and (ii) any new or

US.322200570.24

DocuSign Envelope ID: C2054786-7C79-47F2-9475-ABDBBF643580

additional rationale on which an adverse benefit determination on review will be based. The new evidence or rationale must be provided in time to give the Claimant a reasonable opportunity to respond prior to the Review Panel's deadline for making a decision.

(h)     The Review Panel shall give notice of its decision to the Claimant; such notice shall comply with the requirements set forth in paragraph (b) and shall also include the following:

(i)     If an internal rule, guideline, protocol, or similar criteria was relied upon in making the decision, either a copy of that document or a statement that such document was relied upon and that a copy shall be furnished (free of charge) upon request, or if none exists, a statement that no specific internal rule, guideline, protocol, or other similar criterion exists which could have been relied upon in making the adverse determination;

(ii)     If the Claimant's claim was denied based on a medical necessity or experimental treatment or similar exclusion, a statement explaining the decision, or a statement providing that such explanation will be furnished to the Claimant free of charge upon request;

(iii)     A discussion of the decision, including an explanation of the basis for disagreeing with or not following: (1) the views presented by the Claimant to the Administrator of health care professionals treating the Claimant and vocational professionals who evaluated the Claimant; (2) the views of medical or vocational experts whose advice was obtained on behalf of the Administrator in connection with a Claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination; and (3) a disability determination regarding the Claimant presented by the claimant to the Administrator made by the Social Security Administration;

(iv)     In the statement regarding the Claimant's right to bring an action under Section 502(a) of ERISA, any applicable contractual limitations period that applies to the Claimant's right to bring such an action, including the calendar date on which the contractual limitations period expires for the claim.

**14.5     Exhaustion of Claims Procedure and Right to Bring Legal Action**.  A claimant must exhaust the Plan's Claim Review Procedures before filing an arbitration proceeding and seeking review of an adverse benefit determination under Section 14.6.  No arbitration proceeding shall be brought more than one (1) year after the Review Panel's affirmation of a denial of the claim, as set forth in Section 14.3 or 14.4(f) above, as applicable, or, if earlier, more than four (4) years after the facts or events giving rise to the Claimant's allegation(s) or claim(s) first occurred. Any arbitration proceedings shall be brought pursuant to Section 14.6.

**14.6     Dispute Resolution and Arbitration of Claims.**

(a)     General:  To the fullest extent permitted by applicable law, and in consideration of any rights, benefits, or entitlements provided under or pursuant to the Plan, and as a condition precedent to participation and continuing participation in the Plan, the participants, employees, beneficiaries, settlors, trustees, administrators, and any party making a claim or seeking relief arising under, directly or indirectly related to, or in consequence of the Plan, shall be bound by this Dispute Resolution and Arbitration of Claims provision.

US.322200570.24

Any claim, dispute, or controversy of any kind asserted by a Claimant (which includes any current or former participant, current or former beneficiary, current or former fiduciary, alternate payee, or any of their respective assignees, agents, representatives, assigns, trustees, receivers, or anyone acting on their behalf) that arises out of, implicates, and/or relates to the Plan, including, without limitation, any: (a) claim for benefits under the Plan pursuant to ERISA § 502(a)(1)(B) (following any required exhaustion of administrative remedies); (b) claim pursuant to ERISA § 502(a)(2); or (c) claim pursuant to ERISA § 502(a)(3); (d) claim for any ERISA statutory violation of any kind, including for failure to timely provide notices, documents or information required by ERISA, pursuant to ERISA § 502(c); or (e) claim under any other body of law (collectively "Claim"), will be referred to and finally resolved by confidential binding arbitration.

Arbitration shall be conducted in accordance with the Employment Arbitration Rules and Procedures of New Era ("New Era") ADR (the "New Era Rules"), which can be found at https://www.neweraadr.com/rules-and-procedures/ (except to the extent modified by this Subsection 14.6). A Claimant may obtain a copy of the New Era Rules at any time upon written request to the Plan Administrator or by reviewing the rules at https://www.neweraadr.com/rules-and-procedures/.

This Arbitration of Claims provision shall apply whether or not the Claimant was a current employee, participant, beneficiary, trustee, assignee, agent, representative, assign, receiver, or fiduciary when the alleged act, error, or omission occurred or was discovered, when the action was initiated, when the action accrued, when any injury or loss occurred or was discovered, and whether the Claimant has received a distribution of benefits due or allegedly due.

(b)      Request for Arbitration: A Claimant may initiate arbitration by filing a demand for arbitration with New Era. Any demand must be submitted to arbitration within the applicable statutory or contractual period of limitations. Claims for review of adverse benefit decisions must be made within the time frames set forth in Section 14.5

A Claimant must assert all arbitrable Claims based upon, arising out of, or in consequence of the same underlying alleged facts in the same arbitration and may not split Claims. For example, if a Claimant wishes to pursue both a Claim for benefits under ERISA § 502(a)(1)(B) and a Claim for breach of fiduciary duty under ERISA § 502(a)(2) or ERISA § 502(a)(3), the claimant must first exhaust the Plan's Claims and Appeal Procedures and then assert such claims in one demand for arbitration.

(c)      Selection of Arbitrator: If Claims raised by a Claimant are brought solely pursuant to ERISA § 502(a)(1)(B) and/or ERISA § 502(c), then the Claims will be submitted to and decided by a single arbitrator. All other Claims must be submitted to and decided by a panel of three arbitrators.

For Claims submitted to a single arbitrator, the parties will endeavor to agree to a neutral arbitrator with familiarity with ERISA benefit claims and related claims to the extent practicable. For Claims submitted to a panel of three arbitrators, each party shall appoint one arbitrator within 30 days of the demand for arbitration, and the two arbitrators selected by the parties will then, within 30 days after their appointment, select the third arbitrator from the applicable New Era roster.

The parties and the arbitrators will exercise best efforts to select arbitrators with ERISA benefit claims and ERISA breach of fiduciary claims experience, to the extent practicable. If arbitrator(s) cannot be selected within 30 days of the filing of an arbitration demand, such arbitrator(s) will be selected in accordance with the New Era Rules. "Arbitrator" shall mean the individual arbitrator or panel of arbitrators selected to decide Claims as set forth in this Subsection.

(d)     Notice of Claim:  Any Claim shall first be addressed by direct negotiation between the Claimant and the Plan.  Prior to filing an arbitration proceeding, the Claimant shall provide the Plan with written notice of the Claim ("Notice of Claim") containing a detailed description of the matter in controversy.  The Claimant and the Plan will attempt to resolve the Claim in good faith.  Should the Claim not be resolved within 30 days of the Plan's receipt of the Notice of Claim, the Participant or Claimant may file a demand for arbitration proceeding as set forth in this Section 14.6.  The 30-day requirement may be modified through unequivocal, express, written agreement by the Claimant and the Plan.  In all instances, however, the Claimant must file an arbitration proceeding within the timeframes set forth in Section 14.5

(e)     Governing Law: With respect to any Claim, the Arbitrator shall apply the jurisprudence of ERISA as if brought in the United States District Court for the Central District of California, and shall follow the law established by the United States Court of Appeals for the Ninth Circuit and the Supreme Court of the United States.

(f)     Arbitration Venue; Standard of Review:  Any arbitration proceeding will be held in Los Angeles, California or such other venue as may be selected by mutual agreement of the parties; provided, however, that the same standards of review will apply to the review of any Claim hereunder as would apply had such Claim been filed in the United States District Court for the Central District of California (e.g., any discretionary decision or action will be reviewed under an "abuse of discretion" standard).  Any petition to confirm or vacate the award rendered by the Arbitrator, and any other appeal or subsequent filing seeking to enforce, modify or otherwise seek judicial relief with respect to the award rendered by the Arbitrator may be brought only in the United States District Court for the Central District of California located in Los Angeles, California.

(g)     Arbitration Award:  The award of the Arbitrator(s) will be in writing, with reasonable explanation of the basis for the decision and award. The Arbitrator's decision will be confidential, final and binding in accordance with the New Era Rules.  The judgment on the final award rendered by the Arbitrator may be entered in any court having jurisdiction thereof and will be res judicata as to all Claims that the Claimant asserted or could have asserted in the demand for arbitration.   The Arbitrator's authority shall be limited to deciding the case submitted by the individual Claimant in the arbitration.

(h)     Fees and Expenses:  Except as may be awarded by the Arbitrator in a final award, or as otherwise required by ERISA, each party will bear the expense of their own fees and costs. The Arbitrator shall have authority to award attorney's fees and costs pursuant to ERISA § 502(g) to the same extent a court has such authority.

(i)     Waiver of Class, Collective, and Representative Actions:  To the fullest extent permitted by applicable law:

(i)      The Claimant and any actual or purported participant, beneficiary, assignee, agent, or representative, may not bring a representative, class, or collective action on behalf of any others, including without limitation other Claimants, participants, or beneficiaries. Any Claim in arbitration must be brought on an individual basis. Furthermore, the Arbitrator and/or New Era may not consolidate or join any claims without the express consent of all parties.

(ii)      The Arbitrator(s) shall have the authority to award monetary relief solely with respect to any alleged monetary losses in the individual Claimant's individual defined contribution account under the Plan and may not award monetary relief to or for the benefit of any other participants or beneficiaries. With respect to any Claim brought under ERISA § 502(a)(2) and/or ERISA § 409, a Claimant may obtain losses to the Plan measured by the alleged monetary losses to the individual Claimant's individual defined contribution account.  The Claimant waives, forfeits, and forever relinquishes the right to bring a Claim for monetary damages, losses, or injury to any individual Plan account other than the Claimant's account.

(iii)      With respect to equitable, injunctive, and non-monetary relief that may be available under ERISA, to the fullest extent permitted by ERISA, the Arbitrator(s) must limit such relief solely to the individual Claimant. If any portion of the Arbitration provision or Class Action Waiver is found to prohibit a Claimant from obtaining any relief under ERISA that the Claimant would be able to obtain on an individual basis, the Arbitration provision and Class Action Waiver shall not be deemed void; rather, the Arbitrator(s) shall have the authority to award such relief.

(iv)      This Arbitration provision and Class Action Waiver shall not limit a Claimant's right, if any exists under ERISA, to seek, in the Claimant's individual capacity, relief that may be awarded under ERISA to the Claimant in the Claimant's capacity as an individual who is not bringing a class or collective action.

(v)      Every actual or purported participant, beneficiary, assignee, agent, and representative waives the right to commence, be a party to, or be an actual or putative class member of any class, collective or representative action arising out of or relating to the Plan ("Class Action Waiver").

(vi)      Any challenge to this Class Action Waiver may be brought only in the United States District Court for the Central District of California located in Los Angeles, California, and not in any other judicial or arbitration forum.  If a Claimant brings a challenge to the Class Action Waiver, any purported arbitration on a Plan-wide, class, collective, or representative basis shall be stayed pending determination by the court of said challenge to the Class Action Wavier.  If this Class Action Waiver is found to be unenforceable by a final and binding judgment of a federal court, then any Claim shall be filed and adjudicated in the United States District Court for the Central District of California located in Los Angeles, California, and not in arbitration.

