**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
1117 State Street
Santa Barbara, CA 93101
Telephone: (805) 618-2924
Facsimile: (805) 618-2939
christina@chumphreylaw.com

*[Attorneys for Plaintiffs]*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

PAMELA AVECILLA and SEAN BAILEY, individually and as representatives of a Putative Class of Participants and Beneficiaries, on behalf of the LIVE NATION ENTERTAINMENT, INC. 401(K) SAVINGS PLAN,

Plaintiffs,

v.

LIVE NATION ENTERTAINMENT, INC., LIVE NATION ENTERTAINMENT, INC. 401(K) COMMITTEE; and DOES 1 through 10,

Defendants.

Case No. 2:23-cv-01943-PA-JC

**FIRST AMENDED CLASS ACTION COMPLAINT**

**Judge:** Hon. Percy Anderson
**Place:** Courtroom 9A

**Complaint Filed:** March 15, 2023
**Trial Date:** TBD

FIRST AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

INTRODUCTION …………………………………………...…………...………….1

JURISDICTION AND VENUE…………………………..…..…………….…………3

THE PARTIES…………………………………………..……...……….…….......4

   Plaintiffs…………...………………………………………….…….…4

   Defendants…………….......…………………………….…………….…5

   Parties in Interest……………………..…….…..…………….….………....6

DEFENDANTS' FIDUCIARY OBLIGATIONS.….………………..…………..7

DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE

FEES…………………………………………………………………….........8

THE ESTABLISHEMENT OF THE TRUST AND THE DOCUMENTS RELIED

UPON FOR THE COMPLAINT'S ALLEGATIONS…………………..……10

FACTUAL ALLEGATIONS…………………………...……………….……....10

      A.    Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options……………………………………….………….…..…....10

      B.    Defendants Imprudently Maintained the Plan's Investment in the New York Life Guaranteed Interest Annuity Contract Stable Value Option, When Lower Share Classes Existed and Other Investment Vendor Offered Superior Alternatives.……………………………………………...23

          1.  New York Life's Excessive Spread Fees…………………...25

          2.  Failure to Submit RFP's……………………………………27

          3.  Failure to Diversify……………………………………………28

CLASS ACTION ALLEGATIONS……………………..........…………...30

FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence (Against All Defendants)……………………………..….……..31

-ii-

FIRST AMENDED CLASS ACTION COMPLAINT

SECOND CAUSE OF ACTION Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers (Against All Defendants)……………………………………….………………………..…..33

THIRD CAUSE OF ACTION Prohibited Transactions (Against All Defendants)……………………………………….………………………..…..35

PRAYER FOR RELIEF……………………………………………...………36

## CLASS ACTION COMPLAINT

Plaintiffs Pamela Avecilla and Sean Bailey (collectively "Plaintiffs"), individually and as representatives of participants and beneficiaries of the LIVE NATION ENTERTAINMENT, INC. 401(K) SAVINGS PLAN, (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, on behalf of the Plan and seeking Plan-wide relief pursuant to ERISA §§ 502(a)(2),(3), 409(a), 1109, and/or as otherwise authorized by law, against current Plan sponsor, LIVE NATION ENTERTAINMENT, INC. ("Live Nation"), the named fiduciary LIVE NATION ENTERTAINMENT, INC. 401(K) COMMITTEE ("Plan Committee"), and John Does 1-10 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1. This action is brought by current and former employees / participants / beneficiaries of Defendants' Plan to recover losses due to mismanagement of the 401k retirement plan and certain selected funds. The 401k plan has become the dominant source of retirement savings for most Americans. Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers. This action is filed to recover millions of dollars of funds owed back to the plan on behalf of employees / participants / beneficiaries. These retirement funds are significant to the welfare of the class.

2. Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax

-1-

deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et. seq.* ("ERISA").

3.    The Defendants chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of Defendant organizations have benefitted financially for years from the same tax benefits. However, Defendants have not followed ERISA's standard of care. This lawsuit is filed after careful consultation with experts and review of publicly available documents to return benefits taken from Plan participants by Defendants.

4.    The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. As of December 31, 2021, the Plan had 8974 total participants with account balances and $769,009,907 in assets.

5.    ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

6.    Specifically, Defendants breached their fiduciary duties of prudence and loyalty to the Plan by:

   a. Offering and maintaining funds with higher-cost share classes when identical lower cost class shares were available and could have been offered to participants resulting in participants/beneficiaries paying unnecessary

FIRST AMENDED CLASS ACTION COMPLAINT

costs for services that provided no value to them and resulted in a reduction of compounded return gains;

b. Offering a guaranteed income product that carried unnecessarily high risk, generated relatively low returns and offering an expensive share class of that product;

c. Offering expensive investments, depriving participants of compounded returns which greatly exceed the annual cost of fees and revenue sharing; and

d. Failing to maintain and restore trust assets.

7.    Plaintiffs were injured during the Relevant Time Period by the Defendants' flawed processes in breach of their fiduciary duties.   As a result of Defendant's actions, participants invested in subpar investment vehicles and paid additional unnecessary operating expenses and fees with no value to the participants resulting in a loss of compounded returns.

8.    Plaintiffs, individually and as the representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.    Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

10.    Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2).

-3-

11. The Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

13. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District with corporate offices and headquarters in Beverly Hills, CA, and/or have significant contacts with this District, the Plan is believed to be administered in this District, and because ERISA provides for nationwide service of process.

14. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because many violations of ERISA took place in this District, and Defendants conduct business in this District and reside or may be found in this District with corporate offices and headquarters in Beverly Hills, CA. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## THE PARTIES

*Plaintiffs*

15. Plaintiff Pamela Avecilla, resides in Conyers, Georgia, and was an employee of Live Nation and worked for Live Nation during the Relevant Time Period. Avecilla was and is a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in the some or all of the funds which are at issue in this action. Avecilla was damaged by

-4-
FIRST AMENDED CLASS ACTION COMPLAINT

the Defendants' breaches of their fiduciary duties impacted the Plan as a whole and damaged all Plan participants.

16.     Plaintiff Sean Bailey resides in Dallas, Texas, and was an employee of Live Nation and worked for Defendants during the Relevant Time Period.  Bailey was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.   Bailey was damaged by the Defendants' breaches of their fiduciary duties impacted the Plan as a whole and damaged all Plan participants.