(j)      Savings Clause: For avoidance of doubt, Section 14.6 is intended to make mandatory individual arbitration apply to the maximum extent permissible under ERISA; provided however, that in the event the Class Action Waiver is found to be unenforceable, then any Claim shall be filed and adjudicated in the United States District Court for the Central District of

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

California located in Los Angeles, California, and not in arbitration.  If any other provision of this arbitration provision (aside from the Class Action Waiver) is found impermissible or unenforceable, the arbitration process as mandated in Section 14.6 is still required with the minimum change necessary to allow the arbitration requirement to be permissible and/or enforceable.

       (k)    Jurisdiction of Arbitrator:  If a claimant disputes whether the Claim is arbitrable, the dispute will be decided by the United States District Court for the Central District of California located in Los Angeles, California, and not by the Arbitrator.  To the extent the court finds a Claim not arbitrable, suit may only be filed and adjudicated in the United States District Court for the Central District of California in located in Los Angeles, California.

       (l)    Confidentiality:  In accordance with the New Era Rules, any arbitration of a Claim will be strictly confidential.  Neither the claimant nor Arbitrator may disclose any information relating to an arbitration proceeding without the prior written consent of the Plan Administrator. This confidentiality provision will apply to all aspects of the arbitration proceeding including, without limitation, discovery, testimony, other evidence, briefs, and the award.  The Arbitrator and the parties shall maintain the confidentiality of arbitration, including filing under seal (or taking all appropriate steps to secure permission to file under seal) any pleading seeking to confirm or vacate the arbitration award, to enforce arbitration or otherwise relating in any way to the arbitration.

    In the event of a breach or threatened breach of this confidentiality provision, the Plan Administrator or, if applicable, other respondent, may seek temporary, preliminary, and/or permanent injunctive relief to prevent such breach or threatened breach, as well as any damages suffered by the Plan Administrator, Employer, other respondent. In the event the Plan Administrator or, if applicable, other respondent, brings an action to enforce this confidentiality provision and receives any remedy (whether temporary or permanent), the Claimant or Arbitrator(s) responsible for such breach or threatened breach shall pay the attorneys' fees and expenses incurred in connection with such enforcement action.

US.322200570.24

## ARTICLE XV

## **TOP-HEAVY PROVISIONS**

**15.1** **Purpose**.  This Article is intended to ensure that the Plan complies with Code Section 416.  If the Plan is or becomes Top-Heavy in any Plan Year, then the provisions of this Article shall supersede any conflicting provision in the Plan.

**15.2** **Definitions**.

(a)  Determination Date.  "Determination Date" means the last day of the preceding Plan Year.

(b)  Key Employee.  "Key Employee" means any Employee or former Employee (including the Beneficiaries of such Employee and any deceased Employee) who at any time during the Plan Year that includes the Determination Date, was (i) an officer of the Employer having annual Testing Compensation greater than the amount in effect under Code Section 416(i)(1)(A), as adjusted by the Adjustment Factor (i.e., Two Hundred Thousand Dollars ($200,000) for 2022); (ii) a five percent (5%) owner of the Employer; or (iii) a one percent (1%) owner of the Employer who has annual Testing Compensation of more than One Hundred Fifty Thousand Dollars ($150,000).  For purposes of this Section, the determination of Testing Compensation shall be based only on Testing Compensation that is actually paid.  A determination of who constitutes a Key Employee shall be made in accordance with Code Section 416(i)(1) and the applicable Income Tax Regulations and other guidance of general applicability issued thereunder.

(c)  Non-Key Employee.  "Non-Key Employee" means any Employee who is not a Key Employee.

(d)  Permissive Aggregation Group.  "Permissive Aggregation Group" means the Required Aggregation Group of plans plus any other plan(s) of the Employer that, when considered as a group with the Required Aggregation Group, would continue to satisfy the requirements of Code Sections 401(a)(4) and 410.

(e)  Required Aggregation Group.  "Required Aggregation Group" means:

(i)  each tax-qualified plan of the Employer in which at least one (1) Key Employee participates or participated during the Plan Year ending on the Determination Date (regardless of whether the plan has terminated); and

(ii)  any other tax-qualified plan of the Employer that enables a plan described in paragraph (i) above to meet the requirements of Code Section 401(a)(4) or 410.

(f)  Top-Heavy Plan.  "Top-Heavy Plan" means this Plan, if, for any Plan Year, any of the following conditions exists:

DocuSign Envelope ID: C2054786-7C79-47F2-9475-ABDBBF643580

     (i)  the Top-Heavy Ratio for this Plan exceeds sixty percent (60%) and this Plan is not part of any Required Aggregation Group or Permissive Aggregation Group of plans;

     (ii)  this Plan is part of a Required Aggregation Group of plans but not part of a Permissive Aggregation Group and the Top-Heavy Ratio for the Required Aggregation Group exceeds sixty percent (60%); or

     (iii)  this Plan is part of a Required Aggregation Group and part of a Permissive Aggregation Group of plans and the Top-Heavy Ratio for both the Permissive Aggregation Group and the Required Aggregation Group exceeds sixty percent (60%).

   (g)  <u>Top-Heavy Ratio</u>.  "Top-Heavy Ratio" means:

     (i)  if the Employer maintains one or more defined contribution plans (including any simplified employee pension plan) and the Employer has not maintained any defined benefit plan that during the one (1)-year period ending on the Determination Date(s) has or has had accrued benefits, then the Top-Heavy Ratio for this Plan alone or for the Required or Permissive Aggregation Group, as appropriate, is a fraction, the numerator of which is the sum of the Account balances of all Key Employees as of the Determination Date(s) (including any part of any Account balance distributed in the one (1)-year period ending on the Determination Date(s)), and the denominator of which is the sum of Account balances (including any part of any Account balance distributed in the one (1)-year period ending on the Determination Date(s)), both computed in accordance with Code Section 416.  Both the numerator and denominator of the Top-Heavy Ratio are increased to reflect any contribution not actually made as of the Determination Date, but which is required to be taken into account on that date under Code Section 416.  Notwithstanding the foregoing, in the case of a distribution of a portion of a Participant's Account balance that is made for a reason other than severance from employment, death or Disability, the provisions of this paragraph shall be applied by substituting "five (5)-year period" for "one (1)-year period."

     (ii)  if the Employer maintains one or more defined contribution plans (including any simplified employee pension plan) and the Employer maintains or has maintained one or more defined benefit plans that during the one (1)-year period ending on the Determination Date(s) has or has had any accrued benefits, then the Top-Heavy Ratio for any Required or Permissive Aggregation Group as appropriate, is a fraction, the numerator of which is the sum of Account balances under the aggregated defined contribution plan or plans for all Key Employees, determined in accordance with paragraph (i) above, and the present value of accrued benefits under the aggregated defined benefit plan or plans for all Key Employees as of the Determination Date(s), and the denominator of which is the sum of Account balances under the aggregated defined contribution plan or plans for all participants, determined in accordance with paragraph (i) above, and the present value of accrued benefits under the defined benefit plan or plans for all participants as of the Determination Date(s), all determined in accordance with Code Section 416.  The accrued benefits under a defined benefit plan in both the numerator and denominator of the Top-Heavy Ratio are increased for any distribution of an accrued benefit made in the one (1)-year period ending on the Determination Date.  Notwithstanding the foregoing, in the case of a distribution of a portion of a Participant's Account balance that is made for a reason other than severance from

US.322200570.24

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

employment, death or Disability, the provisions of this paragraph shall be applied by substituting "five (5)-year period" for "one (1)-year period."

(iii)     for purposes of paragraphs (i) and (ii) above, the value of Account balances and the present value of accrued benefits shall be determined as of the last day of the most recent Plan Year that falls within or ends with the twelve (12)-month period ending on the Determination Date, except as provided in Code Section 416 for the first and second plan years of a defined benefit plan.  The Account balances and accrued benefits of a participant who:  (1) is not a Key Employee but was a Key Employee in a prior year; or (2) has not been credited with at least one (1) Hour of Service with any Employer maintaining the Plan at any time during the one (1)-year period ending on the Determination Date shall be disregarded.  The calculation of the Top Heavy Ratio, and the extent to which distributions, rollovers, and transfers are taken into account shall be made in accordance with Code Section 416.  When aggregating plans, the value of Account balances and accrued benefits shall be calculated with reference to the Determination Dates that fall within the same calendar year.

The accrued benefit of a Participant other than a Key Employee shall be determined under:  (1) the method, if any, that uniformly applies for accrual purposes under all defined benefit plans maintained by the Employer; or (2) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional rule of Code Section 411(b)(1)(C).

### 15.3     <u>Minimum Allocation</u>.

(a)     Except as otherwise provided in paragraphs (b) and (c) below, in any Plan Year that the Plan is Top-Heavy, Employer Contributions (other than Deferral Contributions, Roth Contributions, and Catch-Up Contributions) allocated to the Accounts of each Participant who is a Non-Key Employee, shall be not less than the lesser of (i) three percent (3%) of the Non-Key Employee's Testing Compensation, or (ii) in the case where the Employer has no defined benefit plan which designates this Plan to satisfy Code Section 401(a), the largest percentage of Contributions (other than Catch-Up Contributions) and forfeitures (if applicable), as a percentage of Testing Compensation allocated on behalf of any Key Employee for that Plan Year.  The minimum allocation shall be determined without regard to any Social Security contribution.  This minimum allocation shall be made even though, under other provisions of the Plan, the Participant would not otherwise be entitled to receive an allocation or would have received a lesser allocation for the Plan Year because of (i) the Participant's failure to complete one thousand (1,000) Hours of Service (or any equivalent provided in the Plan), or (ii) Testing Compensation less than a stated amount.

(b)     The provisions in paragraph (a) above shall not apply to any Participant who was not employed by the Employer on the last day of the Plan Year.

(c)     The provisions in paragraph (a) above shall not apply to any Participant to the extent the Participant is covered under any other plan or plans of the Employer.

DocuSign Envelope ID: C2054786-7C79-47F3-9475-ABDBBF643580

(d)     The minimum allocation required (to the extent required to be nonforfeitable under Code Section 416(b)) cannot be forfeited under Code Section 411(a)(3)(B) or (D).

US.322200570.24

DocuSign Envelope ID: C2054786-7C79-47F8-9475-ABDBBF643580

# ARTICLE XVI

## GENERAL PROVISIONS

**16.1    Legal or Equitable Action**.  If any legal or equitable action with respect to the Plan is brought by or maintained against any Participant(s) or other individual(s), and the results of such action are adverse to that individual(s), attorney's fees and all other direct and indirect expenses and costs incurred by the Employer, each Participating Employer, the Company (including, without limitation, the Board and the Compensation Committee), the Administrator, the Trustee, and/or the Trust of defending or bringing such action shall, to the extent permitted by law, be charged against the interest, if any, of such individual(s) under the Plan.