17.     Avecilla and Bailey (Plaintiffs) have standing under 29 U.S.C. § 1132(a)(2) to bring this action on behalf of the Plan because Defendants' reckless and insouciant actions caused actual harm to an ERISA plan in which the Plaintiffs participate. Plaintiffs suffered an injury in fact by, *inter alia*, investing in the higher cost mutual fund shares when lower cost shares of the same fund were available to the Plan, being forced into high expense investments because lower choice investments were not made available, being deprived of a high quality and reasonably priced and secure stable value investment option.  Defendants are liable to the Plan for the Plan's losses under 29 U.S.C. § 1109(a).

***Defendants***

18.     Defendant LIVE NATION ENTERTAINMENT, INC. ("Live Nation") is the current sponsor and administrator of the Plan and maintains its principal place of business at 9348 Civic Centre Drive, Beverly Hills, California 90210.  Upon information and belief, Live Nation operates as a sponsor and administrator and/or fiduciary of the Plan.

19.     Defendant LIVE NATION ENTERTAINMENT, INC. 401(K) COMMITTEE ("Committee" or "Investment Committee") is composed of a group of fiduciaries of the plan tasked with selecting and maintaining investments and service providers that are in the best interests of the plan participants and beneficiaries.

FIRST AMENDED CLASS ACTION COMPLAINT

20.     Defendant "Does" or the names of the individuals on the Board of Directors and related Committee(s), including the Plan's Investment Committee, as well as the Plan's manager, and Live Nation's officers during the Relevant Time Period are unknown at this time and are named as "John Does" until the "Does" are known and can be named through amendment to this Complaint.

21.     Live Nation, the Board of Directors, the Plan Investment Committee, the Plan's manager, and the Directors and Officers are fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in whole or part, the Plan or the trust, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

***Parties in Interest***

22.     Finally, although not currently named as Defendants, the covered service providers serve as "Parties of Interest" to this Litigation.

23.     Live Nation contracted with MERRILL LYNCH ("Merrill"), to provide Code 28 Investment management services to the Plan.

24.     Live Nation contracted with STRATEGIC ADVISORS, INC. ("Strategic"), to serve as a Code 27 Investment advisor to the Plan. Strategic served as an investment fiduciary "Advisor" to the Plan during the Relevant Time Period based on Schedules C certified returns filed by Live Nation.

25.     Live Nation contracted with FIDELITY INVESTMENTS INSTITUTIONAL ("Fidelity") to serve as the Plan's recordkeeper and Trustee.  In this capacity, Fidelity received and held the assets of the Fund on behalf of the Participants and Beneficiaries. Fidelity served as investment fiduciary during the relevant time period based on Schedules C certified returns filed by Live Nation.

-6-
FIRST AMENDED CLASS ACTION COMPLAINT

26. Live Nation and the Plan Committee had a concomitant fiduciary duty to monitor and supervise those appointees and contracted parties.

## DEFENDANTS' FIDUCIARY OBLIGATIONS

27. Under ERISA, a fiduciary's duty is akin to the duty of a trust fiduciary. *Tibble v. Edison Intern.*, 575 U.S. 523, 528-29.

28. To state an ERISA claim for a breach of a fiduciary duty, a "plaintiff must make prima facie showing that the defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594.

29. ERISA and common law trusts impose strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. § 1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

30. 29 U.S.C. § 1104(a)(1)(B) and common law requires a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

31. A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. at 1829.

32. 29 U.S.C. §1108(b)(2), as an exemption to the prohibition set forth in 29 U.S.C. §1106(a)(1)(C), allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." Fidelity is a "party in interest" under 29 U.S.C. § 1106(a)(1)(C).

33. 29 U.S.C. § 1132(a)(2) and common law authorize a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

34. Section 1109(a) and common law provides "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." Restatement (Second) of Trusts § 205(c) (1959); *see Eaves v. Penn*, 587 F.2d at 463.

## DEFINED CONTRIBUTION 401(K) PLANS AND THE IMPACT OF EXCESSIVE FEES

35. In a defined contribution plan, participants (and sometimes their employer) make contributions to plan participants' individual accounts. Participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus any investment gains less plan and investment expenses. *See* 29 U.S.C. § 1002(34). Plan Participants' investments are held in trust. Typically, plan participants direct the assets and contributions of their accounts into investment options selected by the plan sponsor and owned by the trust.

36. Because retirement savings in defined contribution plans are intended to grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available to a participant upon retirement. Over time, even small differences in fees and performance compound, and can result in vast differences in the amount of savings available at retirement. As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the

-8-
FIRST AMENDED CLASS ACTION COMPLAINT

value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825.  In short, the damages caused by breaches of fiduciary duties to the Plan cause damages that continue to accrue and compound over time.

37.    In fact, the impact of excessive fees on employees' and retirees' retirement assets is dramatic.  The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[1]

38.    "As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time.

39.    Accordingly, courts have recognized that plan fiduciaries "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International*, 843 F.3d 1187, 1198 (9th Cir. 2016).

40.    The marketplace for retirement plan services is established and competitive. As of 2021, the Plan had 8,974 participants with account balances and $769,009,907 in assets. As a result, the Plan has tremendous bargaining power to

---

[1] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

FIRST AMENDED CLASS ACTION COMPLAINT

demand low-cost administrative and investment management services and well-performing, low-cost investment funds.

## THE ESTABLISHEMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

41.     The Defendants' Annual Returns/Reports of Employee Benefit Plan to the U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public Inspection" and available for download from www.efast.dol.gov for forms filed in 2010 and onward).

42.     The underlying allegations in this Complaint are based on the limited documents provided by Defendants, Plaintiffs' documents, as well as the Defendants' past Forms 5500 filed with U.S. Departments of Treasury and Labor found at www.efast.dol.gov, and mutual fund prospectuses found at https://www.sec.gov/edgar/searchedgar.

## FACTUAL ALLEGATIONS

**A.    Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options.**

43.     While a fiduciary is not required to "scour the market to find and offer the cheapest possible fund," selecting higher-cost funds where other options exist can give rise to the inference "that the process was flawed," demonstrating imprudence. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 595-96 (8th Cir. 2009), (inferring mismanagement and the possibility that the defendant "failed to pay close enough attention to available lower-cost alternatives," where less expensive funds were available).