**16.2    Indemnification**.

(a)    **Defense and Indemnification Obligation**:  The Company and each Participating Employer, as applicable, indemnifies and holds harmless, to the extent permitted by law, all Indemnitees from and against all Loss incurred in conjunction with a Claim brought pursuant to ERISA or any other basis, except when due to the Indemnitee's own gross negligence, willful misconduct, lack of good faith or breach of its fiduciary duties under the Plan or ERISA.

(b)    **No Relief of Responsibility or Liability:**  Nothing herein shall relieve an Indemnitee from any responsibility, obligation or duty under ERISA, or any liability therefor.  This provision is intended to permit the Company and/or Participating Employer, as applicable, to satisfy liability incurred but leave the fiduciary fully responsible and liable. The defense and indemnification required by this Section shall not be made using assets of the Plan.

(c)    **Miscellaneous Requirements:**  It is understood that the Company and the Participating Employers intend for this provision to be interpreted and enforced so as to provide defense and indemnification to an Indemnitee to the fullest extent permitted by law.  If, and only to the extent, applicable law so requires, and only upon order of a court with competent jurisdiction from which no appeal can be taken, then:

(i) An Indemnitee will, if and only to the extent required, provide an undertaking to repay Defense Expenses advanced unless it shall ultimately be determined that the Indemnitee is entitled to indemnification.

(ii) An Indemnitee shall not be entitled to indemnification if, and only to the extent that, a final judgment from which no appeal can be taken establishes that ERISA prohibits indemnification.

Further, the Indemnitee shall promptly notify the General Counsel of the Company (or such other person or entity designated by the Participating Employer with such notice only being effective upon actual receipt of the designee) of any litigation, demand or claim involving the Plan, shall fully cooperate in the defense of any such lawsuit, demand or claim and shall give the Company sole and exclusive authority to act on his or her behalf in the event of any such litigation, claim or demand arising out of, relating to, or resulting from his or her action, inaction or conduct in his or her official capacity with respect to the Plan and/or Trust.

US.322200570.24

DocuSign Envelope ID: C20547B6-7C79-47F2-9475-ABDBBF643580

**(d)**     **Definitions:**  For purposes of this Section:

"<u>Claim</u>" means a verbal or written threat, demand, suit, cause of action, count, request, action, proceeding, investigation, inquiry, or subpoena, whether civil, criminal, administrative, or investigative in nature, that requests any relief from or action by an Indemnitee, and arises out of, directly or indirectly relates to, or is in direct or indirect consequence of the Plan, including an Indemnitee's actual or alleged duties or responsibilities in connection with the management, administration, or operation of the Plan.

"<u>Defense Expenses</u>" means the reasonable costs of investigation and defense of a Claim, including without limitation attorneys' fees, court costs, appeal costs, amounts incurred in connection with an affirmative claim by an Indemnitee if the affirmative claim is reasonable as part of the defense of a Claim against the Indemnitee.

"<u>Indemnitee</u>" means the Administrator, Committee, any past, present, or future Committee member, any Company employee, director, or officer with respect to any actual or alleged act, error, or omission in connection with the Plan arising from or in connection with his or her service in such capacity.

"<u>Loss</u>" means Defense Expenses, settlement amounts, and judgment amounts, including those associated with appeals and costs to comply with non-monetary relief.

**(e)**     **Validity:**  If any provision of this Section shall be held to be invalid, illegal, or unenforceable for any reason whatsoever, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**16.3     <u>No Enlargement of Plan Rights</u>**.  Each individual agrees, as a condition of participation in the Plan, that he or she shall look solely to the assets of the Trust for the payment of any benefit under the Plan.

**16.4     <u>No Enlargement of Employment Rights</u>**.  Nothing appearing in or done pursuant to the Plan shall be construed to give any individual a legal or equitable right or interest in the assets of the Trust or distribution therefrom (except as expressly provided in the Plan), nor against any Participating Employer (except as expressly provided in the Plan), or to create or modify any contract of employment between a Participating Employer and any Employee or to obligate a Participating Employer to continue the services of any Employee.

**16.5     <u>Interpretation</u>**.  The headings contained in this Plan or in any Appendix hereto, are for reference purposes only, and shall not affect in any way the meaning or interpretation of the Plan.  Any capitalized term used in any Appendix hereto, but not otherwise defined therein, shall have the meaning assigned to such term in the Plan.  The masculine pronoun shall include the feminine pronoun and the singular the plural, where the context so indicates.

**16.6     <u>Notices and Form of Communication</u>**.  Notwithstanding anything in the Plan to the contrary, in any instance where an action (including, without limitation, notices, instruments, elections, applications, and communications) by an Eligible Employee, a Participant, a Beneficiary, an Alternate Payee, the Administrator, the Company, a Participating Employer, or

any other person or entity is required to be in writing, such action may be satisfied in such form as the Administrator or the Company, as applicable, may specify, including, without limitation, electronic or telephonic methods, but only to the extent permitted by law. All such actions (including notices, instruments, elections, applications, and communications) to be filed under the Plan shall be filed with the person or entity designated by the Company or the Administrator, as applicable. Each such action shall be effective only upon actual receipt by the designated person or entity.

**16.7    Governing Law**. The Plan shall be construed, administered and governed in all respects in accordance with ERISA, the Code and other pertinent Federal laws and, to the extent not preempted by ERISA, in accordance with the laws of the State of California (irrespective of the choice of law principles of the State of California as to all matters); provided, however, that if any provision is susceptible to more than one interpretation, such interpretation shall be given thereto as is consistent with the Plan being a tax-qualified plan and related tax-exempt trust under Code Sections 401(a) and 501(a), respectively.

**16.8    Non-Alienation of Benefits**. None of the benefits, payments, proceeds or claims of any Participant under the Plan shall be subject to any claim or any creditor of any Participant and, in particular, the same shall not be subject to attachment or garnishment or other legal process by any creditor of any Participant, nor shall any Participant have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits, payments or proceeds that he or she is or may be entitled to receive from the Plan, other than:

(a)    Federal tax levies and executions on Federal tax judgments;

(b)    payments made from the Accounts of a Participant in satisfaction of the rights of Alternate Payees pursuant to a Qualified Domestic Relations Order under Section 9.5;

(c)    enforcement of any security interests or offset rights applicable to the Account of a Participant pursuant to the loan provisions of Section 8.2; or

(d)    any offset of a Participant's Account under the Plan against an amount the Participant is ordered to pay due to a judgment or settlement described in Code Section 401(a)(13)(C).

**16.9    No Reversion**. Notwithstanding any contrary provision of the Plan (except as provided in Section 3.6), no part of the assets in the Trust shall revert to the Employer, and no part of such assets, other than that amount required to pay taxes or reasonable administrative expenses of the Plan, shall be used for any purpose other than exclusive benefit of Participants or their Beneficiaries. However, upon the Administrator's request, the Trustee shall return the appropriate amount to a Participating Employer under any of the following circumstances; provided, however, any such excess amounts shall, to the extent permitted by law, be reduced to the extent there are negative Earnings attributable thereto:

(a)    the amount was all or part of an Employer Contribution that was made as a result of a mistake of fact and the amount contributed is returned to the Participating Employer within one (1) year after the date of the mistaken payment;

(b)       the amount was all or part of an Employer Contribution that was conditioned on its deductibility under Code Section 404 (all contributions under the Plan are conditioned on their deductibility unless stated otherwise) and this condition is not satisfied, and the amount is returned to the Participating Employer within one (1) year after the date on which the deduction was disallowed; or

(c)       the amount that is otherwise permitted to be returned to an Employer under applicable law.

**16.10**   **Conflict**.  In the event of any conflict between the respective provisions of the Plan and the Trust Agreement relating to the rights, obligations and duties of the Trustee, the applicable provisions of the Trust Agreement shall control.  In all other cases, in the event of any conflict between the Plan and the terms of any contract or agreement issued hereunder or with respect hereto, the Plan shall control.

**16.11**   **Severability**.  If any provision of the Plan, or the application thereof to any individual or circumstance, is deemed invalid or unenforceable by a court of competent jurisdiction, then the remainder of the Plan, or the application of such term or provision to individuals or circumstances other than those as to whom it is held invalid or unenforceable, shall not be affected thereby, and each provision of the Plan shall be valid and enforceable to the fullest extent permitted by law.

DocuSign Envelope ID: C2954706-7C70-47F3-9475-ABDBBF643580

       **IN WITNESS WHEREOF,** this Plan is hereby restated as of the Effective Date and executed on this _12th_ day of December, 2022.

               Live Nation Entertainment, Inc.

By:  _____
               Michael G. Rowles

Its:  Executive Vice President and General Counsel

93

## APPENDIX A

## PARTICIPATING AND NON-PARTICIPATING EMPLOYERS

Participation in the Plan by Participating Employers shall be determined pursuant to Article XIII.  The purpose of this Appendix A is to: (a) list each entity that is a member of the Company's controlled group of corporations (pursuant to Code Section 414(b)) that the Company has determined will not be a Participating Employer (a "Non-Participating Controlled Group Member"); and (b) list each affiliate of the Company that is not a member of the Company's controlled group of corporations (pursuant to Code Section 414(b)) but is specifically authorized to participate in the Plan pursuant to corporate action by the Company or a Plan amendment (a "Participating Affiliate").

This Appendix A may be amended from time to time without need for a formal amendment to the Plan.