44.     As described below, Defendants invested Plan funds in high-cost mutual fund share classes when lower cost share classes were available that were identical to the funds chosen, but for their cost and their adverse effect on performance.

45.    Further the flawed fiduciary process employed by Defendants resulted in the selection of high-cost funds, and those funds performed poorly relative to their applicable benchmarks and necessarily relative to their lower cost share options.

46.    Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

47.    Mutual funds often offer multiple "classes" of their shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will charge different operating expenses depending on the class. The various share classes are generally intended to target to particular investors such as retail (individual investors) or institutional investors (such as 401(k) plans).

48.    A mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund to one share class, while charging a lower cost share class of that same fund an expense ratio of .50%.  Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her investment compared to an investor who purchases the share class with the higher operating expense. While the annual return may more closely reflect the difference in share class costs, over time the difference in returns begins to deviate significantly from the original expenses due to cumulative annual costs and lost compounding. Generally, lower cost share classes are available to larger investors, such as 401(k) plans like the Plan.

49.    Plans that select share classes that subject their participants to higher fees engage in share class violations which are among the most clear and obvious breaches of fiduciary duties in the Plan. *See Tibble v. Edison*, 2017 U.S. Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017) ("Because the institutional share

-11-
FIRST AMENDED CLASS ACTION COMPLAINT

classes are otherwise identical to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.").

50. Since at least 2009 and throughout the limitations period, Defendants offered higher cost mutual fund share classes as investment options for the Plan even though at all times lower cost share classes of those exact same mutual funds were readily available to the Plan.

51. Indeed, Defendants have provided as many as 15 fund choices with clear share class violations, with at least 67% of all share classes in the period, and as high as 70% of share classes in the period, violating the fiduciary duty to select the lowest cost share class of the funds. *See* Summary Table by year below.

**Table 1**

|  | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 |
|---|---|---|---|---|---|---|
| Total Funds # | 21 | 21 | 21 | 20 | 22 | 22 |
| Cheaper Shares Classes Available # | 14 | 14 | 14 | 14 | 15 | 15 |
| Cheaper Shares Classes Available % | 67% | 67% | 67% | 70% | 68% | 68% |

1) Assuming no investment changes in 2021 or 2022
2)Assuming tickers sent in documents disclosed by Defendant in pre-litigation are accurate when they differ from the
   Schedule of Assets
3)Excluding the Money Market, Stable Value, and Live Nation Entertainment Common Stock

52. Of the 21-22 investment options for which lower-cost share classes were available, the less expensive options were the better options. Defendants' failure to select those options raises the inference of imprudence. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 588.

53. The following chart illustrates the differences in the operating costs and Returns (performance) between the share classes chosen by Defendants and the least expensive share class available as of January 1, 2017.

54. The fund name listed in the first row and shaded grey represents the share class chosen by Defendants. The second fund name listed and <u>not</u> shaded represents the cheaper share class Defendants should have chosen which was

-12-
FIRST AMENDED CLASS ACTION COMPLAINT

available to them through some or all of the limitations period and in some cases through to the time of selection. The bolded line represents the difference in costs (expenses charged) and the investment returns for the one-, three- and six-year performance periods ending 12/31/2022.

55. Additionally, to highlight the harm caused by the Defendants' imprudent selection of high-cost share classes, the three-, and six-year cumulative returns are included, which shows the compounding effect of excess fees paid over the course of each year.

## Table 2

**Cumulative Total Returns**

(Ending 12/31/22)

| Name | Expense Ratio % | 1-Year % Total | 3-Year Total | 3-Year % / 3* | 2020 BOY Assets | Returns Lost for Using Expensive Share Class | 6-Year Total | 6-Year % / 6* | 2017 BOY Assets | Returns Lost for Using Expensive Share Class |
|---|---|---|---|---|---|---|---|---|---|---|
| Fidelity® Growth Company (2009 - 2022) | 0.79 | -33.78 | 36.07 | | $78,341,988 | | | | | |
| Fidelity® Growth Company K6 | 0.45 | -32.62 | 38.84 | | | | | | | |
| **Cost of Expensive Share Classes** | **-0.34** | **-1.16** | **-2.77** | **-0.92** | | **-$2,172,001** | **0.00** | **0.00** | | **$0.00** |
| Janus Henderson Enterprise T (2016 - 2022) | 0.91 | -16.14 | 18.11 | | $29,356,837 | | 99.43 | | $14,117,238 | |
| Janus Henderson Enterprise N | 0.66 | -15.94 | 18.96 | | | | 102.33 | | | |
| **Cost of Expensive Share Classes** | **-0.25** | **-0.20** | **-0.85** | **-0.28** | | **-$250,371** | **-2.90** | **-0.58** | | **-$409,277.65** |
| Fidelity® Low-Priced Stock (2009 - 2022) | 0.82 | -5.80 | 28.23 | | $21,463,886 | | | | | |
| Fidelity® Low-Priced Stock K6 | 0.50 | -5.21 | 29.24 | | | | | | | |
| **Cost of Expensive Share Classes** | **-0.32** | **-0.60** | **-1.02** | **-0.34** | | **-$218,365** | **0.00** | **0.00** | | **$0.00** |