Non-Participating Controlled Group Members.  Pursuant to Section 13.1, the following entities shall not be eligible to participate in the Plan:

[There are none as of January 1, 2022]

Participating Affiliates.  Pursuant to Section 13.1, the following entities shall be eligible to participate in the Plan as Participating Employers as of the date(s) noted below:

Roc Nation, LLC (June 1, 2012)
Crossroads Presents, LLC (July 1, 2013 through December 31, 2015)
Blueprint Artist Management LLC (aka Blueprint Group, LLC) (November 1, 2014)

Three Six Zero (January 1, 2015 through June 30, 2018; for purposes of clarity, this entity dissolved as of such date)

Insomniac Holdings, LLC (September 1, 2015 through February 29, 2016; and again January 1, 2018)
Host VIP, LLC (January 1, 2016)

Philymack Management, LLC (January 1, 2016)
ESM Productions LLC (January 1, 2017)

SAL & CO Management LP (January 1, 2017)
AC Entertainment, LLC (January 1, 2018 through December 31, 2019; for purposes of clarity, after this date, this entity participates in the Plan as part of the Company's controlled group)

Greenlight Media and Marketing, LLC (January 1, 2018 through April 2021; for purposes of clarity, this entity now participates as part of the Company's controlled group)
Big Loud Mountain Management, LLC (August 1, 2018)

Rebel Artist Management, LLC (August 1, 2018; for purposes of clarity, prior to this date, this entity participated in the Plan as part of the Company's controlled group)

YCFUNCO, LLC (August 1, 2018)
C3 Presents, LLC (December 27, 2018 through December 31, 2018; for purposes of clarity, after this date, this entity participates in the Plan as part of the Company's controlled group)
Reigndeer Entertainment, LLC (January 1, 2019) (now part of the Company's controlled group)

Scoremore Holdings, LLC (March 1, 2019)
Redrock Entertainment Services (September 1, 2019)
Beyond Fabrication, LLC (December 12, 2019)

Neste Event Marketing, LLC (January 1, 2020)
Red Mountain Entertainment, LLC (January 1, 2020)
Beyond Fabrications (Insomniac) (February 1, 2020)
Rolling Loud, LLC (March 1, 2020)

Glow DC LLC (March 1, 2020)
Veeps, Inc. (aka Moveo) (July 1, 2021)
V Major LLC (d/b/a Major Management) (August 1, 2021)
Founders Entertainment LLC (January 1, 2022)

In addition, the following entities were previously Participating Affiliates but terminated participation in the Plan in 2008: Historic Theatre Group, LLC; Concert Productions International, Inc.; the International Hot Rod Association, LLC; NBC-CC Ventures, LLC; and CINQ Group LLC.

Participating Union Groups. Pursuant to Section 2.23(e), the following units of Employees covered by a collective bargaining agreement are eligible to participate in the Plan:

[There are none as of January 1, 2022]

A-2

DocuSign Envelope ID: C2954706-7C70-4753-9475-ABDBBF643580

**APPENDIX B**

**SPECIAL ELIGIBILITY VESTING AND PARTICIPATION PROVISIONS**

This Appendix B includes special provisions to the Plan under Section 6.1 (regarding vesting), Section 3.1 (regarding eligibility), and Section 12.3 (regarding acquisitions) of the Plan.

The general rule for crediting predecessor service under the Plan shall be that any employees of an entity that is acquired by the Company through stock acquisition (each, an "Affiliated Employer") shall receive prior service credit under this Plan so long as such employees are employed on the date of such acquisition. Further, any predecessor service credited by an Affiliated Employer under any tax-qualified retirement plan maintained or merged by such Affiliated Employer (or the Employer) will be credited as service under this Plan with regards to employees of such Affiliated Employer who become Employees under the Plan.

Other special provisions are outlined below:

      (a)    **SFX Entertainment, Inc.** Effective January 1, 1999, an Employee will receive credit for vesting and eligibility purposes for his or her service with any entity acquired through a stock or asset acquisition by SFX Entertainment, Inc. ("SFX"); provided, however, in each case, that such Employee was employed by SFX on December 31, 1998.

      (b)    **SFX Broadcasting, Inc.** Effective January 1, 1999, an Employee will receive credit for vesting and eligibility purposes for his or her service with SPX Broadcasting, Inc. as that company existed before SPX was created; provided, however, in each case, that as such Employee was employed by SFX on December 31, 1998.

      (c)    **Integrated Sports International, Inc.** Effective January 26, 1999, an Employee will receive credit for vesting and eligibility purposes for his or her service with Integrated Sports International, Inc.; provided, however, in each case, that such Employee was employed by Integrated Sports International, Inc. on the date immediately preceding the Employee's first day of employment with the Company or an Affiliated Employer that participates in the Plan.

      (d)    **Premier Motor Sports Marketing Communications Agency.** Effective January 1, 2000, an Employee will receive credit for vesting and eligibility purposes for his or her service with Premier Motor Sports Marketing Communications Agency; provided, however, in each case, that such Employee was employed by Premier Motor Sports Marketing Communications Agency on the date immediately preceding the Employee's first day of employment with the Company or an Affiliated Employer that participates in the Plan.

      (e)    **Fillmore Theatrical Service.** Effective January 1, 2000, an Employee will receive credit for vesting and eligibility purposes for his or her service with Fillmore Theatrical Services; provided, however, in each case, that such Employee was employed by Fillmore Theatrical Services on the date immediately preceding the Employee's first day of employment with the Company or an Affiliated Employer that participates in the Plan.

US.322200570.24

(f)      **City of Concord.**  Effective January 1, 2000, an Employee will receive credit for vesting and eligibility purposes for his or her service with the City of Concord, California at the Chronicle Pavilion facility (formerly known as the Concord Pavilion); provided, however, in each case, that such Employee was employed by Bill Graham Enterprises, Inc., an affiliated company, on May 1, 2000 pursuant to an operation agreement between Bill Graham Enterprises, Inc. and the City of Concord, dated February 29, 2000.

(g)      **Target Center.**  Effective June 30, 2000, an Employee will receive credit for vesting and eligibility purposes for his or her service with Target Center; provided, however, in each case, that such Employee was employed by Target Center on the date immediately preceding the Employee's first day of employment with the Company or an Affiliated Employer that participates in the Plan.

(h)      **Starlake Pavilion Pittsburg.**  Effective as of June 30, 2000, an Employee will receive credit for vesting and eligibility purposes for his or her service with Starlake Pavilion Pittsburg; provided, however, in each case, that such Employee was employed by Starlake Pavilion Pittsburg on the date immediately preceding the Employee's first day of employment with the Company or an Affiliated Employer that participates in the Plan.

(i)      **Wiltern Renaissance, LLC.**  Effective July 1, 2000, an Employee will receive credit for vesting and eligibility purposes for his or her service with Wiltern Renaissance, LLC; provided, however, in each case, that such Employee was employed by Wiltern Renaissance, LLC, on the date immediately preceding the Employee's first day of employment with the Company or an Affiliated Employer that participates in the Plan.

(j)      **Cotter Group, Inc. or Service with Cotter Promotions, Inc.**  Effective August 2, 2000, an Employee will receive credit for vesting and eligibility purposes for his or her service with either the Cotter Group, Inc., or Cotter Promotions, Inc.; provided, however, in each case, that such Employee was employed by either Cotter Group, Inc. or Cotter Promotions, Inc. on August 2, 2000 and, pursuant to an asset purchase agreement by and between Cotter Group, Inc., Cotter Promotions, Inc., the Shareholders of Cotter Group, Inc., and SFX Sports Group, Inc. dated August 2, 2000, began employment with the Employer on August 3, 2000.

(k)      **Belkin, Inc.**  Effective May 14, 2001, an Employee will receive credit for vesting and eligibility purposes for his or her service with Belkin, Inc.; provided, however, in each case, that such Employee was employed by Belkin, Inc. on the date immediately preceding the Employee's first day of employment with the Company or an Affiliated Employer that participates in the Plan.

(l)      **Historic Theatre Group, LLC.**  Effective as of September 1, 2006, Historic Theatre Group, LLC became a Participating Employer in the Plan.  Effective September 1, 2006, an Employee will receive credit for vesting and eligibility purposes for his or her service with the Historic Theatre Group, LLC; provided, however, in each case, that such Employee was employed by that entity on the date immediately preceding his or her commencement of participation in the Plan.

(m)     **Concert Productions International, Inc.**  Effective as of August 1, 2006, Concert Productions International, Inc. became a Participating Employer in the Plan.  Effective September 1, 2006, an Employee will receive credit for vesting and eligibility purposes for his or her service with Concert Productions International, Inc.; provided, however, in each case, that such Employee was employed by Concert Productions International, Inc. on the date immediately preceding the Employee's first day of employment with the Company or an Affiliated Employer that participates in the Plan.

(n)     **International Hot Rod Association, LLC; NBC-CC Ventures, LLC and CINQ Group, LLC.**  Effective as of January 1, 2007, International Hot Rod Association, LLC, NBC-CC Ventures, LLC and CINQ Group, LLC became Participating Employers in the Plan.  Effective January 1, 2007, an Employee will receive credit for vesting and eligibility purposes for his or her service with International Hot Rod Association, LLC; NBC-CC Ventures, LLC or CINQ Group, LLC; provided, however, that in each case the Employee was employed by that entity on the date immediately preceding the Employee's first day of employment with the Company or an Affiliated Employer that participates in the Plan.

(o)     **HOB Entertainment, Inc.**  Effective as of October 12, 2009, HOB Entertainment, Inc. became a Participating Employer in the Plan.  Effective as of October 12, 2009, an Employee will receive credit for vesting and eligibility purposes for his or her service with HOB Entertainment, Inc. in accordance with the elapsed time method in accordance with Department of Labor Regulations Section 2530.200b-9; provided, however, in each case that such Employee was employed by that entity on the date immediately preceding his or her commencement of participation in the Plan.

(p)     **Signatures Network, Inc.**  Effective as of October 18, 2009, Signatures Network, Inc. became a Participating Employer in the Plan.  Effective as of October 18, 2009, an Employee will receive credit for vesting and eligibility purposes for his or her service with Signatures Network, Inc. in accordance with the elapsed time method in accordance with Department of Labor Regulations Section 2530.200b-9; provided, however, in each case that such Employee was employed by that entity on the date immediately preceding his or her commencement of participation in the Plan.

(q)     **Musictoday, LLC.**  Effective as of January 14, 2010, Musictoday, LLC became a Participating Employer in the Plan.  Effective as of January 14, 2010, an Employee will receive service credit for vesting and eligibility purposes for his or her service with Musictoday, LLC; provided, however, in each case that such Employee was employed by that entity on the date immediately preceding his or her commencement of participation in the Plan.

(r)     **Service with Ticketmaster LLC.**  Effective as of January 1, 2011, an Employee will receive service credit for vesting and eligibility purposes for his or her service with Ticketmaster LLC; provided, however, in each case that such Employee was employed by that entity on the date immediately preceding his or her commencement of participation in the Plan.  Effective as of January 1, 2011, Ticketmaster LLC will become a Participating Employer in the Plan.

(s)     **Service with Front Gate Ticketing Affiliates**.  Effective as of July 29, 2016, an Employee will receive service credit for vesting and eligibility purposes for his or her prior service with Front Gate Solutions, Inc. and C3 Presents, LLC; provided, however, in each case that, on the date immediately preceding his or her commencement of participation in the Plan, such Employee was employed by Front Gate Ticketing Solutions, LLC and had an account balance under the Front Gate Ticketing Solutions 401(k) Plan.  Effective as of January 1, 2016, Front Gate Ticketing Solutions, LLC became a Participating Employer in the Plan as a result of becoming a member of the Company's controlled group of corporations (pursuant to Code Section 414(c)).

(t)     **Service with Latitude 38 Entertainment**.  Effective January 1, 2021, an Employee will receive service credit for eligibility and vesting purposes for his or her prior service with Latitude 38 Entertainment, LLC (f/k/a Latitude 38 Entertainment, Inc.); provided, however, that such Employee was employed by that entity on the date immediately preceding his or her commencement of participation in the Plan.