-13-

FIRST AMENDED CLASS ACTION COMPLAINT

| Name | Expense Ratio % | 1-Year % Total | 3-Year Total | 3-Year % / 3* | 2020 BOY Assets | Returns Lost for Using Expensive Share Class | 6-Year Total | 6-Year % / 6* | 2017 BOY Assets | Returns Lost for Using Expensive Share Class |
|---|---|---|---|---|---|---|---|---|---|---|
| Invesco EQV Emerging Markets All Cap R5 (2019 - 2022) | 1.03 | -17.44 | -9.50 | | $5,547,293 | | | | | |
| Invesco EQV Emerging Markets All Cap R6 | 0.94 | -17.41 | -9.31 | | | | | | | |
| **Cost of Expensive Share Classes** | **-0.09** | **-0.03** | **-0.19** | **-0.06** | | **-$10,784** | **0.00** | **0.00** | | **$0.00** |
| Invesco Real Estate R5 (2019 - 2022) | 0.86 | -24.57 | -4.37 | | $4,277,960 | | | | | |
| Invesco Real Estate R6 | 0.78 | -24.49 | -4.11 | | | | | | | |
| **Cost of Expensive Share Classes** | **-0.08** | **-0.08** | **-0.26** | **-0.09** | | **-$11,096** | **0.00** | **0.00** | | **$0.00** |
| Fidelity® Strategic Income Fund (2019 - 2022) | 0.66 | -11.13 | -0.65 | | $4,278,441 | | | | | |
| Fidelity Advisor® Strategic Income Z | 0.61 | -10.99 | -0.49 | | | | | | | |
| **Cost of Expensive Share Classes** | **-0.05** | **-0.13** | **-0.17** | **-0.06** | | **-$7,120** | **0.00** | **0.00** | | **$0.00** |
| Fidelity® Puritan® (2009 - 2022) | 0.50 | -17.24 | 18.68 | | $19,595,373 | | | | | |
| Fidelity® Puritan K6 | 0.32 | -17.11 | 18.69 | | | | | | | |
| **Cost of Expensive Share Classes** | **-0.18** | **-0.13** | **-0.02** | **-0.01** | | **-$3,204** | **0.00** | **0.00** | | **$0.00** |

-14-

FIRST AMENDED CLASS ACTION COMPLAINT

| Name | Expense Ratio % | 1-Year % Total | 3-Year Total | 3-Year % / 3* | 2020 BOY Assets | Returns Lost for Using Expensive Share Class | 6-Year Total | 6-Year % / 6* | 2017 BOY Assets | Returns Lost for Using Expensive Share Class |
|---|---|---|---|---|---|---|---|---|---|---|
| Fidelity Freedom® Income K (2017 - 2022) | 0.42 | -11.30 | -0.27 | | $1,811,531 | | 17.35 | | $1,243,084 | |
| Fidelity Freedom® Income K6 | 0.37 | -11.25 | -0.07 | | | | 17.68 | | | |
| Cost of Expensive Share Classes | -0.05 | -0.06 | -0.20 | -0.07 | | -$3,680 | -0.33 | -0.07 | | -$4,087.04 |
| Fidelity Freedom® 2010 K (2017 - 2022) | 0.44 | -13.18 | 1.98 | | $6,863,274 | | 26.66 | | $5,429,256 | |
| Fidelity Freedom® 2010 K6 | 0.38 | -13.04 | 2.22 | | | | 27.15 | | | |
| Cost of Expensive Share Classes | -0.06 | -0.14 | -0.24 | -0.08 | | -$16,572 | -0.49 | -0.10 | | -$26,832.63 |
| Fidelity Freedom® 2020 K (2017 - 2022) | 0.51 | -16.03 | 4.15 | | $16,655,722 | | 34.94 | | $13,703,752 | |
| Fidelity Freedom® 2020 K6 | 0.42 | -15.92 | 4.49 | | | | 35.70 | | | |
| Cost of Expensive Share Classes | -0.09 | -0.11 | -0.34 | -0.11 | | -$57,369 | -0.75 | -0.15 | | -$103,114.29 |

-15-

FIRST AMENDED CLASS ACTION COMPLAINT

| Name | Expense Ratio % | 1-Year % Total | 3-Year Total | 3-Year % / 3* | 2020 BOY Assets | Returns Lost for Using Expensive Share Class | 6-Year Total | 6-Year % / 6* | 2017 BOY Assets | Returns Lost for Using Expensive Share Class |
|---|---|---|---|---|---|---|---|---|---|---|
| Fidelity Freedom® 2030 K (2017 - 2022) | 0.58 | -16.86 | 7.33 | | $43,435,180 | | 45.94 | | $23,883,085 | |
| Fidelity Freedom® 2030 K6 | 0.46 | -16.77 | 7.69 | | | | 46.97 | | | |
| **Cost of Expensive Share Classes** | **-0.12** | **-0.09** | **-0.36** | **-0.12** | | **-$155,239** | **-1.04** | **-0.21** | | **-$247,495.87** |
| Fidelity Freedom® 2040 K (2017 - 2022) | 0.65 | -18.14 | 12.91 | | $67,098,602 | | 57.97 | | $28,088,149 | |
| Fidelity Freedom® 2040 K6 | 0.50 | -18.06 | 13.34 | | | | 59.15 | | | |
| **Cost of Expensive Share Classes** | **-0.15** | **-0.08** | **-0.44** | **-0.15** | | **-$292,840** | **-1.18** | **-0.24** | | **-$330,457.92** |
| Fidelity Freedom® 2050 K (2017 - 2022) | 0.65 | -18.22 | 12.84 | | $58,035,787 | | 57.89 | | $17,969,036 | |
| Fidelity Freedom® 2050 K6 | 0.50 | -18.10 | 13.32 | | | | 59.28 | | | |
| **Cost of Expensive Share Classes** | **-0.15** | **-0.12** | **-0.48** | **-0.16** | | **-$281,041** | **-1.39** | **-0.28** | | **-$250,640.74** |

-16-

FIRST AMENDED CLASS ACTION COMPLAINT

| Name | Expense Ratio % | 1-Year % Total | 3-Year Total | 3-Year % / 3* | 2020 BOY Assets | Returns Lost for Using Expensive Share Class | 6-Year Total | 6-Year % / 6* | 2017 BOY Assets | Returns Lost for Using Expensive Share Class |
|---|---|---|---|---|---|---|---|---|---|---|
| Fidelity Freedom® 2060 K (2017 - 2022) | 0.65 | -18.18 | 12.89 | | $9,250,742 | | 57.78 | | $98,484 | |
| Fidelity Freedom® 2060 K6 | 0.50 | -18.09 | 13.31 | | | | 58.97 | | | |
| Cost of Expensive Share Classes | -0.15 | -0.09 | -0.42 | -0.14 | | -$39,062 | -1.19 | -0.24 | | -$1,167.42 |

* * The 3-Year %/3 and 6-Year %/6 figures illustrate that the cost to participants in lost returns is typically greater than the charged annual expenses.

56.   Plaintiffs identified 15 funds that had one or more less expensive share classes at the time of selection[2] and/or throughout the limitations period. Apart from the expenses and their adverse effect on yield and performance, share classes are identical. They share the same portfolio manager(s), stocks/bonds, allocations and risk characteristics. While it is possible that some share classes have higher minimum initial investment requirements, those requirements are commonly waived for qualified retirement plans and all of the funds have sufficient assets to meet the highest of those minimums. The harm to participants as a result of lost returns is estimated to be nearly $4.5 million through the limitations period.