(u)     **Service with C3 Presents, LLC**.  Effective as of December 28, 2018, an Employee will receive service credit for eligibility and vesting purposes for his or her prior service with C3 Presents, LLC; provided, however, that such Employee was employed by that entity on the date immediately preceding his or her commencement of participation in the Plan.

**APPENDIX C**

**MERGER OF HOB PLAN**

The HOB Entertainment, Inc. 401(k) Plan (the "HOB Plan") was merged with and into the Plan, effective on or about November 2, 2009 (the "HOB Merger Date"). The merger of the HOB Plan and the Plan is subject to the following provisions:

**C.1.    Transfer of Account Balances.**

The outstanding account balances under the HOB Plan were transferred to the Plan through a direct transfer from the trust for the HOB Plan to the Trust for the Plan, effected on the HOB Merger Date.

**C.2.    Amount of Account Balance.**

The account balance credited to each individual under the HOB Plan immediately prior to the HOB Merger Date was credited to the Prior Plan Account maintained for such individual under the Plan immediately after the HOB Merger Date. Accordingly, the Prior Plan Account balance maintained under the Plan for each individual who was a Participant in the HOB Plan on the HOB Merger Date will be, immediately after the HOB Merger Date, credited with a dollar amount equal to that Participant's HOB Account balance immediately prior to the HOB Merger Date.

**C.3.    Investment of Account Balance.**

The transferred account balance of each HOB Participant (as defined in Section C.5 below) was invested in such investment funds as the Administrator deemed appropriate until such time as any such HOB Participant made a specific investment direction.

**C.4.    Service Credit.**

As set forth in Appendix B, each Participant in the HOB Plan shall, for eligibility and vesting purposes under the Plan, be credited with all service credited to such Participant for eligibility and vesting purposes under the HOB Plan immediately prior to the HOB Merger Date.

**C.5.    Protected Benefits.**

The terms and provisions of the Plan shall govern the rights, benefits and entitlements of all Participants who has an interest in any outstanding Account balance under the surviving Plan. The terms and provisions of the HOB Plan shall, as of the HOB Merger Date, be extinguished and cease to have any force or effect. However, any benefits accrued under the HOB Plan prior to the HOB Merger Date shall, to the extent those benefits are protected benefits under Code Section 411(d)(6) (the "Protected Benefits"), be preserved under the Plan and shall not in any way be affected, reduced or eliminated as a result of the merger of the HOB Plan with and into the Plan, except as permitted under applicable law, including Income Tax Regulations Section 1.411(d)-4. Other than as set forth in this Appendix, there are no Protected Benefits for Participants who held account balances in the HOB Plan as of the HOB Merger Date ("HOB Participants").

To this end, the HOB Participants shall be entitled to the following Protected Benefits under the Plan:

      (a)      Service for a HOB Participant shall be determined for all purposes under the Live Nation Plan in accordance with the elapsed time method, in accordance with Department of Labor Regulations Section 2530.200b-9.

      (b)      Vesting for a HOB Participant in his or her HOB Account attributable to matching contributions (all other contributions are fully vested as of the HOB Merger Date) only shall continue to vest in accordance with the following schedule:

| Years of Vesting Service | Vested Percentage |
|---|---|
| Less than one (1) year | 0% |
| One (1) but less than two (2) years | 33% |
| Two (2) but less than three (3) years | 66% |
| Three (3) years or more | 100% |

Notwithstanding the foregoing, if a HOB Participant is employed by an Employer on his or her Normal Retirement Date, Early Retirement Date, the date of death, or the date he or she has a Disability, then he or she will be fully vested as of such date.

This provision shall constitute a modification to Section 6.1 solely as set forth herein; for all other purposes under the Plan, the vesting schedule and related terms under Section 6.1 shall control.

      (c)      Early Retirement Date, for a HOB Participant, means the date that he or she attains age fifty-five (55).  For this purpose, if a HOB Participant is employed by an Employer on his or her Early Retirement Date, then his or her vested percentage in his or her HOB Account shall be one hundred percent (100%).

      (d)      Disability, for a HOB Participant, means – in addition to the conditions set forth in Section 2.19 of the Plan – that he or she can no longer continue in the service of his or her employer because of a mental or physical condition that is likely to result in death or is expected to continue for a period of at least six (6) months.  A HOB Participant shall be considered as having a Disability only if the Administrator determines that he or she has a Disability based on a written certificate of a physician acceptable to the Administrator.  For this purpose, if a HOB Participant is employed by the Employer when he or she is deemed as having a Disability, then his or her vested percentage in his or her Prior Plan Account shall be one hundred percent (100%).

# **APPENDIX D**

## **MERGER OF SIGNATURES NETWORK PLAN**

The Signatures Network Savings and Investment Plan (the "Signatures Plan") was merged with and into the Plan, effective on or about November 2, 2009 (the "Signatures Merger Date").  The merger of the Signatures Plan and the Plan is subject to the following provisions:

### **D.1.    Transfer of Account Balances.**

The outstanding account balances under the Signatures Plan were transferred to the Plan through a direct transfer from the trust for the Signatures Plan to the Trust for the Plan, effected on the Signatures Merger Date.

### **D.2.    Amount of Account Balance.**

The account balance credited to each individual under the Signatures Plan immediately prior to the Signatures Merger Date were credited to the Prior Plan Account maintained for such participant under the Prior Plan immediately after the Signatures Merger Date.  Accordingly, the Prior Plan Account balance maintained under the Plan for each individual who was a participant in the Signatures Plan on the Signatures Merger Date will be, immediately after the Signatures Merger Date, credited with a dollar amount equal to that Participant's Signatures Account balance immediately prior to the Signatures Merger Date.

### **D.3.    Investment of Account Balance.**

The transferred account balance of each Signature Participant (as defined in Section D.5 below) was invested in such investment funds as the Administrator deemed appropriate until such time as any such Signature Participant made a specific investment direction.

### **D.4.    Service Credit.**

As set forth in Appendix B, each Participant in the Signatures Plan shall, for eligibility and vesting purposes under the Plan, be credited with all Service credited to such Participant for eligibility and vesting purposes under the Signatures Plan immediately prior to the Signatures Merger Date.

### **D.5.    Protected Benefits.**

The terms and provisions of the Plan shall govern the rights, benefits and entitlements of all Participants who have an interest in any outstanding Account balance under the surviving Plan.  The terms and provisions of the Signatures Plan shall, as of the Signatures Merger Date, be extinguished and cease to have any force or effect.  However, any benefits accrued under the Signatures Plan prior to the Signatures Merger Date shall, to the extent those benefits are protected benefits under Code Section 411(d)(6) (the "Protected Benefits"), be preserved under the Plan and shall not in any way be affected, reduced or eliminated as a result of the merger of the Signatures Plan with and into the Plan, except as permitted under applicable law, including Income Tax Regulations Section 1.411(d)-4.  Other than as set forth in this Appendix, there are no Protected

DocuSign Envelope ID: C2954706-7C70-47E3-9475-ABDBBF643580

Benefits for Participants who held account balances in the Signatures Plan as of the Signatures Merger Date ("Signatures Participants").

To this end, the Signatures Members shall be entitled to the following Protected Benefits under the Plan:

(a)   Service for a Signature Participant shall be determined for all purposes under the Plan in accordance with the elapsed time method, in accordance with Department of Labor Regulations Section 2530.200b-9.

US.322200570.24

**APPENDIX E**

**MERGER OF MUSICTODAY PLAN**

The Musictoday, LLC 401(k) Plan (the "Musictoday Plan") was merged with and into the Plan on or about January 14, 2010 (the "Musictoday Merger Date"). The merger of the Musictoday Plan with and into the Plan is subject to the following provisions:

**E.1.   Transfer of Account Balances.**

The outstanding balances under the Musictoday Plan were transferred to the Plan through a direct transfer from the trust for the Musictoday Plan to the Trust for the Plan, effected on the Musictoday Merger Date.

**E.2.   Amount of Account Balances.**

The amount balance credited to each individual under the Musictoday Plan immediately prior to the Musictoday Merger Date was credited to the Prior Plan Account maintained for such individual under the Prior Plan immediately after the Musictoday Merger Date. Accordingly, the Account balance maintained under the Plan for each individual who was a participant in the Musictoday Plan on the Musictoday Merger Date will be, immediately after the Musictoday Merger Date, credited with a dollar amount equal to that individual's Musictoday Account balance immediately prior to the Musictoday Merger Date.

**E.3.   Investment of Account Balances.**

The transferred account balance for each participant in the Musictoday Plan was invested in such investment funds as the Administrator deemed appropriate until such time as any such participant made a specific investment direction.

**E.4.   Service Credit.**

As set forth in Appendix B, each participant in the Musictoday Plan shall, for eligibility and vesting purposes under the Plan, be credited with all Service credited to such participant for eligibility and vesting purposes under the Musictoday Plan immediately prior to the Musictoday Merger Date.

US.322200570.24

# APPENDIX F

## MERGER OF TICKETMASTER PLAN

The Ticketmaster Retirement Savings Plan (the "Ticketmaster Plan") was merged with and into the Plan, effective on or about January 1, 2011 (the "Ticketmaster Merger Date").  The merger of the Ticketmaster Plan and the Plan is subject to the following provisions:

### F.1.     Transfer of Account Balances.

The outstanding account balances under the Ticketmaster Plan were transferred to the Plan through a direct transfer from the trust for the Ticketmaster Plan to the Trust for the Plan, effected on the Ticketmaster Merger Date.

### F.2.     Amount of Account Balance.

The account balance credited to each individual under the Ticketmaster Plan immediately prior to the Ticketmaster Merger Date will be credited to the Prior Plan Account maintained for such Participant under the Plan immediately after the Ticketmaster Merger Date.  Accordingly, the Ticketmaster Account balance maintained under the Plan for each participant in the Ticketmaster Plan on the Ticketmaster Merger Date will be, immediately after the Ticketmaster Merger Date, credited with a dollar amount equal to that participant's Ticketmaster Account balance immediately prior to the Ticketmaster Merger Date.

### F.3.     Investment of Account Balance.

The transferred account balance of each Ticketmaster Participant (as defined in Section F.5 below) was invested in such investment funds as the Administrator deemed appropriate until such time as any such Ticketmaster Participant made a specific investment direction.

### F.4.     Service Credit.

As set forth in Appendix B, each participant in the Ticketmaster Plan shall, for eligibility and vesting purposes under the Plan, be credited with all service credited to such participant for eligibility and vesting purposes under the Ticketmaster Plan immediately prior to the Ticketmaster Merger Date.