57.   Furthermore, Defendants should have been aware of the lower share class options either upon selection or during the proposed class period.

58.   For example, Defendants chose Fidelity Growth Company as an investment option available to participants in or prior to 2009. The cheaper "K" shares had an inception date of May 9, 2008 and cost 0.16% less than the option they chose. In June 2019, Fidelity added the "K6" shares to the Growth Company portfolio, which cost 0.34% less than the share class the Defendants originally selected and continue to use.

59.   Defendants chose Janus Henderson Enterprise T shares as an investment option available to participants in 2016. The cheaper "N" shares had an inception

[2] Plaintiffs are not alleging any breaches at time of selection beyond the six (6) year SOL.

-17-

FIRST AMENDED CLASS ACTION COMPLAINT

date of July 12, 2012. The information provided in the Janus Enterprise annual prospectuses clearly show the significant difference in fees and investment returns between the "T" and "N" share classes at the time of selection and thereafter. The "N" share class costs 0.25% less than the "T" shares the Defendants continue to use. While the "N" share class has a minimum initial investment requirement of $1 million, the fund held over $14 million at the time the fund was chosen.

60.   Defendants chose Fidelity Low-Priced Stock as an investment option available to participants in or prior to 2009. The cheaper "K" shares had an inception date of May 9, 2008 and cost 0.18% less than the option they chose. In May 2017, Fidelity added the "K6" shares to the Low-Priced Stock portfolio, which cost 0.32% less than the share class the Defendants originally selected and continue to use.

61.   Defendants chose Baron Small Cap Retail as an investment option available to participants in or prior to 2009. In May 2009, Baron added the "Institutional" share class to the Small Cap portfolio, which cost 0.25% less than the share class the Defendants used until 2018 when the fund was replaced. At the time the share class became available, the prospectus stated that the Institutional share class is intended to be offered to retirement platforms (among others) and that the $1 million minimum initial investment may be waived.

62.   Defendants chose AIM Developing Markets A (later renamed Invesco Developing Markets and then Invesco EQV Emerging Markets All Cap) as an investment option available to participants in or prior to 2009. In 2009, the Defendants had the option of selecting the "Y" shares, which were 0.25% less expensive than the share class they chose. In September 2012, Invesco added the "R6" share class to the Developing Markets portfolio. At the beginning of the limitations period, the "R6" shares cost 0.42% less than the A shares the Defendants used until 2019, when the Defendants switched to the "R5" share class, which were still 0.05% more expensive than the "R6" option. The more expensive "R5" share class is still being used by the Defendants.

-18-

FIRST AMENDED CLASS ACTION COMPLAINT

63.    Defendants chose AIM Real Estate A (later renamed Invesco Real Estate) as an investment option available to participants in or prior to 2009. In 2009, the Defendants had the option of selecting the "Y" shares, which were 0.25% less expensive than the share class they chose. In September 2012, Invesco added the "R6" share class to the Real Estate portfolio. At the beginning of the limitations period, the "R6" shares cost 0.47% less than the A shares the Defendants used until 2019, when the Defendants switched to the "R5" share class, which were still 0.08% more expensive than the "R6" option. The more expensive "R5" share class is still being used by the Defendants.

64.    Defendants chose Fidelity Advisor Strategic Income A as an investment option available to participants in 2010. In 2010, the Defendants had the option of selecting the "I" shares, which cost 0.23% less than the A shares the Defendants chose. The "A" share class was used until 2019, when the Defendants switched to the newly incepted Fidelity Strategic Income (April 13, 2018). Because the switch was made in 2019, Defendants could have replaced the "A" shares with the "Z" shares of the same portfolio, which also had a 2018 inception date and is 0.05% less expensive than the replacement fund they chose and continue to use.

65.    Defendants chose Fidelity Puritan as an investment option available to participants in or prior to 2009. The cheaper "K" shares had an inception date of May 9, 2008 and cost 0.17% less than the option they chose. In June 2019, Fidelity added the "K6" shares to the Puritan portfolio, which, in 2019 cost 0.21% less than the share class the Defendants originally selected and continue to use.

66.    Defendants chose the Fidelity Freedom target date funds as investment options available to participants in or prior to 2009. In 2017, the year the share class was incepted, Defendants switched to the cheaper "K" share class; however, they could have chosen the "K6" share class, which began a month earlier and are, on average, 0.12% less expensive than the "K" shares the Defendants chose and continue to use.

-19-

FIRST AMENDED CLASS ACTION COMPLAINT

67. Defendants may seek to explain that they offered higher cost share classes with higher fee burdens by pointing to the Plan's ability to use those fees to defray service provider costs. The total excess revenue exceeded reported recordkeeping costs/rebates (Schedule C 5500s) on a consistent basis throughout the class period.

68. Investing Plan assets in higher cost share classes harms plan participants because it causes them to pay excess indirect fees which are not tethered to any service provided to Plan participants but rather are tied to the amounts invested by Plan participants.

69. The indirect fees wildly fluctuated with no explanation other than that asset values fluctuated. For example, considering only the eleven (11) Fidelity funds in the Plan throughout the proposed class period, net revenue retained by Fidelity after rebates to participants was an estimated $439,639 in 2021, $269,310 in 2020, $662,778 in 2019, $326,504 in 2018, and $388,632 in 2018.

70. The use of share classes to create funds for revenue sharing does not justify the increased fees and lost returns imposed on Plan participants. Rather, empirically speaking, revenue sharing burdens on mutual fund investors are always more costly over time than the revenue sharing credit offered by the corresponding mutual fund share class.

71. In addition, because rebates are only made after a set period of time, the Plan effectively lends out the rebated funds until such time as the rebate comes through, rather than keeping them in the Trust and accruing gains during that time.

72. Moreover, Plan participants are generally not aware of the fee burden that their 401k accounts bear from indirect fees. Unlike direct fees, which are clearly listed on participants' statements, indirect fees are unshown and unknown to those paying those costs.