### F.5.     Protected Benefits.

The terms and provisions of the Plan shall govern the rights, benefits and entitlements of all Participants who have an interest in any outstanding Account balance under the surviving Plan. The terms and provisions of the Ticketmaster Plan shall, as of the Ticketmaster Merger Date, be extinguished and cease to have any force or effect.  However, any benefits accrued under the Ticketmaster Plan prior to the Ticketmaster Merger Date shall, to the extent those benefits are protected benefits under Code Section 411(d)(6) (the "Protected Benefits"), be preserved under the Plan and shall not in any way be affected, reduced or eliminated as a result of the merger of the Ticketmaster Plan with and into the Plan, except as permitted under applicable law, including Income Tax Regulations Section 1.411(d)-4.  Other than as set forth in this Appendix, there are no

F-1

DocuSign Envelope ID: C2954706-7C70-4753-9475-A8DBBF643580

Protected Benefits for participants who held account balances in the Ticketmaster Plan as of the Ticketmaster Merger Date ("Ticketmaster Participants").

To this end, the Ticketmaster Participants shall be entitled to the following Protected Benefits under the Plan:

(a)     Service for a Ticketmaster Participant shall be determined for all purposes under the Plan in accordance with the elapsed time method as set forth in Department of Labor Regulations Section 2530.200b-9;

(b)     Vesting for a Ticketmaster Participant in his or her Prior Plan Account attributable to matching contributions (all other contributions are fully vested as of the Ticketmaster Merger Date) only shall continue to vest in accordance with the following schedule:

| Years of Vesting Service | Vested Percentage |
|---|---|
| Less than two (2) years | 0% |
| Two (2) years or more | 100% |

Vesting for a Ticketmaster Participant in his or her Paciolan, Inc. Account attributable to non-elective employer or other matching contributions only shall continue to vest in accordance with the following schedule:

| Years of Vesting Service | Vested Percentage |
|---|---|
| Less than two (2) years | 0% |
| Two (2) years or more | 100% |

Vesting for a Ticketmaster Participant in his or her V.I.P. Tour Company Account attributable to non-elective employer or other matching contributions only shall continue to vest in accordance with the following schedule:

| Years of Vesting Service | Vested Percentage |
|---|---|
| Less than two (2) years | 0% |
| Two (2) but less than three (3) years | 20% |
| Three (3) but less than three (4) years | 40% |
| Four (4) but less than five (5) years | 60% |
| Five (5) but less than six (6) years | 80% |
| Six (6) years or more | 100% |

Notwithstanding the foregoing, if a Ticketmaster Participant is employed by an Employer on his or her Normal Retirement Date, the date of death, or the date he or she has a Disability (as defined below), then he or she will be fully vested as of such date.

Disability with respect to a Ticketmaster Participant's vested interest in his or her V.I.P. Tour Company Account means Participant's employment is terminated (prior to Normal Retirement Age) as a result of a medically determinable physical or mental impairment which may be expected

US.322200570.24

to result in death or to last for a continuous period of not less than twelve (12) months and which renders him or her incapable of performing his or her duties.

This provision shall constitute a modification to Sections 2.19 and 6.1 solely as set forth herein; for all other purposes under the Plan, the definition of Disability under Section 2.19 and the vesting schedule and related terms under Section 6.1 shall control.

(d)      Normal Retirement Date, for a Ticketmaster Participant, means the date that he or she attains age fifty-five (55).  For this purpose, if a Ticketmaster Participant is employed by an Employer on his or her Normal Retirement Date, then his or her vested percentage in his or her Ticketmaster Account shall be one hundred percent (100%).

(e)      A Ticketmaster Participant may withdraw his or her entire vested Prior Plan Account balance at any time subsequent to the date the Participant reaches his or her Normal Retirement Date (as defined above), including if such Ticketmaster Participant has not yet experienced his or her Severance Date.

US.322200570.24

# APPENDIX G

## TRUST-TO-TRUST TRANSFER  TO INSOMNIAC PLAN

The Company approved the withdrawal of Insomniac Holdings, LLC ("Insomniac") from the Plan, effective as the close of market February 29, 2016 (the "Withdrawal Date").  In connection with Insomniac's simultaneous adoption of a tax-qualified plan under Code Section 401(a) and related tax-exempt trust under Code Section 501(a) (the "Insomniac Plan") and pursuant to Section 13.2 of the Plan, the Accounts of all Participants who are current Employees of Insomniac (or any member of its controlled group of corporations) as of the Withdrawal Date (the "Insomniac Participants") are subject to the following provisions:

### G.1.    Transfer of Account Balances.

All assets (vested and unvested) and liabilities of the Accounts attributable to the Insomniac Participants were transferred to the Insomniac Plan through a direct trust-to-trust transfer from the Trust to the Insomniac Plan's tax-exempt trust, effective as soon as reasonably practicable after the Withdrawal Date.

### G.2.    Protected Benefits.

Any benefits accrued under the Plan as of the Withdrawal Date shall, to the extent those benefits are protected benefits under Code Section 411(d)(6), be identified as such to Insomniac.  With respect to all assets and liabilities transferred from the Plan to the Insomniac Plan, Insomniac agreed by accepting such a transfer to satisfy all of its obligations under applicable law, including without limitation Code Section 411(d).

### G.3    Indemnification.

For the avoidance of doubt, Insomniac's duties of indemnification pursuant to Section 16.2 of the Plan with respect to any action, inaction or conduct on or prior to the Withdrawal Date or at any later time in connection with the foregoing transfer from the Plan to the Insomniac Plan, shall survive Insomniac's withdrawal from the Plan and its termination of Participating Employer status.

US.322200570.24

DocuSign Envelope ID: C2954706-7C70-4753-9475-A8DBBF643580

## APPENDIX H

## MERGER OF FRONT GATE TICKETING SOLUTIONS 401(k) PLAN

The Front Gate Ticketing Solutions 401(k) Plan (the "FGTS Plan") was merged with and into the Plan, effective on or about July 29, 2016 (the "FGTS Merger Date").  The merger of the FGTS Plan and the Plan is subject to the following provisions:

### H.1.    Transfer of Account Balances.

The outstanding account balances under the FGTS were transferred to the Plan through a direct transfer from the trust for the FGTS to the Trust for the Plan, effected on the FGTS Merger Date.

### H.2.    Amount of Account Balance.

Immediately after the FGTS Merger Date, the account balance credited to each participant in the FGTS Plan ("FGTS Participant") immediately prior to the FGTS Merger Date were credited to the Prior Plan Account maintained for such FGTS Participant under the Plan.

### H.3.    Investment of Account Balance.

The transferred account balance of each FGTS Participant was invested in such investment funds as the Administrator deemed appropriate until such time as any such FGTS Participant made a specific investment direction.

### H.4.    Roth Account Balances.

An FGTS Participant's Prior Plan Account balance attributable to Prior Plan Roth Contributions to the FGTS Plan shall be credited to a Prior Plans Roth Account.  Any such Prior Plans Roth Account shall be eligible for distributions upon "severance from employment" in accordance with Section 7.9, hardship in accordance with Section 8.1, and for qualified reservist distributions in accordance with Section 7.14(c).

### H.5    Service Credit.

As set forth in Appendix B, each FGTS Participant shall, for eligibility and vesting purposes under the Plan, be credited with all service credited to such participant for eligibility and vesting purposes under the FGTS Plan immediately prior to the FGTS Merger Date, but without any duplication of service already credited under the Plan in connection with Front Gate Ticketing Solutions, LLC's commencement as a Participating Employer in the Plan on January 1, 2016.

### H.6.    Protected Benefits.

The terms and provisions of the Plan shall govern the rights, benefits and entitlements of all FGTS Participants who have an interest in any outstanding Account balance under the surviving Plan. The terms and provisions of the FGTS Plan shall, as of the FGTS Merger Date, be extinguished and cease to have any force or effect.  However, any benefits accrued under the FGTS Plan prior to the FGTS Merger Date shall, to the extent those benefits are protected benefits under Code

US.322200570.24

Section 411(d)(6) (the "Protected Benefits"), be preserved under the Plan and shall not in any way be affected, reduced or eliminated as a result of the merger of the FGTS Plan with and into the Plan, except as permitted under applicable law, including Income Tax Regulations Section 1.411(d)-4.  Other as set forth in this Appendix, there are no Protected Benefits for FGTS Participants.

To this end, the FGTS Participants shall be entitled to the following Protected Benefits under the Plan:

(a)     A FGTS Participant may withdraw his or her entire vested Prior Plan Account balance at any time subsequent to the date he or she has a Disability (as defined below), including if such FGTS Participant has not yet experienced his or her Severance Date.

(b)     A Year of Service for a FGTS Participant respect to his or her Prior Plan Account attributable to matching contributions only (each FGTS Participant's interest in all other contributions in his or her Prior Plan Account, if any, are fully vested and nonforfeitable as of the FGTS Merger Date) shall be determined for all purposes under the Plan in accordance with the elapsed time method as set forth in Department of Labor Regulations Section 2530.200b-9.

(c)     For any FGTS Participant who was an employee of Front Gate Ticketing Solutions, LLC before September 13, 2012, his or her interest in his or her Prior Plan Account attributable to matching contributions, if any, are fully vested and nonforfeitable as of the FGTS Merger Date.

(d)     Except as provided in paragraph H.6(c) of this Appendix, vesting for a FGTS Participant in his or her Prior Plan Account attributable to matching contributions only shall continue to vest in accordance with the following schedule:

| Years of Vesting Service | Vested Percentage |
|---|---|
| Less than one (1) year | 0% |
| One (1) but less than two (2) years | 25% |
| Two (2) but less than three (3) years | 50% |
| Three (3) but less than four (4) years | 75% |
| Four (4) years or more | 100% |

Notwithstanding the foregoing, if a FGTS Participant is employed by an Employer on his or her Normal Retirement Date, the date of death, or the date he or she has a Disability (as defined below), then his or her interest in his or her Prior Plan Account attributable to matching contributions, if any, shall be fully vested and nonforfeitable as of such date.

(e)     Disability with respect to a FGTS Participant's vested interest in his or her Prior Plan Account attributable to matching contributions means the FGTS Participant experiences an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months.  The permanence and degree of such impairment must be supported by medical evidence.  The determination of

H-2

US.322200570.24

DocuSign Envelope ID: C3954706-7C70-4753-9475-ABDBBF643580

whether a Participant has a Disability shall be made by the Administrator and shall be final,
binding and conclusive on all persons and entities.

This provision shall constitute a modification to Sections 2.19 and 6.1 solely as set forth herein;
for all other purposes under the Plan, the definition of Disability under Section 2.19 and the vesting
schedule and related terms under Section 6.1 shall control.

H-3

DocuSign Envelope ID: C2954706-7C70-4753-9475-ABDBBF643580

# APPENDIX I

## MERGER OF THE LATITUDE 38 ENTERTAINMENT 401(K) SAVINGS PLAN

The Latitude 38 Entertainment 401(k) Savings Plan (the "Latitude 38 Plan") was merged with and into the Plan, effective at 12:01 A.M. on January 1, 2021 (the "Latitude 38 Merger Date"). The merger of the Latitude 38 Plan and the Plan is subject to the following provisions:

### I.1.    Transfer of Account Balances.

The outstanding account balances under the Latitude 38 Plan were transferred to the Plan through a direct transfer from the trust for the Latitude 38 Plan to the Trust for the Plan, effected on or as soon as administratively after the Latitude 38 Merger Date.