73. Indeed, because not all funds generate fees for revenue sharing, only those participants invested in the revenue sharing funds pay for the revenue sharing

and the other participants get a free ride – which is impermissible discrimination against participants.

74. In fact, the Plan set the Fidelity Freedom target date funds as the qualified default investment alternative, thus pushing new participants into paying fees in the high fee share class.

75. Likewise, the rebate formula used may not equitably return funds to participants if participants make withdrawals or transfer out of the fun prior to the credit being posted.

76. Further, by focusing on funds with expensive share classes that generated high funds for revenue sharing, the Plan limited the universe of funds available for selection and selects funds based on revenue generating share classes as opposed to the best interests of the Plan itself.

77. Because the Plan could have invested in identical mutual funds with a lower cost share class, the Defendants' actions were directly erosive to the trust's growth.

78. Defendants thus caused Plan participants/beneficiaries harm by not just forcing them to pay higher fees, but also caused lost yield and returns as a result of those higher fees on the majority of investments offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compounds over time substantially lowering the corpus of participants' retirement investments.

79. In selecting share classes with higher fees, Defendants demonstrated a lack of basic skill and prudence when selecting investments.

80. Defendants failed to use the Plan's bargaining power to leverage lower cost mutual fund options for the Plan participants and frankly allowed the recordkeeper, Fidelity, to peddle its own funds so that it could earn more fees than those set forth in this complaint (management fees, etc.). As an example, all of the actively managed proprietary Fidelity funds, including the qualified default investment alternative (QDIA) target-date funds, had lower cost share classes

-21-
FIRST AMENDED CLASS ACTION COMPLAINT

available through at least December 31, 2021. Interestingly, the least expensive share class of several nonproprietary funds, such as PGIM Total Return Bond R6, Vanguard Equity-Income Admiral and John Hancock International Growth R6 were selected. One reason for this is that it appears that Fidelity was generating revenue for itself through the use of expensive share classes on its own products that it would not generate from other firms. This is also an inequitable method of payment because participants who invested in these expensive share classes covered the majority of service provider costs. To put it another way, participants who invested only in the Fidelity Index funds, or nonproprietary funds that did not pay out any revenue sharing, would not have paid any of the service provider costs apart from those directly billed.

81.     The Defendants' actions to choose high-cost funds demonstrates a lack of prudence.  Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs."  Uniform Prudent Investor Act (the "UPIA") §7.

82.     As is evident from the allegations in the Complaint, Defendants did not systemically and regularly review or institute other processes in place to fulfill their continuing obligation to monitor Plan investments and reduce Plan costs, or, in the alternative, failed to follow the processes, as evidenced by the offering of higher cost share classes as Plan investment options when lower cost options of the same funds were available.

83.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.   The total amount of excess mutual fund expenses paid by Plan participants over the past six years, which correspondingly reduced the return

-22-

FIRST AMENDED CLASS ACTION COMPLAINT

on the Plan participants' investments, resulted in millions of dollars of damages to participants.

**B.    Defendants Imprudently Maintained the Plan's Investment in the New York Life Guaranteed Interest Annuity Contract Stable Value Option, When Lower Share Classes Existed and Other Investment Vendor Offered Superior Alternatives.**

84.    During the proposed class period, Defendants offered the New York Life Guaranteed Interest Annuity Contract Stable Value Option (NYL GIC).

85.    Stable value products, including guaranteed investment contracts, are not required to be registered with the SEC. Single Company fixed annuity contracts are structured as an insurance company general account, or an insurance company separate account, and are solely regulated by the State Insurance Commissioner selected by the insurance company. There are also synthetic based stable value funds, which are run by a Registered Investment Advisor (RIA) regulated by the SEC.   The differences between the different types of funds are critical from a fiduciary standpoint.  The NYL GIC was an insurance company general account.

86.    A stable value account in a retirement plan is (i) similar to a money market fund in that it provides principal protection, and (ii) similar to a bond fund in that it provides higher consistent returns over time. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – to intermediate – term bond fund.   The stability of assets enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value.  Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in

FIRST AMENDED CLASS ACTION COMPLAINT

interest rates associated with bond funds. [3] Single fixed annuity contracts are set by the insurance company at their discretion which typically maximizes profit to the insurance company and minimizes returns to participants which is a fiduciary breach.

87.   There are several different types of stable value accounts in the 401(k) marketplace. Large plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers"[4] and the fund owns the assets of the underlying funds. Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because there is only one "wrap" provider. As a result, they offer higher crediting rates. General account products, such as the NYL GIC, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently offer the highest rates.

88.   While the majority of plans the size of Live Nation use a lower risk synthetic stable value product, there are still some Separate Account and General Account products.

89.   The NYL GIC is a general account product established pursuant to a contract between Live Nation and New York Life. The investment funds are deposited by New York Life in its general account, which enables New York Life to earn a "spread" representing by the difference between the crediting rate and the returns earned by New York Life from general account funds. The NYL GIC also was subject to the single entity credit risk of New York Life, the issuer of the contract. The crediting rate, set in advance by New York Life and reset from time to time in New York Life's sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest. Thus,

---

[3] *See* Stable Value Fund v. Money Market Fund, Financial Web describing difference between stable value funds and money market funds), available at: http://www.finweb.com/investing/stable-value-fund-vs-money-marketfund/html#axzz44EaLfQnQ.

[4] Stable value funds invest in fixed-income securities and wrap contracts offered by banks and insurance companies. Wrap contracts guarantee a certain return even if the underlying investments decline in value. To support that guarantee, a wrap contract relies on both the value of the associated assets and the financial backing of the wrap issuer.

-24-

FIRST AMENDED CLASS ACTION COMPLAINT

Live Nation had the opportunity and duty to evaluate the investment in advance; this is not a case of judging an investment with the benefit of hindsight.

90.    As an ERISA fiduciary, Live Nation had an obligation to monitor the fees and performance of the NYL GIC and to remove or replace it where a substantially identical investment option can be obtained from the same provider at a lower cost. *See, e.g.*, *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products the trustee has already selected.").