### I.2.    Amount of Account Balance.

The account balance credited to each individual under the Latitude 38 Plan immediately prior to the Latitude 38 Merger Date was credited to the Prior Plan Account maintained for such participant under the Prior Plan immediately after the Latitude 38 Merger Date.  Accordingly, the Prior Plan Account balance maintained under the Plan for each individual who was a participant in the Latitude 38 Plan on the Latitude 38 Merger Date was, immediately after the Latitude 38 Merger Date, credited with a dollar amount equal to that Participant's Latitude 38 Account balance immediately prior to the Latitude 38 Merger Date.

### I.3.    Investment of Account Balance.

As soon as administratively on or after the Latitude 38 Merger Date, the transferred account balance of each Latitude 38 Participant (as defined in Section I.5 below) was invested in such investment funds as the Administrator deemed appropriate until such time as any such Latitude 38 Participant made a specific investment direction.

### I.4.    Service Credit.

As set forth in Appendix B, each Latitude 38 Participant shall, for eligibility and vesting purposes under the Plan, be credited with all service credited to such participant for eligibility and vesting purposes under the Latitude 38 Plan immediately prior to the Latitude 38 Merger Date.

### I.5.    Protected Benefits.

The terms and provisions of the Plan shall govern the rights, benefits and entitlements of all Latitude 38 Participants who have an interest in any outstanding Account balance under the surviving Plan.  The terms and provisions of the Latitude 38 Plan shall, as of the Latitude 38 Merger Date, be extinguished and cease to have any force or effect.  However, any benefits accrued under the Latitude 38 Plan prior to the Latitude 38 Merger Date shall, to the extent those benefits are protected benefits under Code Section 411(d)(6) (the "Protected Benefits"), be preserved under the Plan and shall not in any way be affected, reduced or eliminated as a result of the merger of

US.322200570.24

DocuSign Envelope ID: C2954706-7C70-4753-9475-ABDBBF643580

the Latitude 38 Plan with and into the Plan, except as permitted under applicable law, including Income Tax Regulations Section 1.411(d)-4.  Other than as set forth in this Appendix, there are no Protected Benefits for Latitude 38 Participants who held account balances in the Latitude 38 Plan as of the Latitude 38 Merger Date ("Latitude 38 Participants").

To this end, the Latitude 38 Participants shall be entitled to the following Protected Benefits under the Plan:

      (a)     A Latitude 38 Participant's Prior Plan Account under the Latitude 38 Plan shall be fully vested and nonforfeitable as of the Latitude 38 Merger Date.

      (b)     Normal Retirement Date, for a Latitude 38 Participant, means the date that he or she attains age fifty-nine and a half (59.5).  A Latitude 38 Participant may elect to receive a distribution of his or her vested Prior Plan Account balance on or after the date such Latitude 38 Participant reaches his or her Normal Retirement Date, regardless of whether or not the Participant has a Severance Date.

US.322200570.24

## APPENDIX J

## MERGER OF THE GREEN LIGHT MEDIA & MARKETING, LLC 401(K) PLAN

The Green Light Media & Marketing LLC 401(k) Plan (the "Green Light Plan") was merged with and into the Plan, effective on or about September 17, 2018 (the "Green Light Merger Date"). The merger of the Green Light Plan and the Plan is subject to the following provisions:

### J.1.    Transfer of Account Balances.

The outstanding account balances under the Green Light Plan were transferred to the Plan through a direct transfer from the trust for the Green Light Plan to the Trust for the Plan, effected on the Green Light Merger Date.

### J.2.    Amount of Account Balance.

The account balance credited to each individual under the Green Light Plan immediately prior to the Green Light Merger Date was credited to the Prior Plan Account maintained for such participant under the Prior Plan immediately after the Green Light Merger Date. Accordingly, the Prior Plan Account balance maintained under the Plan for each individual who was a participant in the Green Light Plan on the Green Light Merger Date was, immediately after the Green Light Merger Date, credited with a dollar amount equal to that Participant's Green Light Account balance immediately prior to the Green Light Merger Date.

### J.3.    Investment of Account Balance.

The transferred account balance of each Green Light Participant (as defined in Section J.5 below) was invested in such investment funds as the Administrator deemed appropriate until such time as any such Green Light Participant made a specific investment direction.

### J.4.    Service Credit.

As set forth in Appendix B, each Green Light Participant shall, for eligibility and vesting purposes under the Plan, be credited with all service credited to such participant for eligibility and vesting purposes under the Green Light Plan immediately prior to the Green Light Merger Date.

### J.5.    Protected Benefits.

The terms and provisions of the Plan shall govern the rights, benefits and entitlements of all Green Light Participants who have an interest in any outstanding Account balance under the surviving Plan. The terms and provisions of the Green Light Plan shall, as of the Green Light Merger Date, be extinguished and cease to have any force or effect. However, any benefits accrued under the Green Light Plan prior to the Green Light Merger Date shall, to the extent those benefits are protected benefits under Code Section 411(d)(6) (the "Protected Benefits"), be preserved under the Plan and shall not in any way be affected, reduced or eliminated as a result of the merger of the Green Light Plan with and into the Plan, except as permitted under applicable law, including Income Tax Regulations Section 1.411(d)-4. Other than as set forth in this Appendix, there are no

DocuSign Envelope ID: C2954706-7C70-4753-9475-A8DBBF643580

Protected Benefits for Green Light Participants who held account balances in the Green Light Plan as of the Green Light Merger Date ("Green Light Participants").

To this end, the Green Light Participants shall be entitled to the following Protected Benefits under the Plan:

(a)     A Green Light Participant's Prior Plan Account under the Green Light Plan shall be fully vested and nonforfeitable as of the Green Light Merger Date.

(b)     A Green Light Participant may withdraw his or her entire vested Prior Plan Account balance at any time subsequent to the date he or she has a Disability, including if such Green Light Participant has not yet experienced his or her Severance Date.  For this purpose, a Green Light Participant shall be considered to have a Disability if the Green Light Participant is disabled as a result of a sickness or injury, is prevented from engaging in any substantial gainful activity, and is eligible for and receives a disability benefit under Title II of the Federal Social Security Act.  The determination of whether a Participant has a Disability shall be made by the Administrator and shall be final, binding and conclusive on all persons and entities.  This provision shall constitute a modification to Sections 2.19 solely as set forth herein; for all other purposes under the Plan, the definition of Disability under Section 2.19 shall control.

(c)     A Green Light Participant may elect to have his or her vested interest in his or her Prior Plan Account paid in the method provided in Section 7.7 or in a (i) a straight life annuity; (ii) single life annuity with certain periods of 5, 10, or 15 years; (iii) a single life annuity with installment refund; (iv) survivorship life annuities with installment refund and survivorship percentages of 50%, 66 2/3%, 75%, or 100%; or (v) fixed period annuities for any period of whole months that is not less than 60, as described in the Green Light Plan.

(d)     Early Retirement Date, for a Green Light Participant, means the date that he or she attains age fifty-five (55).  A Green Participant may elect to receive a distribution of his or her vested Prior Plan Account balance as an early retirement benefit on or after the date such Green Light Participant reaches his or her Early Retirement Date and has a Severance Date.

US.322200570.24

DocuSign Envelope ID: C3954706-7C70-4753-9475-A8DBBF643580

**APPENDIX K**

**MERGER OF THE C3 PRESENTS, LLC 401(K) RETIREMENT PLAN**

The C3 Presents, LLC 401(k) Plan (the "C3 Plan") was merged with and into the Plan, effective on or about December 28, 2018 (the "C3 Merger Date").  The merger of the C3 Plan and the Plan is subject to the following provisions:

**K.1.    Transfer of Account Balances.**

The outstanding account balances under the C3 Plan were transferred to the Plan through a direct transfer from the trust for the C3 Plan to the Trust for the Plan, effected on the C3 Merger Date.

**K.2.    Amount of Account Balance.**

The account balance credited to each individual under the C3 Plan immediately prior to the C3 Merger Date was credited to the Prior Plan Account maintained for such participant under the Prior Plan immediately after the C3 Merger Date.  Accordingly, the Prior Plan Account balance maintained under the Plan for each individual who was a participant in the C3 Plan on the C3 Merger Date was, immediately after the C3 Merger Date, credited with a dollar amount equal to that Participant's C3 Account balance immediately prior to the C3 Merger Date.

**K.3.    Investment of Account Balance.**

The transferred account balance of each C3 Participant (as defined in Section K.5 below) was invested in such investment funds as the Administrator deemed appropriate until such time as any such C3 Participant made a specific investment direction.

**K.4    Service Credit.**

As set forth in Appendix B, each C3 Participant shall, for eligibility and vesting purposes under the Plan, be credited with all service credited to such participant for eligibility and vesting purposes under the C3 Plan immediately prior to the C3 Merger Date.

**K.5.    Protected Benefits.**

The terms and provisions of the Plan shall govern the rights, benefits and entitlements of all C3 Participants who have an interest in any outstanding Account balance under the surviving Plan. The terms and provisions of the C3 Plan shall, as of the C3 Merger Date, be extinguished and cease to have any force or effect.  However, any benefits accrued under the C3 Plan prior to the C3 Merger Date shall, to the extent those benefits are protected benefits under Code Section 411(d)(6) (the "Protected Benefits"), be preserved under the Plan and shall not in any way be affected, reduced or eliminated as a result of the merger of the C3 Plan with and into the Plan, except as permitted under applicable law, including Income Tax Regulations Section 1.411(d)-4. Other than as set forth in this Appendix, there are no Protected Benefits for C3 Participants who held account balances in the C3 Plan as of the C3 Merger Date ("C3 Participants").

To this end, the C3 Participants shall be entitled to the following Protected Benefits under the Plan:

US.322200570.24

DocuSign Envelope ID: C2954706-7C70-4753-9475-ABDBBF643580

(a)      A C3 Participant may withdraw his or her entire vested Prior Plan Account balance at any time subsequent to the date he or she has a Disability (as defined below), including if such C3 Participant has not yet experienced his or her Severance Date.

(b)      A Year of Service for a C3 Participant with respect to his or her Prior Plan Account attributable to discretionary matching contributions for participants whose entry date was prior to September 1, 2016 only (each C3 Participant's interest in all other contributions in his or her Prior Plan Account, if any, are fully vested and nonforfeitable as of the C3 Merger Date) shall be determined for all purposes under the Plan in accordance with the elapsed time method as set forth in Department of Labor Regulations Section 2530.200b-9.