### 1.    *New York Life's Excessive Spread Fees*

91.    Live Nation did not have a viable methodology for monitoring the costs or performance of the NYL GIC. Not only were comparable products available from other providers with higher crediting rates, but identical or substantially identical products were available to Live Nation from New York Life and other stable value providers with higher crediting rates and lower spread fees. In fact, the NYL GIC charged the Live Nation employees 225 basis points more and returned 225 basis points less than the very same type of fund offered by New York Life to other similarly situated retirement plans. **While not all information is publicly available for comparison purposes,[5] limited documentation for 2022 showed a 2.05% crediting rate paid by NY Life to plan participants, while NY Life for the same product on the web claims a 4.3% rate,[6] the same contract crediting rate**

_____

[5] In September 2010 the trade group for State Government 401(k) plans, the National Association of Government Defined Contribution Administrators, (NAGDCA), created a brochure with the following characterization of insurance company general account stable value funds. "Due to the fact that the plan sponsor does not own the underlying investments, the portfolio holdings, performance, risk, and management fees are generally not disclosed. This limits the ability of plan sponsors to compare returns with other SVFs [stable-value funds]. It also makes it nearly impossible for plan sponsors to know the fees (which can be increased without disclosure) paid by participants in these funds—a critical component of a fiduciary's responsibility."
[6] www.newyorklifeinvestments.com/assets/documents/stable-value/nylim-guaranteed-interest-account-529-plans.pdf   4.30%.  While the advertisement is for a 529 college plan, the product is the same.  Moreover, even the minimum crediting rate of 2.25% in the advertisement is higher than the crediting rate for Live Nation.

-25-
FIRST AMENDED CLASS ACTION COMPLAINT

**offered by New York Life to a top client for the same product -College Savings Plan of New York**.

92. Higher spread fees result in lower crediting rates. This difference, more than 2% per year on average, is the excess spread that Live Nation failed to monitor and rectify. Taking inflation into account, the difference in real dollar terms was even more pronounced, with real (net of inflation) returns for the Live Nation fund near zero.

93. Live Nation did not have to scour the marketplace to find a better performing fund, it simply had to make an effort, which it failed to make, to determine whether the same fund was available at a lower cost. Fact sheets showing the available rates of market rate New York Life funds and similar products from other providers were readily available had Live Nation exercised even a minimal amount of due diligence.

94. This breach of fiduciary duty alone resulted in a loss (before compounding) in excess of $2 million of participants' retirement savings. This loss is something a competent, prudent, and diligent fiduciary would have known was happening in advance and would have been able to avoid. There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere, from the standpoint of how a fiduciary's choice is to be evaluated. The product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows prior to the date the product is selected what the returns will be six months in advance.

95. The plan fiduciary also knows that, because of the manner in which crediting rates are calculated, the product is less sensitive to interest rates than bond funds. Consequently, a stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such

as the Live Nation product, generally continues to perform poorly, in a stable manner.

96.    A prudent fiduciary – that is, a fiduciary that monitors the investment, understands the pricing mechanism and informs itself of the crediting rates and spread fees available in the market – would have known that New York Life's stable value product would underperform and that being a stable value product it would continue to underperform in a stable manner.

97.    Live Nation could have done substantially better for participants with other substantially identical risky insurance separate account products.  In addition, as set forth in more detail below, there are substantially similar risky insurance separate account products such as some from Mass Mutual with over double the return of 4% and higher which are far more cost efficient.

### 2.    Failure to Submit RFP's

98.    A plan with a $25 million stable value fund has considerable bargaining power in the marketplace. There are any number of stable value products available to plans with a $25 million stable value fund that are simply not available to plans with funds of a smaller size.

99.    To take advantage of this bargaining power, Live Nation should have submitted requests for proposal to other stable value fund providers. Products from any number of providers were available with better products, lower fees, and higher crediting rates.  For example, Mass Mutual offered better crediting rates, resulting in substantial losses during the proposed class period, as set forth in the last column:

**Table 3**

| Period Start | Live Nation | Mass Mutual | Excess Spread Fees (%) | Losses |
|---|---|---|---|---|
| Dec-16 | 2.05% | 3.79% | 1.74% | 61,527 |
| Mar-17 | 2.05% | 3.91% | 1.86% | 66,765 |
| Jun-17 | 2.05% | 4.02% | 1.97% | 71,767 |

-27-

FIRST AMENDED CLASS ACTION COMPLAINT

| Period Start | Live Nation | Mass Mutual | Excess Spread Fees (%) | Losses |
|---|---|---|---|---|
| Sep-17 | 2.05% | 3.96% | 1.91% | 70,603 |
| Dec-17 | 2.05% | 3.97% | 1.92% | 72,000 |
| Mar-18 | 2.05% | 4.22% | 2.17% | 82,731 |
| Jun-18 | 2.05% | 4.64% | 2.59% | 100,363 |
| Sep-18 | 2.05% | 4.68% | 2.63% | 103,556 |
| Dec-18 | 2.05% | 4.66% | 2.61% | 104,400 |
| Mar-19 | 2.05% | 4.66% | 2.61% | 110,672 |
| Jun-19 | 2.05% | 4.47% | 2.42% | 108,431 |
| Sep-19 | 2.05% | 4.41% | 2.36% | 111,413 |
| Dec-19 | 2.05% | 4.55% | 2.50% | 124,030 |
| Mar-20 | 2.05% | 4.03% | 1.98% | 105,206 |
| Jun-20 | 2.05% | 4.03% | 1.98% | 112,180 |
| Sep-20 | 2.05% | 4.03% | 1.98% | 119,153 |
| Dec-20 | 2.05% | 4.03% | 1.98% | 126,127 |
| Mar-21 | 2.05% | 4.03% | 1.98% | 126,770 |
| Jun-21 | 2.05% | 4.03% | 1.98% | 127,414 |
| Sep-21 | 2.05% | 4.03% | 1.98% | 128,057 |
| Dec-21 | 2.05% | 4.03% | 1.98% | 128,700 |
| Mar-22 | 2.05% | 4.03% | 1.98% | 128,700 |
| Jun-22 | 2.05% | 4.03% | 1.98% | 128,700 |
| Sep-22 | 2.05% | 4.03% | 1.98% | 128,700 |
| Dec-22 | 2.05% | 4.03% | 1.98% | 128,700 |

100.   Other plans with stable value assets of this size have bid out their stable value funds and obtained better products. Upon information and belief, Live Nation did not make a regular practice of submitting requests for proposal for the stable value fund.  Thus, Live Nation was not able to take advantage of better rates.