(c)      Vesting for a C3 Participant whose entry date in the C3 Plan was prior to September 1, 2016 in such C3 Participant's Prior Plan Account attributable to discretionary matching contributions only (all other contributions are fully vested as of the C3 Merger Date) shall continue to vest in accordance with the following schedule:

| Years of Vesting Service | Vested Percentage |
|---|---|
| Less than one (1) year | 0% |
| One (1) but less than two (2) years | 25% |
| Two (2) but less than three (3) years | 50% |
| Three (3) years | 100% |

Notwithstanding the foregoing, if a C3 Participant whose entry date in the C3 Plan was prior to September 1, 2016 is employed by an Employer on his or her Normal Retirement Date, the date of death, or the date he or she has a Disability (as defined below), then his or her interest in his or her Prior Plan Account attributable to discretionary matching contributions, if any, shall be fully vested and nonforfeitable as of such date.

This provision shall constitute a modification to Section 6.1 solely as set forth herein; for all other purposes under the Plan, the vesting schedule and related terms under Section 6.1 shall control.

(d)      Disability with respect to a C3 Participant's vested interest in his or her Prior Plan Account means the C3 Participant experiences an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months. The permanence and degree of such impairment must be supported by medical evidence. The determination of whether a Participant has a Disability shall be made by the Administrator and shall be final, binding and conclusive on all persons and entities.

(e)      A C3 Participant may elect to have his or her vested interest in his or her Prior Plan Account paid in the method provided in Section 7.7 or in a series of substantially equal annual or more frequent installments (but not more frequently than monthly) for a period not exceeding the

K-2

life expectancy of the Participant or the joint life expectancy of the Participant and his or her Beneficiary.

US.322200570.24

## APPENDIX L

## MERGER OF THE ARTIST NATION 401(K) PLAN

The Artist Nation 401(k) Plan (the "Artist Nation Plan") was merged with and into the Plan, effective on October 1, 2021 (the "Artist Nation Merger Date"). The merger of Artist Nation Plan and the Plan is subject to the following provisions:

### L.1.    Transfer of Account Balances.

The outstanding account balances under the Artist Nation Plan were transferred to the Plan through a direct transfer from the trust for the Artist Nation Plan to the Trust for the Plan, effected on or as soon as administratively after the Artist Nation Merger Date.

### L.2.    Amount of Account Balance.

The account balance credited to each individual under the Artist Nation Plan immediately prior to the Artist Nation Merger Date was credited to the Prior Plan Account maintained for such participant under the Prior Plan immediately after the Artist Nation Merger Date. Accordingly, the Prior Plan Account balance maintained under the Plan for each individual who was a participant in the Artist Nation Plan on the Artist Nation Merger Date was, immediately after the Artist Nation Merger Date, credited with a dollar amount equal to that Participant's Artist Nation Account balance immediately prior to the Artist Nation Merger Date.

### L.3.    Investment of Account Balance.

As soon as administratively possible on or after the Artist Nation Merger Date, the transferred account balance of each Artist Nation Participant (as defined in Section L.5 below) was invested in such investment funds as the Administrator deemed appropriate until such time as any such Artist Nation Participant made a specific investment direction.

### L.4.    Service Credit.

As set forth in Appendix B, each Artist Nation Participant shall, for eligibility and vesting purposes under the Plan, be credited with all service credited to such participant for eligibility and vesting purposes under the Artist Nation Plan immediately prior to the Artist Nation Merger Date.

### L.5.    Protected Benefits.

The terms and provisions of the Plan shall govern the rights, benefits and entitlements of all Artist Nation Participants who have an interest in any outstanding Account balance under the surviving Plan. The terms and provisions of the Artist Nation Plan shall, as of the Artist Nation Merger Date, be extinguished and cease to have any force or effect. However, any benefits accrued under the Artist Nation Plan prior to the Artist Nation Merger Date shall, to the extent those benefits are protected benefits under Code Section 411(d)(6) (the "Protected Benefits"), be preserved under the Plan and shall not in any way be affected, reduced or eliminated as a result of the merger of the Artist Nation Plan with and into the Plan, except as permitted under applicable law, including

Income Tax Regulations Section 1.411(d)-4.  Other than as set forth in this Appendix, there are no Protected Benefits for Artist Nation Participants.

To this end, the Artist Nation Participants shall be entitled to the following Protected Benefits under the Plan:

(a)     An Artist Nation Participant may withdraw his or her entire vested Prior Plan Account balance at any time subsequent to the date he or she has a Disability (as defined below), including if such Artist Nation Plan Participant has not yet experienced his or her Severance Date.  For this purpose, an Artist Nation Participant shall be considered to have a Disability if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  In addition, an Artist Nation Participant who has a Disability as described herein while performing qualified military services (as defined in Code Section 414(u)(1)) on or after January 1, 2007, shall be treated as having resumed employment on the day prior to becoming disabled and then terminated employment on account of Disability.  The determination of whether a Participant has a Disability shall be made by the Administrator and shall be final, binding and conclusive on all persons and entities.  This provision shall constitute a modification to Sections 2.19 solely as set forth herein; for all other purposes under the Plan, the definition of Disability under Section 2.19 shall control.

(b)     An Artist Nation Participant's Prior Plan Account under the Artist Nation Plan, if any, shall be fully vested and nonforfeitable as of the Artist Nation Merger Date.  For purposes of clarity, this includes, without limitation, an Artist Nation Participant's interest, if any, in his or her Prior Plan Account attributable to Frozen ER Profit Sharing contributions and Top Heavy Contributions, within the meaning given under the Artist Nation Plan. This provision shall constitute a modification to Section 6.1 solely as set forth herein; for all other purposes under the Plan, the vesting schedule and related terms under Section 6.1 shall control.

## APPENDIX M

## MERGER OF THE STUBBS AUSTIN 401(k) PROFIT SHARING PLAN

The Stubbs Austin 401(k) Profit Sharing Plan (the "Stubbs Plan") is merged with and into the Plan, effective at 12:01 A.M. January 1, 2023 (the "Stubbs Merger Date"). The merger of the Stubbs Plan with and into the Plan is subject to the following provisions:

**M.1.    Transfer of Account Balances.**

The outstanding account balances under the Stubbs Plan will be transferred to the Plan through a direct transfer from the trust for the Stubbs Plan to the Trust for the Plan, effected on or as soon as administratively possible after the Stubbs Merger Date.

**M.2.    Amount of Account Balance.**

The account balance credited to each participant under the Stubbs Plan immediately prior to the Stubbs Merger Date ("Stubbs Participant") will be credited to the Prior Plan Account maintained for such Participant under the Plan immediately after the Stubbs Merger Date. Accordingly, the Prior Plan Account balance maintained under the Plan for each individual who is a participant in the Stubbs Plan on the Stubbs Merger Date will be, immediately after the Stubbs Merger Date, credited with a dollar amount equal to that Participant's Stubbs Account balance immediately prior to the Stubbs Merger Date.

**M.3.    Investment of Account Balance.**

As soon as administratively possible on or after the Stubbs Merger Date, the transferred account balance of each Stubbs Participant will be invested in such investment funds as the Administrator deemed appropriate until such time as any such Participant makes a specific investment direction.

**M.4.    Service Credit.**

As set forth in Appendix B, each Stubbs Participant shall, for eligibility and vesting purposes under the Plan, be credited with all service credited to such participant for eligibility and vesting purposes under the Stubbs Plan immediately prior to the Stubbs Merger Date.

**M.5.    Protected Benefits.**

The terms and provisions of the Plan shall govern the rights, benefits and entitlements of all Stubbs Participants who have an interest in any outstanding Account balance under the surviving Plan. The terms and provisions of the Stubbs Plan shall, as of the Stubbs Merger Date, be extinguished and cease to have any force or effect. However, any benefits accrued under the Stubbs Plan prior to the Stubbs Merger Date shall, to the extent those benefits are protected benefits under Code Section 411(d)(6) (the "Protected Benefits"), be preserved under the Plan and shall not in any way be affected, reduced or eliminated as a result of the merger of the Stubbs Plan with and into the Plan, except as permitted under applicable law, including Income Tax Regulations Section 1.411(d)-4. Other than as set forth in this Appendix, there are no Protected Benefits for Stubbs Participants.

To this end, the Stubbs Participants shall be entitled to the following Protected Benefits under the Plan:

(a)      A Stubbs Participant may withdraw his or her entire vested Prior Plan Account balance at any time subsequent to the date he or she has a Disability, including if such Stubbs Plan Participant has not yet experienced his or her Severance Date.  For this purpose, a Stubbs Participant shall be considered to have a "Disability" if the Participant has been determined to be disabled by a physician chosen by the Plan Administrator and the disability has lasted or can be expected to last for at least 12 months.

(b)      In addition, a Stubbs Participant who has a Disability as described herein while performing qualified military services (as defined in Code Section 414(u)(1)) on or after January 1, 2007, shall be treated as having resumed employment on the day prior to becoming disabled and then terminated employment on account of Disability.  The determination of whether a Participant has a Disability shall be made by the Administrator and shall be final, binding and conclusive on all persons and entities.  This provision shall constitute a modification to Sections 2.19 solely as set forth herein; for all other purposes under the Plan, the definition of Disability under Section 2.19 shall control.

Vesting for a Stubbs Participant in his or her Prior Plan Account attributable to all matching contributions and employer nonelective contributions (all other contributions are fully vested as of the Stubbs Merger Date) shall continue to vest in accordance with the following schedule:

| Years of Vesting Service | Vested Percentage |
| --- | --- |
| Less than one (1) year | 0% |
| One (1) but less than two (2) years | 25% |
| Two (2) but less than three (3) years | 50% |
| Three (3) but less than four (4) years | 75% |
| Four (4) years or more | 100% |

Notwithstanding the foregoing, if a Stubbs Participant is employed by an Employer on his or her Normal Retirement Date, the date of death or the date he or she has a Disability (including death or Disability incurred while performing Qualified Military Service), then he or she will be fully vested as of such date.

This provision shall constitute a modification to Section 6.1 solely as set forth herein; for all other purposes under the Plan, the vesting schedule and related terms under Section 6.1 shall control.

(c)      A Stubbs Participant may withdraw all or a portion of his or her Prior Plan Account attributable to voluntary contributions (as defined under the Stubbs Plan) at any time, subject to any requirements of the Administrator, including if such Stubbs Participant has not yet experienced his or her Severance Date. Any such withdrawal shall be a cash lump sum in the amount specified by the Participant, up to the value of his or her vested Prior Plan Account balance attributable to such voluntary contributions; provided, however, that to the extent that at the time of his or her withdrawal under this Section all or any portion

M-2

DocuSign Envelope ID: C2954706-7C70-47F3-9475-A8DBBF643580

of such Prior Plan Account is invested in Company Stock, such distribution may, at the election of the Participant, be in the form of whole shares of Company Stock, with any fractional shares distributed in the form of cash.

US.322200570.24