### 3.    *Failure to Diversify*

101.   The funds invested in the NYL GIC stable value account also was not adequately diversified. The risk and return characteristic of the fund depended entirely on the creditworthiness and rates declared by a single entity, New York Life.

FIRST AMENDED CLASS ACTION COMPLAINT

102. ERISA § 1104(a)(1)(C) provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

103. The NYL Guaranteed Interest stable value fund is not diversified. The NYL GIC is a contract, a piece of paper, subject to the single entity credit risk of New York Life, as the issuer of the contract. The return of the investment depends on crediting rates set at the discretion of a single provider, New York Life. The crediting rate, set by New York Life alone, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest.

104. In recent years, large 401(k) plans fled fixed annuity products backed by the general account of a single insurance company due to concerns about single entity credit and liquidity risk. Following the high-profile default failures of GIC Issuers in 1992 and 1993 by Executive and Confederation Life, the Federal Reserve expressed concerns about the high risk of the insurance company general account products and the flimsy nature of the state guarantees backing the insurance contracts. The industry immediately responded by offering more separate account contracts, which put creditors in line ahead of general account contracts but still resulted in 100% single entity credit and liquidity exposure. Synthetic value was created in 1995 and by 1999, most of the largest plans were in a synthetic based stable value fund. Synthetic Stable value continued to gain market share over the next 20 years going into smaller and smaller plans.

105. If Defendants were going to continue to offer a stable value fund, the most prudent choice would be for Live Nation to move to a low-cost lower risk synthetic GIC structure. Further, Defendants should have specifically negotiated in the contract that New York Life was a fiduciary and that it could exit at no costs if New York Life was downgraded for any reason. The single entity annuity contract constrained liquidity and the ability to replace it without incurring exit charges.

-29-

FIRST AMENDED CLASS ACTION COMPLAINT

106.   Defendants breached their fiduciary duty by offering the unnecessarily risky NYL GIC product and by offering a share class that did not maximize Plan Participants' returns.

## CLASS ACTION ALLEGATIONS

107.   Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

108.   All participants in or beneficiaries of the the LIVE NATION ENTERTAINMENT, INC. 401(K) SAVINGS PLAN from six years prior to the filing of the complaint in this matter through the date of judgment (the "Class Period").

109.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The Plan has over 8974 participants with account balances.

110.   Questions of law and fact common to the members of the Class

111.   predominate over questions that may affect individual class members, including, inter alia:

(a) whether Defendants are fiduciaries of the Plan;

(b) whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

(c) whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d) whether Defendants breached their duty to monitor other fiduciaries and parties of interest to the Plan;

(e) whether Defendants engaged in prohibited transactions; and

(e) the extent of loss sustained by the Plan and Class members and the appropriate measure of loss.

-30-

FIRST AMENDED CLASS ACTION COMPLAINT

112.   Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

113.   Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

114.   Plaintiffs have no interests that conflict with those of the Class.

115.   Defendant does not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

116.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty of Prudence

### (Against All Defendants)

117.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

118.   Defendants were fiduciaries of the Plan under ERISA §§ 3(21) and/or 402(a)(1), 29 U.S.C. §§ 1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan Administrator, a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plan,

-31-

and/or the negotiation over services and fees for the Plan, and/or were responsible for the administration and operation of the Plan.

119. As a fiduciary of the Plan, Defendants were required, pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

120. Common law and ERISA's duty of prudence required Defendant to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." Tibble, 135 S. Ct. at 1828.

121. As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways. Defendants failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Defendants failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan and failed to investigate other guaranteed investment stable value products. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan to secure significantly reduced fees for comparable investment strategies.

122.   Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

123.   As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§ 502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§ 1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendant's breaches of the duties of prudence, and such other appropriate equitable relief as the Court deems proper.

## SECOND CAUSE OF ACTION

**Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor**

**Investments and Covered Service Providers**

**(Against All Defendants)**

124.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

125.   Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

126.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect

-33-
FIRST AMENDED CLASS ACTION COMPLAINT

the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

127. Defendants also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

128. Defendants breached their fiduciary monitoring duties by, among other things:

129. (a) failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for a substantially identical investment products readily available elsewhere, as detailed herein;

130. (b) failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiffs and members of the Class; and

131. (c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain excessively costly investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings;

132. (d) failing to institute competitive bidding for covered service providers.

133. As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiffs, and members of the Class suffered millions of dollars of losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

-34-
FIRST AMENDED CLASS ACTION COMPLAINT

134. Pursuant to ERISA § 502(a)(2) and (a)(3), and ERISA § 409(a), 29 U.S.C. § 1132(a)(2) and (a)(3), and 29 U.S.C. § 1109(a), Defendant is liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## THIRD CAUSE OF ACTION

### Prohibited Transactions

### (Against All Defendants)

135. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

136. As service providers to the Plan, Merrill, Strategic and Fidelity are parties in interest. 29 U.S.C. §1002(14)(B).

137. By causing the Plans to use Fidelity as recordkeeper and Merrill as an investment manager and Strategic as investment advisor from year to year, Defendants caused the Plans to engage in transactions that Defendants knew or should have known constituted a direct or indirect furnishing of services between the Plan and Fidelity and Strategic prohibited by 29 U.S.C. §1106(a)(1)(C). These transactions occurred each time the Plan paid fees to Fidelity and Merrill Lynch and Strategic.

138. Total losses to the Plan will be determined after complete discovery in this case and are continuing.

139. Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions and are subject to other appropriate equitable or remedial relief.

140. Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plans to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances

-35-

FIRST AMENDED CLASS ACTION COMPLAINT

to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Christina Humphrey Law, P.C. as Class Counsel;
- Find and declare that Defendants have breached their fiduciary duties as described above;
- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;
- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;
- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);
- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;
- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;
- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

FIRST AMENDED CLASS ACTION COMPLAINT

- Order equitable restitution against Defendants including injunctive relief;
- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and
- Grant other equitable or remedial relief as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE BY LAW.**

Dated: October 20, 2025                    **CHRISTINA HUMPHREY LAW, P.C.**

By:    */s/ Christina A. Humphrey*
       CHRISTINA A. HUMPHREY
       *Attorneys for Plaintiffs*

FIRST AMENDED CLASS ACTION COMPLAINT